CASE NO. 14-15700

IN THE UNITED STATES CIRCUIT COURT OF APPEALS
FOR THE NINTH CIRCUIT

S. ROWAN WILSON,

Plaintiff-Appellant,

v.

ERIC HOLDER, as Attorney General of the United States; THE U.S. BUREAU OF
ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; B. TODD JONES, as Acting
Director of the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives; ARTHUR
HERBERT, as Assistant Director of the U.S. Bureau of Alcohol, Tobacco, Firearms and
Explosives; and THE UNITED STATES OF AMERICA,

Defendants-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT,
DISTRICT COURT OF NEVADA

EXCERPTS OF RECORD OF APPELLANT S. ROWAN WILSON

VOLUME 1

Rainey Legal Group PLLC
CHARLES C. RAINEY, ESQ.
Nevada Bar No. 10723
Chaz@raineylegal.com
JENNIFER J. HURLEY, ESQ.
Nevada Bar No. 11817
Jennifer@raineylegal.com
9340 West Martin Avenue
Las Vegas, Nevada 89148
Telephone: +1.702.425.5100
Facsimile: +1.888.867.5734
Attorneys for Plaintiff/Appellant

# INDEX

Document                                                                                           Page:

**Volume 1:**

The United States' Motion to Dismiss or, in the Alternative,
For Summary Judgment (Filed February 3, 2012, Doc. No. 10)…………………………1


Plaintiff's Response to the United States' Motion to Dismiss or,
in the Alternative, For Summary Judgment, and Plaintiff's
Crossmotion for Summary Judgment (filed March 9, 2012, Doc. No. 17)……………..46


Defendants' Reply in Support of their Motion to Dismiss or,
In the Alternative, for Summary Judgment, and Opposition to
Plaintiff's Crossmotion for Summary Judgment (Filed
March 30, 2012, Doc. No. 20)………………………………………………...........79


First Amended Complaint (Filed December 17, 2012, Doc. No. 34)…………………..110


Transcript of Hearing on Motion to Dismiss
(Filed January 18, 2013, Doc. No. 35)…………………………………………………127


**Volume 2:**

Defendants' Motion to Dismiss Plaintiff's First Amended
Complaint or, in the Alternative, for Summary Judgment
(Filed January 31, 2013, Doc. No. 37)………………………………………………….....201


Response to Defendants' Motion to Dismiss Plaintiff's First
Amended Complaint or, in the Alternative, for Summary Judgment
(Filed February 25, 2013, Doc. No. 41)………………………………………………...257


Order (Filed March 12, 2014, Doc. No. 49)………………………………………………301

Notice of Appeal (Filed April 10, 2014, Doc. No. 51)…………………………………328

District Court Docket Sheet……………………………………………………………….358

TONY WEST
Assistant Attorney General

DANIEL G. BOGDEN
United States Attorney

SANDRA SCHRAIBMAN
Assistant Director, Federal Programs Branch

ALICIA N. ELLINGTON
JOHN K. THEIS
Trial Attorneys, Federal Programs Branch
United States Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Rm. 7226
Washington, D.C.  20530
Telephone: (202) 305-8550
Facsimile: (202) 616-8460
John.K.Theis@usdoj.gov
Alicia.N.Ellington@usdoj.gov

*Attorneys for Defendants the United States of America,*
*ATF, U.S. Attorney General Eric Holder,*
*Acting ATF Director B. Todd Jones, and*
*Assistant ATF Director Arthur Herbert,*
*in their official capacities (collectively, the United States)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

S. ROWAN WILSON,                     )
                                     )
              Plaintiff,             )
                                     )
        v.                           )     Case No.: 2:11-CV-1679-GMN-(PAL)
                                     )
ERIC HOLDER, Attorney General of the )
United States et al.,                )
                                     )
              Defendants.            )
                                     )
_____)

## THE UNITED STATES'S MOTION TO DISMISS OR,
## IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56, Defendants the

United States of America, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and

the individual defendants in their official capacities (collectively, the United States), by their undersigned counsel, hereby move this Court to dismiss Plaintiff's Complaint or, in the alternative, to enter summary judgment for Defendants.  A Memorandum of Points and Authorities accompanies this motion, along with an Appendix of Secondary Material and a Statement of Undisputed Material Facts.

Dated: February 3, 2012                   Respectfully submitted,

                                          TONY WEST
                                          Assistant Attorney General

                                          DANIEL G. BOGDEN
                                          United States Attorney

                                          SANDRA SCHRAIBMAN
                                          Assistant Director

                                          /s/ Alicia N. Ellington
                                          ALICIA N. ELLINGTON
                                          JOHN K. THEIS
                                          Trial Attorneys
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          20 Massachusetts Ave., N.W., Rm. 7226
                                          Washington, D.C.  20530
                                          Telephone: (202) 305-8550
                                          Facsimile: (202) 616-8460
                                          Alicia.N.Ellington@usdoj.gov
                                          John.K.Theis@usdoj.gov

                                          *Attorneys for Defendants the United States of America, ATF, U.S. Attorney General Eric Holder, Acting ATF Director B. Todd Jones, and Assistant ATF Director Arthur Herbert,* in their official capacities (collectively, the United States)

2

**TABLE OF CONTENTS**

                                                                                    **PAGE**

INTRODUCTION ..............................................................................................................2

BACKGROUND ...............................................................................................................3

I.      THE GUN CONTROL ACT AND THE CONTROLLED SUBSTANCES ACT..............3

II.     NEVADA'S LAW REGARDING THE MEDICAL USE OF MARIJUANA .................5

III.    ATF'S SEPTEMBER 2011 OPEN LETTER TO FFLS ...........................................8

IV.     PLAINTIFF'S COMPLAINT ...............................................................................10

ARGUMENT ...................................................................................................................11

I.      PLAINTIFF'S SECOND AMENDMENT RIGHTS HAVE NOT BEEN
        VIOLATED ...........................................................................................................11

        A.      As Applied to Plaintiff, 18 U.S.C. § 922(g)(3), as Implemented and
                Interpreted by ATF, Does Not Violate the Second Amendment ........................12

                1.      Plaintiff's Second Amendment Challenge to § 922(g)(3) Is
                        Foreclosed By the Ninth Circuit's Decision in <u>Dugan</u> .............................12

                2.      Unlawful Drug Users Fall Outside the Scope of the Second
                        Amendment as Understood at the Adoption of the Bill of Rights .............15

                3.      In Any Event, As Applied to Marijuana Users, 18 U.S.C.
                        § 922(g)(3) Substantially Relates to the Important
                        Governmental Interest in Protecting Public Safety and
                        Combating Violent Crime ...............................................................20

        B.      As Applied to Plaintiff, 18 U.S.C. § 922(d)(3), as Implemented and
                Interpreted by ATF, Does Not Violate the Second Amendment .........................27

II.     PLAINTIFF'S RIGHT TO EQUAL PROTECTION HAS NOT BEEN
        VIOLATED ...........................................................................................................29

III.    PLAINTIFF MAY NOT PURSUE CLAIMS FOR MONETARY RELIEF
        AGAINST THE UNITED STATES, ATF, OR THE INDIVIDUAL
        DEFENDANTS IN THEIR OFFICIAL CAPACITIES. ...................................................30

IV.     PLAINTIFF'S CONSPIRACY CLAIM AGAINST THE UNITED STATES
        MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.........31

CONCLUSION………………………………………………………………………..33

i

1

## **TABLE OF AUTHORITIES**

2

**CASES** **PAGE(S)**

3

Azpilcueta v. State of Nev. ex rel. Transp. Auth.,
    2010 WL 2871073 (D. Nev. 2010) ...................................................... 33

4

Balser v. Department of Justice, Office of U.S. Trustee,
    327 F.3d 903 (9th Cir. 2003) ........................................................... 30

5

6

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007) ........................................................................ 33

7

Bolling v. Sharpe,
    347 U.S. 497 (1954) ........................................................................ 29

8

9

Boorman v. Nev. Mem'l Cremation Soc'y, Inc.,
    772 F. Supp. 2d 1309 (D. Nev. 2011) .............................................. 33

10

Buzz Stew, LLC v. City of N. Las Vegas,
    181 P.3d 670 (Nev. 2008) ............................................................... 33

11

12

City of Cleburne v. Cleburne Living Center, Inc.,
    473 U.S. 432 (1985) ........................................................................ 29

13

Dep't of Army v. Blue Fox, Inc.,
    525 U.S. 255 (1999) ........................................................................ 30

14

15

Dickerson v. New Banner Inst.,
    460 U.S. 103 (1983) ......................................................................... 4

16

District of Columbia v. Heller,
    554 U.S. 570 (2008) .................................................................. passim

17

18

Dyer v. U.S.,
    166 F. App'x 908 (9th Cir. 2006) .................................................... 31

19

Fire Equip. Mfrs. Ass'n v. Marshall,
    679 F.2d 679 (7th Cir. 1982) .......................................................... 29

20

21

GES, Inc. v. Corbitt,
    21 P.3d 11 (Nev. 2001) ................................................................... 33

22

Gonzales v. Raich,
545 U.S. 1 (2005)...........................................................................5, 15

23

24

Gonzalez-Medina v. Holder,
    641 F.3d 333 (9th Cir. 2011) ........................................................ 29,30

25

Hamrick v. Brusseau,
    80 F. App'x 116, 116 (D.C. Cir. 2003) ............................................ 31

26

ii

27

28

Heller v. District of Columbia ("Heller II"),
    __F.3d __, 2011 WL 4551558 (D.C. Cir. Oct. 4, 2011) ................................ 19, 21

Huddleston v.United States,
    415 U.S. 814 (1974) ................................................................................ 22, 23

Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety,
    110 P.3d 30 (Nev. 2005) ................................................................................ 32

Lane v. Pena,
    518 U.S. 187 (1996) ...................................................................................... 31

Levin v. United States,
    663 F.3d 1059 (9th Cir. 2011) ................................................................... 30, 32

Marin Alliance for Medical Marijuana v. Holder,
    __ F.2d __, 2011 WL 5914031 (N.D. Cal. Nov. 28, 2011) .............................. 30

McDonald v. City of Chicago,
    130 S. Ct. 3020 (2010) .................................................................................. 13

Mont. Caregivers Ass'n v. United States,
    2012 WL 169771(D. Mont. Jan. 20, 2012) ..................................................... 15

Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales,
    468 F.3d 826 (D.C. Cir. 2006) ....................................................................... 28

Nixon v. Shrink Mo. Gov't PAC,
    528 U.S. 377 (2000) ...................................................................................... 22

Nordyke v. King,
    644 F.3d 776 (9th Cir. 2011) ......................................................................... 20

Peruta v. Cnty. of San Diego,
758 F. Supp. 2d 1106 (S.D. Cal. 2010).............................................................21

Raich v. Gonzales ("Raich II"),
    500 F.3d 850 (9th Cir. 2007) ......................................................................... 14

Robertson v. Baldwin,
    165 U.S. 275 (1897) ...................................................................................... 16

Rutan v. Republican Party of Ill.,
    497 U.S. 62 (1990)......................................................................................... 16

Schall v. Martin,
    467 U.S. 253 (1984) ...................................................................................... 21

State v. Shelby,
    90 Mo. 302 (Mo. 1886) .................................................................................. 19

iii

Stormans, Inc. v. Selecky,
    586 F.3d 1109 (9th Cir. 2009) ................................................................. 21

Tucson Airport Authority v. General Dynamics Corp.,
    136 F.3d 641 (9th Cir. 1998) ................................................................... 31

Turner Broad. Sys. v. FCC,
    512 U.S. 622 (1994) ......................................................................... 22, 26

United States v. 12 200-Foot Reels of Super 8 mm
    413 U.S. 123 (1973) ................................................................................ 27

United States v. Carter,
    __ F.3d __ No. 09-5074, slip op. at 7–8 (4th Cir. Jan. 23, 2012) ................... passim

United States v. Chafin,
    423 F. App'x 342 (4th Cir. Apr. 13, 2011) ............................................... 27

United States v. Chester,
    628 F.3d 673 (4th Cir. 2010) ................................................................... 19

United States v. Dugan,
    657 F.3d 998 (9th Cir. 2011) ............................................................... passim

United States v. Hendrix,
    2010 WL 1372663 (W.D. Wis. Apr. 6, 2010) ...................................... 13, 19

United States v. Korbe,
    2010 WL 2404394 (W.D. Pa. June 9, 2010)………………………………13

United States v. Miller,
    604 F. Supp. 2d 1162 (W.D. Tenn. 2009)................................................ 26

United States v. Oakland Cannabis Buyers' Coop.,
    532 U.S. 483 (2001) ................................................................................. 5

United States v. Patterson,
    431 F.3d 832 (5th Cir. 2005) ................................................................... 13

United States v. Reese,
    627 F.3d 792 (10th Cir. 2010) ................................................................. 21

United States v. Rene E.,
    583 F.3d 8 (1st  Cir. 2009))..................................................................... 19

United States v. Richard,
    350 F. App'x 252 (10th Cir. 2009) ......................................................... 13

United States v. Salerno,
    481 U.S. 739 (1987) ................................................................................. 21

iv

United States v. Seay,
   620 F.3d 919 (8th Cir. 2010) ............................................................................... 13

United States v. Skoien,
   614 F.3d 638 (7th Cir. 2010) ............................................................... 16, 18, 26

United States v. Smith,
   499 U.S. 160 (1991) ............................................................................................. 32

United States v. Stacy,
   2010 WL 4117276 (S.D. Cal. Oct. 18, 2010) ................................................... 15

United States v. Tooley,
   717 F. Supp. 2d 580 (S.D. W.Va. 2010) ........................................... 17, 18, 26

United States v. Vongxay,
   594 F.3d 1111 (9th Cir. 2010) ........................................................................... 19

United States v. Yancey,
   621 F.3d 681 (7th Cir. 2010) ..................................................................... passim

Wilson v. Drake,
   87 F.3d 1073 (9th Cir. 1996)……………………………………………………..32

**UNITED STATES CONSTIUTION**

U.S. Const. amend. II ............................................................................................. 12

U.S. Const. amend. XIV, § 1 ................................................................................. 29

**STATUTES**

5 U.S.C. § 702 ........................................................................................................... 31

18 U.S.C. § 922(d)(3) ...................................................................................... passim

18 U.S.C. § 922(g) .............................................................................................. 3,13

18 U.S.C. § 922(g)(3) ...................................................................................... passim

21 U.S.C. § 802 ....................................................................................................... 4,5

21 U.S.C. § 802(6) ................................................................................................... 23

21 U.S.C. § 812 ........................................................................................................... 4

21 U.S.C. § 812(b)(1) ........................................................................................ 5, 14

v

21 U.S.C. § 812(c) ........................................................................................... 5

21 U.S.C. § 823(f) ........................................................................................... 5

21 U.S.C. § 829 ........................................................................................... 5,14

21 U.S.C. § 844(a) ...................................................................................... 5,15

28 U.S.C. § 2675(a) ......................................................................................... 32

28 U.S.C. § 2679(d)(1) ................................................................................... 32

28 U.S.C. 2680(a) ............................................................................................ 33

The Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220 ................... 3

Firearm Owners' Protection Act, Pub. L. 99-308, 100 Stat. 449, 452 (1986) ............................ 23

## RULES AND REGULATIONS

27 C.F.R. § 478.11 ................................................................................. passim

27 C.F.R. § 478.124 ......................................................................................... 9

Notice of Denial of Petition, 76 Fed. Reg 40552 (July 8, 2011) ................................... 5

## STATE LAWS

Ala. Code § 13A-11-72(b)...................................................................................23

Ark. Code Ann. § 5-73-309(7), (8) ...................................................................23

Cal. Penal Code § 12021(a)(1) .........................................................................23

Colo. Rev. Stat. § 18-12-203(1) .......................................................................23

Del. Code Ann. tit. 11, § 1448(a)(3) ...............................................................23

D.C. Code § 22-4503(a)(4) ..............................................................................23

Fla. Stat. § 790.25(2)(b)(1) ...............................................................................23

Ga. Code Ann. § 16-11-129(b)(2)(F), (I), (J) ...................................................23

Haw. Rev. Stat. § 134-7(c)(1) ..........................................................................23

Idaho Code Ann. § 18-3302(1)(e) ....................................................................23

720 Ill. Comp. Stat. 5/24-3.1(a)(3) ..................................................................23

Ind. Code § 35-47-1-7(5) ................................................................................. 23

vi

Kan. Stat. Ann. § 21-4204(a)(1) ................................................ 23

Ky. Rev. Stat. Ann. § 237.110(4)(d), (e) .................................... 23

Md. Code Ann., Public Safety, 5-133(b)(4), (5) ........................... 23

Mass. Gen. Laws ch. 140, § 129B(1) .......................................... 23

Minn. Stat. § 624.713(1)(10)(iii) ................................................ 23

Mo. Rev. Stat. § 571.070(1)(1) .................................................. 23

Nev. Rev. Stat. § 202.360(1)(c).............................................6, 23

Nev. Rev. Stat. § 202.360(3)(a).............................................6, 23

Nev. Rev. Stat. §§ 453.336.........................................................5

Nev. Rev. Stat. Ch. 453A............................................................6

Nev. Rev. Stat. § 453A.050........................................................7

Nev. Rev. Stat. § 453A.200(1)(f)................................................6

Nev. Rev. Stat. § 453A.200(3)....................................................6

Nev. Rev. Stat. § 453A.210(2)..................................................25

Nev. Rev. Stat. § 453A.210(2)(a)........................................6, 7, 25

Nev. Rev. Stat. § 453A.220(4)....................................................7

Nev. Rev. Stat. § 453A.230........................................................7

Nev. Rev. Stat. § 453A.240........................................................7

Nev. Rev. Stat. § 453A.300(1)....................................................6

N.H. Rev. Stat. Ann. § 159:3(b)(3) ........................................... 23

N.J. Stat. Ann. § 2C:58-3(c)(2) ................................................. 23

N.C. Gev. Stat. § 14-404(c)(3) ................................................. 23

Ohio Rev. Code Ann. § 2923.13(A)(4) ....................................... 23

R.I. Gen. Laws § 11-47-6 ......................................................... 23

S.C. Code Ann. § 16-23-30(A)(1) .............................................. 23

vii

**9**

S.D. Codified Laws § 23-7-7.1(3) ............................................................................. 23

W. Va. Code § 61-7-7(a)(2), (3)………………………………………………………23

**LEGISLATIVE MATTERIAL**

114 Cong. Rec. 21657, 21784 (1968) ..................................................................... 23

H.R. Rep. No. 90-1577, at 7 (1968), reprinted in 1968 U.S.C.C.A.N. 4410, 4411 ..................... 22

S. Rep. No. 90-1501, at 22 (1968) ........................................................................ 22

**MISCELLANEOUS**

1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1698).......................................... 17

2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) ...........................17

Joyce Lee Malcolm, To Keep and Bear Arms 123 (1994)    17

Bureau of Justice Statistics, Drugs and Crime Facts at 3 .......................................... 24

National Institute of Drug Abuse, Topics in Brief: Marijuana, at 1 (Dec. 2011) ....................... 25

Nev. State Health Div., Important Notice  (Feb. 12, 2009),
http://health.nv.gov/PDFs/MMP/ImportantNotice.pdf ............................................... 7

Nev. State Health Div., Program Facts (Feb. 12, 2009),
http://health.nv.gov/PDFs/MMP/ProgramFacts.pdf .................................................. 8

Nev. State Health Div., Medical Marijuana, Frequently Asked Questions, No. 8,
http://health.nv.gov/MedicalMarijuana_FAQ.htm ................................................... 8

ONDCP, ADAM II 2010 Annual Report, at 20........................................................... 24

ONDCP, Fact Sheet: Marijuana Legalization, at 1 (Oct. 2010) ...................................... 24

Robert E. Shalhope, The Armed Citizen in the Early Republic, 49 Law & Contemp. Probs.
125, 130 (1986).................................................................................. 18

Don B. Kates, Jr., The Second Amendment: A Dialogue, 49 Law & Contemp. Probs. 143,
146 (1986)...................................................................................... 19

Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An
Analytical Framework and Research Agenda, 56 UCLA L. Rev.
1443, 1497 (2009)............................................................................... 18

Patrick J. Charles, "Arms for Their Defence"?: An Historical, Legal, and Textual Analysis
of the English Right to Have Arms and Whether the Second Amendment
Should Be Incorporated in McDonald v. City of Chicago, 57 Clev. State L.
Rev. 351, 373, 376, 382-83, 405 (2009) ........................................................ 17

viii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TONY WEST
Assistant Attorney General

DANIEL G. BOGDEN
United States Attorney

SANDRA SCHRAIBMAN
Assistant Director, Federal Programs Branch

ALICIA N. ELLINGTON
JOHN K. THEIS
Trial Attorneys, Federal Programs Branch
United States Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Rm. 7226
Washington, D.C.  20530
Telephone: (202) 305-8550
Facsimile: (202) 616-8460
John.K.Theis@usdoj.gov
Alicia.N.Ellington@usdoj.gov

*Attorneys for Defendants the United States of America,*
*ATF, U.S. Attorney General Eric Holder,*
*Acting ATF Director B. Todd Jones, and*
*Assistant ATF Director Arthur Herbert,*
*in their official capacities (collectively, the United States)*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| S. ROWAN WILSON,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ERIC HOLDER, Attorney General of the<br>United States <u>et al.</u>,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No.: 2:11-CV-1679-GMN-(PAL)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES'S**
**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**INTRODUCTION**

One provision of the Gun Control Act of 1968, as amended—18 U.S.C. § 922(g)(3)—prohibits an unlawful user of a controlled substance from possessing a firearm, while another provision—18 U.S.C. § 922(d)(3)—makes it unlawful to sell a firearm while knowing or having reasonable cause to believe that the purchaser is an unlawful user of a controlled substance. Under the Controlled Substances Act, marijuana is classified as a Schedule I controlled substance that cannot be lawfully prescribed and that the general public may not lawfully possess. Although a number of states, including Nevada, have exempted from state criminal prosecution certain individuals who use marijuana for medical purposes,[1] these state laws do not alter the fact that marijuana possession remains prohibited under federal law. To advise federal firearms licensees ("FFLs") of this basic fact, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") issued an Open Letter to all FFLs on September 21, 2011, stating that "any person who uses . . . marijuana, regardless of whether his or her State has passed legislation authorizing marijuana use for medicinal purposes, is an unlawful user of . . . a controlled substance, and is prohibited by Federal law from possessing firearms or ammunition." See Compl., Ex. 2-B. The Open Letter further informed FFLs that "if you are aware that the potential transferee is in possession of a card authorizing the possession and use of marijuana under State law, then you have 'reasonable cause to believe' that the person is an unlawful user of a controlled substance" and "you may not transfer firearms or ammunition to the person." Id. (quoting 18 U.S.C. § 922(d)(3)).

Alleging that she possesses a medical marijuana registry card issued by the State of Nevada and has been prevented from purchasing a handgun, Plaintiff S. Rowan Wilson claims that 18 U.S.C. § 922(g)(3), 18 U.S.C. § 922(d)(3), an ATF regulation defining certain statutory

---

[1] As discussed herein, see infra at 5, the federal government does not recognize a medical use for marijuana. Any use in this memorandum of terms such as "medical use" or "for medical purposes" should not be read to suggest otherwise.

1  terms, and ATF's September 2011 Open Letter "prohibit[] a certain class of law-abiding,

2  responsible citizens from exercising their right to keep and bear arms" and therefore violate the

3  Second Amendment and the equal protection component of the Fifth Amendment's Due Process

4  Clause. Compl. ¶ 3.  Plaintiff seeks a declaratory judgment, a permanent injunction, and

5  monetary damages, but she has failed to state a claim for which relief can be granted.

6       First, Plaintiff's claim that § 922(g)(3) violates her Second Amendment rights must fail

7  because the Ninth Circuit has already rejected a Second Amendment challenge to this provision,

8  see United States v. Dugan, 657 F.3d 998 (9th Cir. 2011), and that constitutional analysis is not

9  altered when the provision is applied to prohibit firearm possession by someone who uses

10 marijuana in accordance with state law but in violation of federal law.  Second, because it is

11 consistent with the Second Amendment to prohibit any and all unlawful drug users from

12 possessing firearms and because the Second Amendment does not convey a right to sell firearms,

13 there can be no Second Amendment violation as a result of § 922(d)(3)'s ban on selling firearms

14 to someone the seller knows or has reasonable cause to believe is an unlawful drug user,

15 including those who possess a state-issued medical marijuana card as a result of having

16 affirmatively registered to use marijuana.  Third, Plaintiff's equal protection claim fails because

17 she is not similarly situated to persons who are not violating federal law by using marijuana.

18 And finally, even if Plaintiff had stated a claim against the federal government, no waiver of

19 sovereign immunity allows her to recover monetary damages from the United States, whether for

20 her constitutional damages claims or her conspiracy claim.   Accordingly, the Complaint should

21 be dismissed in its entirety.

22                              **BACKGROUND**

23 **I.     THE GUN CONTROL ACT AND THE CONTROLLED SUBSTANCES ACT**

24      The Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220, included a

25 provision—now codified at 18 U.S.C. § 922(g)—designed "to keep firearms out of the hands of

26 presumptively risky people," including felons, the mentally ill, fugitives from justice, and

27

28

                                        3

unlawful drug users.  <u>Dickerson v. New Banner Inst., Inc.</u>, 460 U.S. 103, 112 n.6 (1983).

Specifically, as applied to unlawful drug users, § 922(g)(3) provides that

> [i]t shall be unlawful for any person . . . who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)) . . . to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(3).  To help effectuate the firearm exclusions in § 922(g), Congress also banned selling firearms to the same categories of presumptively risky people; as relevant here, § 922(d)(3) makes it

> unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person . . . is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)).

<u>Id.</u> § 922(d)(3).

In addition to challenging the constitutionality of these two provisions, Plaintiff also targets 27 C.F.R. § 478.11, a regulation issued by ATF to define certain statutory terms. Specifically, the regulation defines an "[u]nlawful user of or addicted to any controlled substance" as

> [a] person who uses a controlled substance and has lost the power of self-control with reference to the use of the controlled substance; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician.  Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct.  A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm.  An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time . . . .

27 C.F.R. § 478.11.  Additionally, the regulation echoes §§ 922(g)(3) and 922(d)(3) by providing that a "controlled substance" is "[a] drug or other substance, or immediate precursor, as defined in section 102 of the Controlled Substances Act, 21 U.S.C. § 802." <u>Id.</u>

4

1    Section 102 of the Controlled Substances Act, in turn, defines "controlled substance" as

2 "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of

3 part B of this subchapter [21 U.S.C. § 812]."  21 U.S.C. § 802(6).  Since the enactment of the

4 Controlled Substances Act, marijuana (also known as cannabis) has been classified as a Schedule

5 I drug.  21 U.S.C. § 812(c), Schedule I(c)(10).  By classifying marijuana as a Schedule I drug,

6 Congress has determined that marijuana "has a high potential for abuse," that it "has no currently

7 accepted medical use in treatment in the United States," and that "[t]here is a lack of accepted

8 safety for use of [marijuana] under medical supervision."  Id. § 812(b)(1).[2]  As such, Schedule I

9 drugs, including marijuana, cannot be legally prescribed for medical use.  See 21 U.S.C. § 829;

10 see also United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 491 (2001) ("Whereas

11 some other drugs can be dispensed and prescribed for medical use, . . . the same is not true for

12 marijuana.").  Additionally, it is generally unlawful for any person to knowingly or intentionally

13 possess marijuana.  See 21 U.S.C. § 844(a).  For Schedule I drugs like marijuana, the only

14 exception to this ban on possession is for a federally approved research project.  See id. § 823(f);

15 see also Gonzales v. Raich, 545 U.S. 1, 14 (2005) ("By classifying marijuana as a Schedule I

16 drug, as opposed to listing it on a lesser schedule, the . . . possession of marijuana became a

17 criminal offense, with the sole exception being use of the drug as part of a Food and Drug

18 Administration preapproved research study.").

19 **II.    NEVADA'S LAW REGARDING THE MEDICAL USE OF MARIJUANA**

20    Separate and apart from federal law, the State of Nevada also criminalizes the possession

21 of marijuana.  See Nev. Rev. Stat. § 453.336.  In 2000, however, Nevada's Constitution was

22

_____

[2] The Controlled Substances Act delegates authority to the Attorney General to reschedule
23 controlled substances after consulting with the Secretary of Health and Human Services.  Id.
§ 811.  The Department of Justice's Drug Enforcement Agency ("DEA") has repeatedly denied
24 petitions to have marijuana removed from schedule I, most recently in 2011.  See Notice of
Denial of Petition, 76 Fed. Reg. 40552 (July 8, 2011); see also Gonzales v. Raich, 545 U.S. 1, 15
25 & n.23 (2005).  Based largely on scientific and medical evaluations prepared by the Department
of Health and Human Services, DEA has consistently found that marijuana continues to meet the
26 criteria for schedule I control.  See 76 Fed. Reg. at 40552.

27

28

5

1  amended by initiative petition to add the following provision regarding the medical use of

2  marijuana:

> The legislature shall provide by law for . . . [t]he use by a patient, upon the advice
> of his physician, of a plant of the genus Cannabis for the treatment or alleviation
> of cancer, glaucoma, acquired immunodeficiency syndrome; severe, persistent
> nausea of cachexia resulting from these or other chronic or debilitating medical
> conditions; epilepsy and other disorders characterized by seizure; multiple
> sclerosis and other disorders characterized by muscular spasticity; or other
> conditions approved pursuant to law for such treatment.

7  Nev. Const. art. IV, § 38(1)(a).  Pursuant to this constitutional amendment, Nevada enacted

8  legislation in 2001 that exempts the medical use of marijuana from state prosecution in certain

9  circumstances.  See Nev. Rev. Stat. Ch. 453A.  Subject to certain exceptions, the law provides

10 that "a person who holds a valid registry identification card . . . is exempt from state prosecution

11 for . . . [a]ny . . . criminal offense in which the possession, delivery or production of marijuana

12 . . . is an element."  Nev. Rev. Stat. § 453A.200(1)(f).[3]  This exemption only applies to the extent

13 that the holder of a registry identification card (i) engages in "the medical use of marijuana in

14 accordance with the provisions of this chapter as justified to mitigate the symptoms or effects of

15 the person's chronic or debilitating medical condition;" and (ii) "[d]o[es] not, at any one time,

16 collectively possess, deliver or produce more than . . . [o]ne ounce of usable marijuana[,] [t]hree

17 mature marijuana plants[,] and [f]our immature marijuana plants."  Id. § 453A.200(3).

18       The law also specifies who is eligible to receive a state-issued registry identification card,

19 requiring applicants to provide, inter alia, "[v]alid, written documentation from the person's

20 attending physician stating that . . . [t]he person has been diagnosed with a chronic or debilitating

21 medical condition."  Id. § 453A.210(2)(a)(1).[4]  The applicant must also provide documentation

22 _____

23 [3] The statute specifies, however, that cardholders are not exempt from state prosecution for a
   number of other crimes related to marijuana use.  Id. § 453A.300(1).  In addition, a separate
   provision of Nevada law specifies that "[a] person shall not own or have in his or her possession
24 or under his or her custody or control any firearm if the person . . . [i]s an unlawful user of, or
   addicted to, any controlled substance," and defines the term "controlled substance" by reference
25 to the federal Controlled Substances Act.  Nev. Rev. Stat. § 202.360(1)(c), (3)(a).

26 [4] The statute defines the term "chronic or debilitating medical condition" to include AIDS,
27 cancer, and glaucoma, as well as "[a] medical condition or treatment for a medical condition that
   *(Footnote continued on following page.)*

28

6

**16**

1   from his or her physician stating that "[t]he medical use of marijuana may mitigate the symptoms
2   or effects of that condition" and that "[t]he attending physician has explained the possible risks
3   and benefits of the medical use of marijuana."  Id. § 453A.210(2)(a)(2)–(3).  The state-issued
4   registry identification card is valid for one year and must be renewed by annually submitting
5   updated written documentation from the cardholder's attending physician, including proof that
6   the individual continues to suffer from a chronic or debilitating medical condition.  Id.
7   §§ 453A.220(4), 453A.230.  If a cardholder is "diagnosed by the person's attending physician as
8   no longer having a chronic or debilitating medical condition, the person . . . shall return the[]
9   registry identification card[] to the [State] within 7 days after notification of the diagnosis."  Id.
10  § 453A.240.

11          Nevada's law governing the medical use of marijuana does not purport to "legalize"
12  medical marijuana, but rather specifies the limited circumstances under which the possession of
13  limited amounts of marijuana for medical use is exempt from state prosecution.  This fact is
14  evidenced by the overall structure of the statute, as well as by the act's inclusion of a directive
15  instructing the next session of the Nevada legislature to "review statistics provided by the
16  legislative counsel bureau with respect to . . . [w]hether persons exempt from state prosecution
17  [under] this act have been subject to federal prosecution for carrying out the activities concerning
18  which they are exempt from state prosecution pursuant to [the act]."  Act of June 14, 2001
19  (Assembly Bill 453), ch. 592, § 48.5.  Along these lines, a one-page "Important Notice" posted
20  on the State of Nevada's Department of Health and Human Services, Health Division's website
21  advises the public that "**ISSUANCE OF A STATE OF NEVADA MEDICAL MARIJUANA**
22  **REGISTRY CARD DOES NOT EXEMPT THE HOLDER FROM PROSECUTION**
23  **UNDER FEDERAL LAW**."  See Nev. State Health Div., Important Notice (Feb. 12, 2009),
24
25  _____
26  produces, for a specific patient," one or more of the following symptoms: (i) cachexia, (ii)
    persistent muscle spasms, (iii) seizures, (iv) severe nausea, or (v) severe pain.  Id. § 453A.050.
27
28
                                          7

1   http://health.nv.gov/PDFs/MMP/ImportantNotice.pdf (emphasis in original) [App.[5] at Tab 1]; see

2   also Nev. State Health Div., Program Facts 2 (Feb. 12, 2009),

3   http://health.nv.gov/PDFs/MMP/ProgramFacts.pdf [App. at Tab 2] (stating, in a two-page

4   document posted on the Health Division's website, that "[t]he Medical Marijuana law is a state

5   law, offering protection from state law enforcement only" and that "[t]he federal government

6   does not recognize the state law and is not bound by it").  A section of the Nevada Health

7   Division's website answering frequently asked questions also informs the public that cardholders

8   cannot fill a prescription for medical marijuana at a pharmacy because "[t]he federal government

9   classifies marijuana as a Schedule I drug, which means licensed medical practitioners cannot

10   prescribe it."  Nev. State Health Div., Medical Marijuana, Frequently Asked Questions, No. 8,

11   http://health.nv.gov/MedicalMarijuana_FAQ.htm (last updated Sept. 29, 2011) [App. at Tab 3].

12   The frequently asked questions page also specifies that a patient may withdraw from the program

13   by submitting a written statement indicating that he or she wishes to withdraw and by returning

14   the individual's registry identification card.  Id., No. 12.

15   **III.**    **ATF'S SEPTEMBER 2011 OPEN LETTER TO FFLS**

16        On September 21, 2011, ATF issued an "Open Letter to All Federal Firearms Licensees."

17   See Compl., Ex. 2-B.  The Open Letter first notes that ATF "has received a number of inquiries

18   regarding the use of marijuana for medicinal purposes and its applicability to Federal firearms

19   laws" and that the "purpose of this open letter is to provide guidance on the issue and to assist

20   [FFLs] in complying with Federal firearms laws and regulations."  Id.  The Open Letter then

21   observes that "[a] number of States have passed legislation allowing under State law the use or

22   possession of marijuana for medicinal purposes" and that "some of these States issue a card

23   authorizing the holder to use or possess marijuana under State law."  Id.  The Open Letter

24   proceeds to summarize the relevant provisions of federal law, noting (i) that "18 U.S.C.

25

26   _____

[5] Pursuant to Local Rule 7-3, the United States has concurrently filed an appendix to this
memorandum containing secondary materials cited herein.

27

28

1   § 922(g)(3)[] prohibits any person who is an 'unlawful user of or addicted to any controlled

2   substance . . .' from shipping, transporting, receiving or possessing firearms or ammunition;" (ii)

3   that the Controlled Substances Act lists marijuana as a Schedule I controlled substance and that

4   "there are no exceptions in Federal law for marijuana purportedly used for medicinal purposes,

5   even if such use is sanctioned by State law;" (iii) that "18 U.S.C. § 922(d)(3)[] makes it unlawful

6   for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing

7   or having reasonable cause to believe that such person is an unlawful user of or addicted to a

8   controlled substance;" and (iv) that, under 27 C.F.R. § 478.11, "'an inference of current use may

9   be drawn from evidence of a recent use or possession of a controlled substance or a pattern of

10  use or possession that reasonable covers the present time.'"  Compl., Ex. 2-B (emphasis in

11  original).  The Open Letter then interprets these provisions to draw two conclusions: first, "any

12  person who uses or is addicted to marijuana, regardless of whether his or her State has passed

13  legislation authorizing marijuana use for medicinal purposes, is an unlawful user of or addicted

14  to a controlled substance, and is prohibited by Federal law from possessing firearms or

15  ammunition."  Id.  Second, if an FFL is "aware that the potential transferee is in possession of a

16  card authorizing the possession and use of marijuana under State law, then [the FFL] ha[s]

17  'reasonable cause to believe' that the person is an unlawful user of a controlled substance" and

18  "may not transfer firearms or ammunition to the person."  Id.  This conclusion holds, the Open

19  Letter notes, even if the potential transferee answered "no" to Question 11(e) on ATF Form

20  4473,[6] which asks, "Are you an unlawful user of, or addicted to, marijuana, or any depressant,

21  stimulant, or narcotic drug, or any other controlled substance?"  Id.; see also Compl., Ex. 2-C.

22

23

24

25  _____

26  [6] ATF Form 4473 is a firearms transaction record that all potential purchasers are required to
    complete before receiving a firearm from an FFL.  See 27 C.F.R. § 478.124.

27

28

                                          9

**19**

**IV.    PLAINTIFF'S COMPLAINT**

According to the Complaint,[7] Plaintiff applied for a medical marijuana registry card from the State of Nevada in October 2010. Compl. ¶ 35. Since the age of ten, Plaintiff has experienced severe menstrual cramps, which she describes as "sometimes debilitating, even leading to further painful side effects, such as severe nausea and cachexia." Compl., Ex. 1, ¶ 20. As part of her application for a registry identification card, Plaintiff "obtained a doctor's recommendation for the use of medical marijuana." Compl. ¶ 36. On May 12, 2011, Nevada issued a registry identification card to Plaintiff. Id. ¶ 37; see also Compl., Ex. 1-B.

Approximately five months later, on October 4, 2011, Plaintiff visited Custom Firearms & Gunsmithing, a federally licensed gun store in Moundhouse, Nevada, to purchase a handgun. In order to effect the transaction, Plaintiff began to complete ATF Form 4473, but left Question 11(e) blank. See Compl., Ex. 1-C. Plaintiff alleges that her "natural inclination" was to answer "no" to Question 11(e), but that Mr. Frederick Hauseur, IV, the store's proprietor, informed her that ATF had "promulgated a policy whereby any person holding a medical marijuana registry card is automatically considered an 'unlawful user of, or addicted to marijuana.'" Compl. ¶ 42. She states that she decided to leave the question blank because she "holds a valid medical marijuana registry card issued by the State of Nevada, but is clearly not an unlawful user of or addicted to marijuana." Id. ¶ 43. When Plaintiff provided the form to Mr. Hauseur, he informed her that he was prohibited from selling her any firearm or ammunition. Compl., Ex. 1, ¶ 32. Mr. Hauseur and Plaintiff had known each other for nearly a year, and Mr. Hauseur was previously aware that Plaintiff possessed a state-issued medical marijuana registry card. Id.; Compl., Ex. 2, ¶ 11. With that knowledge and having received notice of ATF's Open Letter, Mr. Hauseur determined he could not sell Plaintiff a firearm without jeopardizing his status as a FFL. Compl., Ex. 2, ¶ 12. Plaintiff alleges more generally that she "presently intends to acquire a functional

---

[7] The facts alleged in Plaintiff's Complaint are accepted as true for purposes of the United States's Motion to Dismiss.

10

1    handgun for use within her home for self-defense but is prevented from doing so" by federal law,

2    as implemented by ATF.  Compl. ¶ 6.

3            On October 18, 2011, Plaintiff filed a three-count Complaint against the United States,

4    ATF, U.S. Attorney General Eric Holder, ATF Acting Director B. Todd Jones, and ATF

5    Assistant Director Arthur Herbert.[8]  In Count One, Plaintiff alleges that 18 U.S.C. § 922(g)(3),

6    18 U.S.C. § 922(d)(3), 27 C.F.R. § 478.11, and ATF's September 2011 Open Letter violate her

7    right to keep and bear arms under the Second Amendment.  Compl. ¶¶ 46–51.  In Count Two,

8    Plaintiff alleges that these same "laws and policies" violate her Fifth Amendment right to equal

9    protection.  Id. ¶¶ 52–57.  In Count Three, Plaintiff raises a conspiracy claim, alleging that "[t]he

10   Defendants, and each of them, acted in concert to deprive the Plaintiff of her Second and Fifth

11   Amendment rights by enacting and enforcing the unconstitutional laws, policies, practices and/or

12   procedures complained of in this action."  Id. ¶ 59.  For relief, Plaintiff seeks a declaration "that

13   18 U.S.C. §§ 922(g)(3) and 922(d)(3) and derivative regulations, such as 27 C.F.R. § 478.11,"

14   violate the Second Amendment and the Due Process Clause of the Fifth Amendment, as well as

15   an injunction preventing the enforcement of these laws and regulations.  Compl., Prayer for

16   Relief, ¶¶ 1–3.  She also seeks compensatory and punitive damages.  Id. ¶ 4.

17                                        **ARGUMENT**

18   **I.    PLAINTIFF'S SECOND AMENDMENT RIGHTS HAVE NOT BEEN VIOLATED**

19           The Ninth Circuit has held that Congress did not violate the Second Amendment by

20   prohibiting unlawful drug users from possessing firearms.  See United States v. Dugan, 657 F.3d

21   998 (9th Cir. 2011).  This binding holding applies to all unlawful drug users, even those whose

22   marijuana use is not a crime as a matter of state law.  Even if the Ninth Circuit had not already

23   upheld 18 U.S.C. § 922(g)(3) against a Second Amendment challenge, Plaintiff's claim against

24   _____

25   [8] Plaintiff names Defendants Holder, Jones, and Herbert in both their official and their individual
     capacities.  A separate, contemporaneously-filed motion to dismiss by the individual defendants
26   addresses the specific reasons why Plaintiff's claims against these defendants in their individual
     capacities must fail.

27

28

                                            11

1    that provision would still fail because it proscribes activity that falls outside the scope of the

2    Second Amendment's protections.  In any event, because prohibiting possession of firearms by

3    unlawful drug users, including marijuana users, substantially relates to the important

4    governmental interests in combating violent crime and protecting public safety, 18 U.S.C.

5    § 922(g)(3) does not violate Plaintiff's Second Amendment rights.  Plaintiff's challenge to

6    § 922(d)(3) and to ATF's interpretation of that provision in the September 2011 Open Letter

7    similarly fails.  The Second Amendment does not protect a right to sell firearms.  Moreover,

8    because § 922(g)(3)—which prohibits unlawful drug users' firearm possession—does not violate

9    the Second Amendment, the fact that § 922(d)(3) might prevent unlawful drug users from

10   acquiring firearms does not render that provision constitutionally suspect.

**A.     As Applied to Plaintiff, 18 U.SC. § 922(g)(3), as Implemented and Interpreted by ATF, Does Not Violate the Second Amendment.**

**1.     Plaintiff's Second Amendment Challenge to § 922(g)(3) Is Foreclosed By the Ninth Circuit's Decision in <u>Dugan</u>.**

14       The Second Amendment provides: "A well regulated Militia, being necessary to the

15   security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

16   U.S. Const. amend. II.  In <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), after determining

17   that the Second Amendment confers an individual right to keep and bear arms, <u>id.</u> at 595, the

18   Supreme Court held that "the District's ban on handgun possession in the home violates the

19   Second Amendment, as does its prohibition against rendering any lawful firearm in the home

20   operable for the purpose of immediate self defense," <u>id.</u> at 635.  The Court's holding was narrow

21   and addressed only the "core" right of "<u>law-abiding, responsible</u> citizens to use arms in defense

22   of hearth and home."  <u>Id.</u> at 634–35 (emphasis added).

23       The Supreme Court also took care to note that, like other constitutional rights, the right to

24   keep and bear arms is "not unlimited."  <u>Id.</u> at 626.  Although the Supreme Court declined to

25   "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," it

26   cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding

27

28

1   prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing

2   conditions and qualifications on the commercial sale of arms."  Id. at 626–27.  The Court

3   clarified that it was "identify[ing] these presumptively lawful regulatory measures only as

4   examples" and that its list was not "exhaustive."  Id. at 627 n.26; see also McDonald v. City of

5   Chicago, 130 S. Ct. 3020, 3047 (2010).

6        Following Heller, numerous Second Amendment challenges have been raised against

7   § 922(g)(3), and not one has succeeded.  See, e.g., United States v. Yancey, 621 F.3d 681, 683,

8   687 (7th Cir. 2010) (holding that § 922(g)(3) was "equally defensible" as, and analogous to, the

9   categorical bans described as presumptively lawful in Heller and that "Congress acted within

10   constitutional bounds by prohibiting illegal drug users from firearm possession because it is

11   substantially related to the important governmental interest in preventing violent crime"); United

12   States v. Seay, 620 F.3d 919, 925 (8th Cir. 2010) ("find[ing] that § 922(g)(3) is the type of

13   'longstanding prohibition[] on the possession of firearms' that Heller declared presumptively

14   lawful"); United States v. Richard, 350 F. App'x 252, 260 (10th Cir. 2009) (unpublished);

15   United States v. Korbe, Criminal No. 09-05, 2010 WL 2404394, at *3–4 (W.D. Pa. June 9,

16   2010); United States v. Hendrix, No. 09-cr-56-bbc, 2010 WL 1372663, at *3 (W.D. Wis. Apr. 6,

17   2010); see also United States v. Patterson, 431 F.3d 832, 835–36 (5th Cir. 2005) (holding, pre-

18   Heller, that although the Fifth Circuit recognized an individual right to bear arms, a criminal

19   defendant's Second Amendment challenge to § 922(g)(3) was unavailing).[9]

--------

20   [9] United States v. Carter, __ F.3d __, No. 09-5074, 2012 WL 207067 (4th Cir. Jan. 23, 2012), is
not to the contrary.  There, the Fourth Circuit found that the government had failed to meet its
21   burden of establishing a record showing a reasonable fit between § 922(g)(3) and the
government's important interest in public safety, and it therefore remanded to allow the
22   government an opportunity to substantiate the record.  Carter, 2012 WL 207067, at *7–8.  In
doing so, however, the Fourth Circuit noted that the record necessary to justify § 922(g)(3) "need
23   not be as fulsome as that necessary to justify" other sub-sections of § 922(g) because, unlike the
other sub-sections, § 922(g)(3) "only applies to persons who are currently unlawful users or
24   addicts."  Id. at *6.  Indeed, the court proceeded to observe that the government's burden on
remand "should not be difficult to satisfy in this case, as the government has already asserted in
25   argument several risks of danger from mixing drugs and guns" and noted that the Seventh Circuit
in Yancey had "identified a number of studies demonstrating 'the connection between chronic
26   drug abuse and violent crime.'"  Id. at *7–8.

27

28

1    The Ninth Circuit similarly upheld § 922(g)(3) against a Second Amendment challenge in

2   Dugan.  Like the other courts to have considered the issue, the Ninth Circuit found significant

3   Heller's language indicating that § 922(g)(1)'s prohibition on firearm possession by felons and

4   § 922(g)(4)'s prohibition on firearm possession by the mentally ill were presumptively lawful.

5   Dugan, 657 F.3d at 999.  The court found that "the same amount of danger" is presented by

6   allowing habitual drug users to possess firearms because "[h]abitual drug users, like career

7   criminals and the mentally ill, more likely will have difficulty exercising self-control,

8   particularly when they are under the influence of controlled substances."  Id.  The court also

9   found an important distinction between § 922(g)(3) and the two prohibitions declared

10  presumptively lawful by Heller that actually favored § 922(g)(3)'s constitutionality—namely,

11  that "an unlawful drug user may regain his right to possess a firearm simply by ending his drug

12  abuse," whereas those individuals who have been convicted of a felony or committed to a mental

13  institution generally face a lifetime ban.  Id.  The court therefore concluded that "[b]ecause

14  Congress may constitutionally deprive felons and mentally ill people of the right to possess and

15  carry weapons, . . . Congress may also prohibit illegal drug users from possessing firearms."  Id.

16  at 999–1000.

17        Although not evident from the face of the opinion, Dugan, like Plaintiff, possessed a

18  state-issued card exempting him from state prosecution for using marijuana for medical

19  purposes.  See Brief for Appellant at 59, Dugan, 657 F.3d 998 (No. 08-10579), ECF No. 57

20  ("Here, Mr. Dugan was . . . licensed to grow and use medical marijuana.").  Indeed, the central

21  argument in Dugan's Second Amendment challenge was that "millions of Americans peacefully

22  engage in the unlawful use of marijuana—and millions more do so legally under state medical

23  marijuana laws—without engaging in any behavior that would provide a legitimate basis for

24  excluding them from the reach of the Second Amendment."  Id. at 57.  The Ninth Circuit,

25  however, treated Dugan's status as a medical marijuana cardholder as irrelevant to his Second

26  Amendment claim—and rightly so.  Congress has determined that marijuana "has no currently

27

28

14

1   accepted medical use in treatment in the United States," 21 U.S.C. § 812(b)(1)(B), and has

2   accordingly specified that it may not be validly prescribed or lawfully possessed, id. §§ 829,

3   844(a).  Although several states, including Nevada, have taken a different view of marijuana's

4   potential medical benefits, it is well settled that Congress has authority under the Commerce

5   Clause to criminalize marijuana possession, even if such possession is not also illegal under state

6   law.  See Gonzales v. Raich, 545 U.S. 1 (2005); see also Raich v. Gonzales ("Raich II"), 500

7   F.3d 850, 861–64 (9th Cir. 2007) (holding, on remand from the Supreme Court, that there is no

8   Ninth Amendment or substantive due process right to use marijuana for claimed medical

9   purposes); Mont. Caregivers Ass'n v. United States, __ F. Supp. 2d __, No. CV 11-74-M-DWM,

10  2012 WL 169771 (D. Mont. Jan. 20, 2012).  All users of marijuana are therefore unlawful users

11  of a controlled substance, and Dugan's holding that Congress may "prohibit illegal drug users

12  from possessing firearms" without violating the Second Amendment applies equally to them all.

13  657 F.3d at 999–1000; see also United States v. Stacy, No. 09cr3695 BTM, 2010 WL 4117276,

14  at *7 (S.D. Cal. Oct. 18, 2010) (noting, in the course of rejecting a Second Amendment challenge

15  to § 922(g)(3), that "[t]he fact that this particular case involves the alleged lawful use of

16  marijuana under state law does not have any bearing on the presumptively lawful nature of the

17  restriction").  As such, Plaintiff's claim that her Second Amendment rights have been violated by

18  § 922(g)(3), as interpreted by ATF, must fail.

19          **2.      Unlawful Drug Users Fall Outside the Scope of the Second
                       Amendment as Understood at the Adoption of the Bill of Rights.**
20

21          Even if Plaintiff's Second Amendment challenge to § 922(g)(3) were not foreclosed by

22  Dugan, it would still fail because unlawful drug users are not within the class of law-abiding,

23  responsible citizens historically protected by the Second Amendment.  As noted earlier, Heller's

24  holding was relatively narrow, recognizing only the "core" right of "law-abiding, responsible

25  citizens to use arms in defense of hearth and home."  554 U.S. at 634–35 (emphasis added).

26  Given this, as well as the Court's recognition that categorical prohibitions on firearm possession

27

28

                                            15

by felons and the mentally ill are presumptively lawful, it is clear that <u>Heller</u>'s determination that the Second Amendment confers an individual right to keep and bear arms cannot be misconstrued as recognizing a right for <u>all</u> individuals to possess firearms, no matter the circumstances.  Rather, <u>Heller</u>'s carefully crafted articulation of the right at the core of the Second Amendment acknowledges that the Anglo-American right to arms that was incorporated into the Bill of Rights was subject to certain well-recognized exceptions.[10]  Given the relatively recent history of federal enactments disqualifying felons and the mentally ill from possessing weapons,[11] <u>Heller</u> also teaches that "exclusions [from the right to bear arms] need not mirror limits that were on the books in 1791," when the Second Amendment was enacted.  <u>United States v. Skoien</u>, 614 F.3d 638, 641 (7th Cir. 2010) (en banc); <u>see also id.</u> at 640 ("[<u>Heller</u>] tell[s] us that statutory prohibitions on the possession of weapons by some persons are proper—and . . . that the legislative role did not end in 1791.  That <u>some</u> categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details.").  Nevertheless, the history of the right to arms as it developed in England and the American colonies is consistent not only with the disarmament of convicted felons and the mentally ill, but also more broadly supports Congress's authority to prohibit firearm possession by non-law-abiding citizens, including those who violate drug laws.

---

[10] It is "perfectly well settled" that the Bill of Rights embodies "certain guaranties and immunities which we had inherited from our English ancestors," and "which had, from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case."  <u>Robertson v. Baldwin</u>, 165 U.S. 275, 281 (1897).  The Court similarly recognized that "[i]n incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed."  <u>Id.</u>; <u>see also</u> <u>Rutan v. Republican Party of Ill.</u>, 497 U.S. 62, 95-96 (1990) (Scalia, J., dissenting) ("The provisions of the Bill of Rights . . . did not create by implication novel individual rights overturning accepted political norms.").

[11] <u>See</u> <u>Skoien</u>, 614 F.3d at 640–41 ("The first federal statute disqualifying felons from possessing firearms was not enacted until 1938 . . . . [T]he ban on possession by <u>all</u> felons was not enacted until 1961. . . . Moreover, legal limits on the possession of firearms by the mentally ill also are of 20th Century vintage; § 922(g)(4), which forbids possession by a person 'who has been adjudicated as a mental defective or who has been committed to a mental institution,' was not enacted until 1968." (citations omitted)).

16

1    <u>Heller</u> identified the right protected by the 1689 English Declaration of Rights as "the

2    predecessor to our Second Amendment."  554 U.S. at 593.  This document provided, "That the

3    subjects which are Protestants may have arms for their defense suitable to their conditions and <u>as</u>

4    <u>allowed by law</u>."  <u>Id.</u> (quoting 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689))

5    (emphasis added).  It is undisputed that both before and after its adoption, the English

6    government retained the power to disarm individuals it viewed as dangerous.  <u>Id.</u> at 582.

7    Moreover, "like all written English rights," this right to arms "was held only against the Crown,

8    not Parliament," <u>id.</u> at 593, and thus its scope was only "as allowed by law."  Significantly, the

9    English Declaration of Rights did <u>not</u> repeal the 1662 Militia Act, which authorized lieutenants

10    of the militia (appointed by the King) to disarm "any person or persons" judged "<u>dangerous to</u>

11    <u>the Peace of the Kingdom</u>,"  13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.) (emphasis added), and "was

12    to remain in force with only insignificant changes for many years to come," Joyce Lee Malcolm,

13    <u>To Keep and Bear Arms</u> 123 (1994) [App. at Tab 4]; <u>accord</u> Patrick J. Charles, "<u>Arms for Their</u>

14    <u>Defence</u>"?: <u>An Historical, Legal, and Textual Analysis of the English Right to Have Arms and</u>

15    <u>Whether the Second Amendment Should Be Incorporated in McDonald v. City of Chicago</u>, 57

16    Clev. State L. Rev. 351, 373, 376, 382–83, 405 (2009).  Since the act was employed against

17    those viewed as "disaffected or dangerous," Charles, 57 Clev. State L. Rev. at 376–78,

18    individuals could be disarmed without any adjudication of wrongdoing.

19        The documentary record surrounding the adoption of the Constitution similarly confirms

20    that the right to keep and bear arms was limited to "law-abiding and responsible" citizens.  In

21    other words, "it is clear that the colonists, at least in some manner, carried on the English

22    tradition of disarming those viewed as 'disaffected and dangerous.'"  <u>United States v. Tooley</u>,

23    717 F. Supp. 2d 580, 590 (S.D. W.Va. 2010).  Notably, "<u>Heller</u> identified as a 'highly

24    influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the

25    Minority of the Convention of the State of Pennsylvania to Their Constituents," which "asserted

26    that citizens have a personal right to bear arms '<u>unless for crimes committed, or real danger of</u>

27

28

17

1   public injury from individuals.'" Skoien, 614 F.3d at 640 (quoting Heller, 554 U.S. at 604; 2

2   Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) (emphasis added)).

3   "One reason for considering this proposal 'highly influential,' is that it represents the view of the

4   Anti-federalists – the folk advocating . . . for a strong Bill of Rights." Tooley, 717 F. Supp. 2d at

5   590. This proposal demonstrates that, at the time the Constitution was adopted, even ardent

6   supporters of guaranteeing an individual right to keep and bear arms recognized that criminals

7   and other dangerous individuals should not enjoy its benefits. Although the Second Amendment

8   itself proved more "succinct[]" than the Pennsylvania proposal, Heller, 554 U.S. at 659 (Stevens,

9   J., dissenting), the latter remains probative of how the Amendment's supporters viewed the

10  balance between public security and the right to keep and bear arms. See id. at 605 (reaffirming

11  that "the Bill of Rights codified venerable, widely understood liberties").

12          The Pennsylvania proposal, moreover, supports the view that "the right to arms does not

13  preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the

14  mentally unbalanced, are deemed incapable of virtue." Don B. Kates & Clayton E. Cramer,

15  Second Amendment Limitations and Criminological Considerations, 60 Hastings L.J. 1339, 1360

16  (2009); see also Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-

17  Defense: An Analytical Framework and Research Agenda, 56 UCLA L. Rev. 1443, 1497 (2009)

18  ("[A]ny textual or original-meaning limitations on who possesses the right will often stem from

19  the perception that certain people aren't trustworthy enough to possess firearms."); id. at 1510

20  (opining that "those whose judgment is seen as compromised by mental illness, mental

21  retardation, or drug or alcohol addiction have historically been seen as less than full

22  rightholders"); Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American

23  Origins of Gun Control, 73 Fordham L. Rev. 487, 492 (2004); Robert E. Shalhope, The Armed

24  Citizen in the Early Republic, 49 Law & Contemp. Probs. 125, 130 (1986). Additional historical

25  support for this understanding of the right is found in nineteenth-century cases upholding state

26  legislation restricting firearm possession by certain classes of people perceived to be dangerous.

27

28

1   For example, the Missouri Supreme Court held in 1886 that a state law prohibiting intoxicated

2   persons from carrying firearms did not violate the state constitutional right to keep and bear

3   arms.  State v. Shelby, 2 S.W. 468, 468–69 (Mo. 1886).

4         Courts interpreting the Second Amendment following Heller have recognized the

5   importance of the Amendment's historical limitations.  See, e.g., Heller v. District of Columbia

6   ("Heller II"), __F.3d __, 2011 WL 4551558, at *5 (D.C. Cir. Oct. 4, 2011); United States v.

7   Chester, 628 F.3d 673 (4th Cir. 2010).  Indeed, the First Circuit recently relied, in part, on

8   historical sources in holding that the right to keep arms does not extend to juveniles.  United

9   States v. Rene E., 583 F.3d 8, 15-16 (1st Cir. 2009), cert. denied, 130 S. Ct. 1109 (Jan. 11, 2010).

10  The Ninth Circuit has recognized this history as well, noting that "most scholars of the Second

11  Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a

12  'virtuous citizen[ry]' . . . and that 'the right to bear arms does not preclude laws disarming the

13  unvirtuous citizens (i.e. criminals)."  United States v. Vongxay, 594 F.3d 1111, 1118 (9th Cir.

14  2010) (quoting Don B. Kates, Jr., The Second Amendment: A Dialogue, 49 Law & Contemp.

15  Probs. 143, 146 (1986)).

16        This history is sufficient to resolve Plaintiff's challenge to § 922(g)(3).  Simply put,

17  unlawful drug users—a category that includes all marijuana users—are outside the class of "law-

18  abiding, responsible" citizens historically protected by the Second Amendment.  Because the

19  right to keep arms does not extend to those who are actively engaged in illegal activity,

20  § 922(g)(3), as interpreted by ATF, cannot violate the Second Amendment.  See Hendrix, 2010

21  WL 1372663, at *3 ("Preventing criminal users of controlled substances from possessing guns is

22  not a restriction on the values that the Second Amendment protects, which, to repeat, is the right

23  of law-abiding citizens to possess handguns in their homes for self-protection.").

24

25

26

27

28

19

**29**

### 3. In Any Event, As Applied to Marijuana Users, 18 U.S.C. § 922(g)(3) Substantially Relates to the Important Governmental Interest in Protecting Public Safety and Combating Violent Crime.

Even if the Court declines to reach the issue of whether unlawful drug users fell outside the scope of the Second Amendment as understood at the time of its adoption, it should still uphold § 922(g)(3), as applied to all marijuana users, because the statute easily survives heightened review.  In Heller, the Supreme Court did not specify which standard of review should be applied in Second Amendment cases, other than to rule out use of rational-basis scrutiny.  554 U.S. at 628 & n.27.  This question is still unsettled in the Ninth Circuit: a panel of that court recently took a step towards resolving the issue, holding that "only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment," although declining to decide "precisely what type of heightened scrutiny applies to laws that substantially burden Second Amendment rights."  Nordyke v. King, 644 F.3d 776, 786 & n.9 (9th Cir. 2011).  The Ninth Circuit has decided to rehear that case en banc, however, and the panel opinion has been stripped of precedential force.  Nordyke, No. 07-15763, 2011 WL 5928130 (9th Cir. Nov. 28, 2011).  The other courts of appeals that have addressed the standard-of-review issue have uniformly concluded that this type of regulation is, at most, subject to intermediate scrutiny.  The Fourth Circuit, for example, recently declined to decide whether firearm possession by unlawful drug users was understood to be within the scope of the Second Amendment's guarantee at the time of ratification, but then rejected the defendant's claim that strict scrutiny should apply to his challenge because he purchased the guns at issue for self-defense in the home.  United States v. Carter, __ F.3d __, No. 09-5074, 2012 WL 207067, at *4 (4th Cir. Jan. 23, 2012).  Instead, the court applied intermediate scrutiny, explaining that "[w]hile we have noted that the application of strict scrutiny is important to protect the core right of self-defense identified in Heller, that core right is only enjoyed, as Heller made clear, by 'law-abiding, responsible citizens,'" which unlawful drug users "cannot claim to be."  Id.  The court noted that it was "join[ing] the other courts of appeals that have rejected the application of strict

20

1    scrutiny in reviewing the enforcement of § 922(g)(3), or, for that matter, any other subsection of

2    § 922(g)."  Id. at *5; see also Yancey, 621 F.3d at 683 (applying intermediate scrutiny to a §

3    922(g)(3) challenge); cf. United States v. Reese, 627 F.3d 792, 802 (10th Cir. 2010) (applying

4    intermediate scrutiny to challenge to § 922(g)(8)); Heller II, 2011 WL 4551558, at *9 (applying

5    intermediate scrutiny to review novel gun registration laws).  Given this weight of authority,

6    intermediate scrutiny is the highest standard of review that should potentially apply here.

7         There can be no doubt that § 922(g)(3), as applied to marijuana users, satisfies

8    intermediate scrutiny.  Under intermediate scrutiny, "a regulation must be substantially related to

9    an important governmental objective."  Stormans, Inc. v. Selecky, 586 F.3d 1109, 1134 (9th Cir.

10   2009).  An important—indeed, compelling—governmental interest is at stake here—namely, the

11   government's interest in protecting public safety and preventing violent crime.  See United States

12   v. Salerno, 481 U.S. 739, 748, 750 (1987) (noting that the Supreme Court has "repeatedly held

13   that the Government's regulatory interest in community safety can, in appropriate circumstances,

14   outweigh an individual's liberty interest" and that the "[g]overnment's general interest in

15   preventing crime is compelling"); Schall v. Martin, 467 U.S. 253, 264 (1984) ("The 'legitimate

16   and compelling state interest' in protecting the community from crime cannot be doubted."); see

17   also Carter, 2012 WL 207067, at *5 ("We readily conclude in this case that the government's

18   interest in 'protecting the community from crime' by keeping guns out of the hands of dangerous

19   persons is an important governmental interest."); Yancey, 621 F.3d at 684 ("The broad objective

20   of § 922(g)—suppressing armed violence—is without doubt an important one.").

21        In terms of evaluating the fit between the indisputably important objectives at stake and

22   the prohibition in § 922(g)(3), there are several relevant considerations that affect the analysis.

23   First, intermediate scrutiny, "by definition, allows [the government] to paint with a broader

24   brush" than strict scrutiny.  Peruta v. Cnty. of San Diego, 758 F. Supp. 2d 1106, 1117 (S.D. Cal.

25   2010) (internal quotation marks and citation omitted).  Second, in order to advance its

26   compelling interests in combating crime and protecting public safety, Congress may need to

27

28

21

1   make "predictive judgments" about the risk of dangerous behavior.  Turner Broad. Sys. v. FCC,

2   512 U.S. 622, 665 (1994).  Such judgments are entitled to "substantial deference" by the courts

3   because Congress is "far better equipped than the judiciary" to collect, weigh, and evaluate the

4   relevant evidence and to formulate appropriate firearms policy in response.  Id. at 665–66.

5   Third, "the nature and quantity of any showing required by the government 'to satisfy heightened

6   judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility

7   of the justification raised.'"  Carter, 2012 WL 207067, at *6 (quoting Nixon v. Shrink Mo. Gov't

8   PAC, 528 U.S. 377, 391 (2000)).  Since it is hardly novel—and entirely plausible—that mixing

9   guns and drugs poses a severe risk to public safety, the government's burden here is relatively

10  low.  Finally, the government may carry its burden by relying on "a wide range of sources, such

11  as legislative text and history, empirical evidence, case law, and common sense, as

12  circumstances and context require."  Id.

13         All of these sources point inexorably to the conclusion that a substantial relationship

14  exists between § 922(g)(3) as applied to marijuana users and Congress's goals of protecting

15  public safety and combatting violent crime.  Congress enacted the precursor to what is now

16  § 922(g)(3) in the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213.  Congressional

17  action was prompted by the "increasing rate of crime and lawlessness and the growing use of

18  firearms in violent crime."  H.R. Rep. No. 90-1577, at 7 (1968), reprinted in 1968 U.S.C.C.A.N.

19  4410, 4412.  To meet this growing problem, Congress banned certain classes of individuals from

20  receiving firearms shipped in interstate commerce based on Congress's determination that access

21  to guns by those groups of people was generally contrary to the public interest.  See Huddleston

22  v. United States, 415 U.S. 814, 824 (1974) ("The principal purpose of the federal gun control

23  legislation . . . was to [curb] crime by keeping 'firearms out of the hands of those not legally

24  entitled to possess them because of age, criminal background, or incompetency.'" (quoting S.

25  Rep. No. 90-1501, at 22 (1968))).  As the House manager stated during debate on the legislation:

26         [W]e are convinced that a strengthened [firearms control system] can significantly
            contribute to reducing the danger of crime in the United States.  No one can

27

28

22

1
2  dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses from buying, owning, or possessing firearms.   This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons.

3  114 Cong. Rec. 21657, 21784 (1968) (quoted in <u>Huddleston</u>, 415 U.S. at 828; <u>Yancey</u>, 621 F.3d

4  at 686).  Moreover, Congress evidenced a particular concern with marijuana use: "[w]hile the

5  statute swept in users of several different categories of drugs, marijuana was the only drug

6  specifically listed by name."  <u>Carter</u>, 2012 WL 207067, at *5 (citing 82 Stat. 1213, 1220–21,

7  which prohibited receipt of firearms by any person who is "'an unlawful user of or addicted to

8  marihuana or any depressant or stimulant drug . . . or narcotic drug'"). [12]

9  Significantly, Congress is not the only legislative body to draw the conclusion that guns

10  and drugs do not mix.  Rather, as the court in <u>Yancey</u> found significant, "many states have

11  restricted the right of habitual drug abusers or alcoholics to possess or carry firearms."  621 F.3d

12  at 684. [13]  Indeed, Nevada is among the states that have codified an analogue to § 922(g)(3); the

13  state legislature amended a pre-existing provision in 2003 to specify that "[a] person shall not

14  own or have in his or her possession or under his or her custody or control any firearm if the

15  person . . . [i]s an unlawful user of, or addicted to, any controlled substance."  Nev. Rev. Stat.

16  § 202.360(1)(c).  Like § 922(g)(3), the state statute further provides that "'controlled substance'

17  has the meaning ascribed to it in 21 U.S.C. § 802(6)."  <u>Id.</u> § 202.360(3)(a).  Taken together, the

18
   _____

19  [12] As <u>Carter</u> notes in recounting § 922(g)(3)'s legislative history, the "the 1968 enactment . . .
20  contained a number of loopholes."  <u>Id.</u> at *6.  The provision took its current shape with the enactment of the Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449, 452 (1986).

21  [13] <u>See</u> Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(7), (8); Cal. Penal Code
   § 12021(a)(1); Colo. Rev. Stat. § 18-12-203(1)(e), (f); Del. Code Ann. tit. 11, § 1448(a)(3); D.C.
22  Code § 22-4503(a)(4); Fla. Stat. § 790.25(2)(b)(1); Ga. Code Ann. § 16-11-129(b)(2)(F), (I), (J);
   Haw. Rev. Stat. § 134-7(c)(1); Idaho Code Ann. § 18-3302(1)(e); 720 Ill. Comp. Stat. 5/24-
23  3.1(a)(3); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-4204(a)(1); Ky. Rev. Stat. Ann.
   § 237.110(4)(d), (e); Md. Code Ann., Public Safety, 5-133(b)(4), (5); Mass. Gen. Laws ch. 140,
24  § 129B(1)(iv); Minn. Stat. § 624.713(1)(10)(iii); Mo. Rev. Stat. § 571.070(1)(1); Nev. Rev. Stat.
   § 202.360(1)(c); N.H. Rev. Stat. Ann. § 159:3(b)(3); N.J. Stat. Ann. § 2C:58-3(c)(2); N.C. Gev.
25  Stat. § 14-404(c)(3); Ohio Rev. Code Ann. § 2923.13(A)(4); R.I. Gen. Laws § 11-47-6; S.C.
   Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7-7.1(3); W. Va. Code § 61-7-7(a)(2),
26  (3).

27
28

23

1  state legislation "demonstrate[s] that Congress was not alone in concluding that habitual drug

2  abusers are unfit to possess firearms."  Yancey, 621 F.3d at 684.

3       This shared legislative judgment is amply supported by academic research and empirical

4  studies demonstrating the heightened risk to the public safety posed by the possession of firearms

5  by marijuana users.  According to the Bureau of Justice Statistics, a 2004 survey found that

6  "32% of state prisoners and 26% of federal prisoners said they had committed their current

7  offense while under the influence of drugs."  Bureau of Justice Statistics, Drugs and Crime Facts,

8  http://bjs.ojp.usdoj.gov/content/dcf/duc.cfm [App. at Tab 5].  Marijuana, moreover, was the most

9  frequent drug of choice: a 2002 survey of convicted jail inmates found that marijuana was the

10  most common drug used at the time of the offense, and similar results were found among

11  probationers.  Id.  Moreover, the Office of National Drug Control Policy's ("ONDCP's") arrestee

12  drug abuse monitoring program, which collects data in 10 cities from males 18 years and older at

13  the point of their involvement in the criminal justice system, found that "[m]arijuana was the

14  most commonly detected drug in all of the . . . sites in 2010."  ONDCP, ADAM II 2010 Annual

15  Report, at 20 (2010), available at http://www.whitehouse.gov/sites/default/files/ondcp/policy-

16  and-research/adam2010.pdf [App. at Tab 6].  In the ten years that ONDCP has been collecting

17  data, "the proportion of arrestees testing positive for marijuana has never been less than 30

18  percent of the sample in any of the current 10 sites."  Id.  Indeed, "[i]n 2010, in 9 of the 10 sites,

19  40 percent or more of the arrestees reported [marijuana] use in the prior 30 days."  Id. at 22.

20       This correlation between marijuana use and crime should be no surprise given the well-

21  documented deleterious effects regular marijuana use has on an individual.  Marijuana use is

22  associated with impaired cognitive functioning, dependence, mental illness, and poor motor

23  performance.  See ONDCP, Fact Sheet: Marijuana Legalization, at 1 (Oct. 2010), available at

24  http://www.whitehouse.gov/sites/default/files/ondcp/Fact_Sheets/marijuana_legalization_fact_sh

25  eet_3-3-11.pdf [App. at Tab 7].  Marijuana intoxication "can cause distorted perceptions,

26  difficulty in thinking and problem solving," and "[s]tudies have shown an association between

27

28

1   chronic marijuana use and increased rates of anxiety, depression, suicidal thoughts, and

2   schizophrenia." Id. at 2; see also National Institute of Drug Abuse, Topics in Brief: Marijuana,

3   at 1 (Dec. 2011), available at https://www.drugabuse.gov/sites/default/files/marijuana_3.pdf

4   [App. at Tab 8] (noting that marijuana can have wide-ranging effects, including impaired short

5   term memory, slowed reaction time and impaired motor coordination, altered judgment and

6   decision-making, and altered mood); id. at 2 ("Population studies reveal an association between

7   cannabis use and increased risk of schizophrenia and, to a lesser extent, depression and

8   anxiety.").

9       The potential risks posed by the firearm possession of someone who uses this mind-

10  altering substance are clear.  Moreover, nothing in these studies indicates that the effects of

11  marijuana that make it dangerous for a user to possess a firearm are somehow mitigated when a

12  doctor has indicated that "use of marijuana may mitigate the symptoms or effects of [a chronic or

13  debilitating medical] condition."  Nev. Rev. Stat. § 453A.210(2)(a)(2).  The documented effects

14  of marijuana use thus corroborate the substantial relationship between § 922(g)(3) and

15  Congress's goal of protecting the public's safety.  See Yancey, 621 F.3d at 685 (recognizing that

16  "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-

17  control, making it dangerous for them to possess deadly firearms.").

18      In addition, the limited temporal reach of § 922(g)(3) helps ensure that it bears a

19  reasonable fit to the ends that it serves.  Unlike most of § 922(g)'s other firearm exclusions,

20  which may operate as lifetime bans, § 922(g)(3) only applies to those who are currently unlawful

21  users.  See 27 C.F.R. § 478.11 (defining "unlawful user" so that any unlawful use must have

22  "occurred recently enough to indicate that the individual is actively engaged in such conduct").

23  Through this feature, "Congress tailored the prohibition to cover only the time period during

24  which it deemed such persons to be dangerous."  Carter, 2012 WL 207067, at *7.  Moreover,

25  § 922(g)(3) "enables a drug user who places a high value on the right to bear arms to regain that

26  right by parting ways with illicit drug use."  Id.  The choice is the user's, and nothing in the

27

28

25

1   Second Amendment "require[s] Congress to allow [the unlawful user] to simultaneously choose

2   both gun possession and drug abuse." Yancey, 621 F.3d at 687.

3          Especially given the "substantial deference" afforded to "predictive judgments" made by

4   Congress in order to advance the nation's interests, Turner Broad. Sys., 512 U.S. at 665, these

5   sources demonstrate that § 922(g)(3), as applied to marijuana users, satisfies intermediate

6   scrutiny.  That Plaintiff has registered to use marijuana for purported medical purposes, as

7   opposed to recreational purposes, does nothing to change the result.  Plaintiff may attempt to

8   argue that § 922(g)(3) is unconstitutional as applied to her because she is a responsible marijuana

9   user who poses no genuine threat to public safety.  But such an argument is clearly precluded by

10  the Supreme Court's recognition in Heller that "some categorical disqualifications are

11  permissible" and that "Congress is not limited to case-by-case exclusions of persons who have

12  been shown to be untrustworthy with weapons."  Skoien, 614 F.3d at 641 (emphasis added); see

13  also Tooley, 717 F. Supp. 2d at 597 ("Section 922(g)(9) is of course overbroad in the sense that

14  not every domestic violence misdemeanant who loses his or her right to keep and bear arms

15  would have misused them against a domestic partner or other family member.  Under

16  intermediate scrutiny, however, the fit does not need to be perfect, but only be reasonably

17  tailored in proportion to the important interest it attempts to further.  As such, intermediate

18  scrutiny tolerates laws that are somewhat overinclusive." (citations omitted)); United States v.

19  Miller, 604 F. Supp. 2d 1162, 1172 (W.D. Tenn. 2009) ("[T]he nature of the threat posed by gun

20  violence makes narrowing the scope of gun regulation impracticable.").  Nor can Plaintiff

21  succeed on a Second Amendment challenge by "disagree[ing] with Congress' policy decision to

22  link the firearms prohibition in § 922(g)(3) to the Controlled Substances Act." Carter, 2012 WL

23  207067, at *8.  As the Fourth Circuit recognized, "[i]n enacting § 922(g)(3), Congress could

24  have chosen to reexamine the foundations of national drug policy and to identify precisely what

25  kinds of drug users ought to be prohibited from possessing firearms.  Instead, it opted, quite

26  reasonably, to connect § 922(g)(3)'s prohibition on the carefully studied and regularly updated

27

28

                                            26

1   list of substances contained in the Controlled Substances Act." Id.  Given that § 922(g)(3)'s

2   means need only be reasonably tailored to its ends, this reasonable legislative judgment is

3   entirely consistent with the Second Amendment.

4        In sum, a variety of sources, including legislative text and history, empirical evidence,

5   case law, and common sense, demonstrate that § 922(g)(3), as applied to marijuana users, is

6   substantially related to the indisputably important government interest in protecting public safety

7   and preventing crime.  It therefore satisfies the requirements of intermediate-scrutiny review,

8   providing yet another reason why Plaintiff's constitutional challenge to § 922(g)(3), as

9   interpreted by ATF, must fail.

10        **B.     As Applied to Plaintiff, 18 U.S.C. § 922(d)(3), as Implemented and
               Interpreted by ATF, Does Not Violate the Second Amendment.**

11

12        Given that § 922(g)(3) is consistent with the Second Amendment, Plaintiff's challenge to

13   § 922(d)(3), as interpreted by ATF in the September 2011 Open Letter, is similarly unavailing.

14   First, it is important to note that § 922(d)(3)'s restriction is directed toward firearm sellers, not

15   the putative purchaser.  Nothing in Heller suggests that individuals have a right to sell firearms;

16   indeed, Heller's language, indicating that "nothing in our opinion should be taken to cast doubt

17   on . . . laws imposing conditions and qualifications on the commercial sale of arms," strongly

18   suggests otherwise.  554 U.S. at 626–27.  Along these lines, only one court to date appears to

19   have considered a Second Amendment challenge to § 922(d)(3), and it found that there was no

20   authority indicating that, "at the time of its ratification, the Second Amendment was understood

21   to protect an individual's right to sell a firearm."  United States v. Chafin, 423 F. App'x 342, 344

22   (4th Cir. Apr. 13, 2011) (unpublished).  Additionally, the right of "law-abiding, responsible

23   citizens to use arms in defense of hearth and home" that is at the "core" of the Second

24   Amendment, Heller, at 634–35, "does not necessarily give rise to a corresponding right to sell a

25   firearm," Chafin, 423 F. App'x at 344; cf. United States v. 12 200-Foot Reels of Super 8 mm.

26   Film, 413 U.S. 123, 128 (1973) ("We have already indicated that the protected right to possess

27

28

1   obscene material in the privacy of one's home does not give rise to a correlative right to have

2   someone sell or give it to others.").

3          This is not to say that restrictions on the sale of firearms can never implicate Second

4   Amendment concerns.  Yet, even assuming that to be the case, § 922(d)(3) still cannot run afoul

5   of the Second Amendment because, for all the reasons discussed above, the unlawful drug users

6   who are precluded from acquiring firearms by the statute's operation may constitutionally be

7   prohibited from possessing firearms.  In other words, given that it is consistent with the Second

8   Amendment for § 922(g)(3) to prohibit unlawful drug users from <u>possessing</u> firearm, § 922(d)(3)

9   cannot violate the Second Amendment simply because it blocks that same group from <u>acquiring</u>

10  firearms.

11         To be sure, in addition to banning the sale of firearms to individuals who are known

12  unlawful drug users, § 922(d)(3) also prohibits the sale of firearms to individuals who the seller

13  has reasonable cause to believe are unlawful drug users, including individuals like Plaintiff who

14  have affirmatively registered to use marijuana.  Nothing in this restriction, however, violates the

15  Second Amendment.  Those who hold state-issued medical marijuana cards are either unlawful

16  drug users or are holding cards that serve them no purpose.  Plaintiff has a choice: she can either

17  retain her Nevada-issued medical marijuana card and forfeit the right to acquire a firearm, or she

18  can refrain from using marijuana, return her card to the State, and regain the right to acquire a

19  firearm.  Given that Plaintiff has chosen to keep her card, it is reasonable to infer that she has

20  done so in order to use marijuana.  Having made that decision, the "Second Amendment . . . does

21  not require Congress to allow [her] to simultaneously choose . . . gun possession." <u>Yancey</u>, 621

22  F.3d at 687.[14]  As a result, Plaintiff has failed to state a Second Amendment claim against either

23  § 922(d)(3) or ATF's interpretation of that provision.

24  _____

25  [14] Indeed, because Plaintiff's inability to acquire a firearm stems from her own decision to retain
    her medical marijuana registry card, any injury she suffers is traceable not to Defendants, but to
    her own decisionmaking, and is therefore insufficient to confer standing to prosecute her claims.

26  <u>See</u> <u>Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales</u>, 468 F.3d 826, 831 (D.C.
    Cir. 2006) ("[S]elf-inflicted harm doesn't satisfy the basic requirements for standing."); <u>Fire</u>

27  <span style="float:right">(<i>Footnote continued on following page.</i>)</span>

28

1    **II.     PLAINTIFF'S RIGHT TO EQUAL PROTECTION HAS NOT BEEN VIOLATED.**

2           The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state

3    shall. . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const.

4    amend. XIV, § 1.  Although this clause expressly applies only to the States, the Supreme Court

5    has found that its protections are encompassed by the Due Process Clause of the Fifth

6    Amendment and therefore apply to the federal government.  Bolling v. Sharpe, 347 U.S. 497

7    (1954).  Count II of the Complaint challenges §§ 922(g)(3) and 922(d)(3), as implemented and

8    interpreted by ATF, under the equal protection component of the Due Process Clause, Compl.

9    ¶¶52–57, but this claim is also without merit.

10          The equal protection component of the Due Process Clause "is essentially a direction that

11   all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr.,

12   Inc., 473 U.S. 432, 439 (1985).  As a result, "[t]o establish an equal protection violation, [the

13   plaintiff] must show that she is being treated differently from similarly situated individuals."

14   Gonzalez-Medina v. Holder, 641 F.3d 333, 336 (9th Cir. 2011).  Plaintiff's equal protection

15   claim appears to be premised on the theory that the United States is treating holders of medical

16   marijuana registry cards differently from other law-abiding citizens.  See Compl. ¶ 3 (alleging

17   that "Defendants have prohibited a certain class of law-abiding, responsible citizens from

18   exercising their right to keep and bear arms"); id. ¶ 4 ("Based on the Defendants' interpretation

19   of Section 922(g)(3) of the federal criminal code, the law prohibits law-abiding adults who have

20   obtained medical marijuana cards pursuant to state law from lawfully purchasing" firearms).

21   Yet, Plaintiff's characterization to the contrary, the class of individuals holding state-issued

22   medical marijuana registry cards is not similarly situated to law-abiding citizens.  It is entirely

23   reasonable for the government to infer that those individuals who have affirmatively registered to

24

25   Equip. Mfrs. Ass'n v. Marshall, 679 F.2d 679, 682 n.5 (7th Cir. 1982) ("[P]etitioners cannot
     allege an injury from one of the options where they can choose another which causes them no
26   injury").

27

28

                                              29

1   use marijuana on the basis of chronic medical conditions are, in fact, marijuana users.  And

2   because all users of marijuana are violating federal law, they are not similarly situated to those

3   citizens who are not violating federal law.  See Marin Alliance for Med. Marijuana v. Holder, __

4   F.2d __, 2011 WL 5914031, at *13 (N.D. Cal. Nov. 28, 2011) (finding that those whose drug use

5   violates the Controlled Substances Act are not similarly situated to those whose use is permitted

6   by that law).  As a result, Plaintiff's Complaint does not allege that she has been "treated

7   differently from similarly situated individuals," Gonzalez-Medina, 641 F.3d at 336, and it

8   therefore fails to state an equal protection claim.

9   **III.   PLAINTIFF MAY NOT PURSUE CLAIMS FOR MONETARY RELIEF AGAINST THE UNITED STATES, ATF, OR THE INDIVIDUAL DEFENDANTS**

10  **IN THEIR OFFICIAL CAPACITIES.**

11          To the extent that Plaintiff asserts claims against the United States for monetary relief,

12  such claims must be dismissed, as the waiver of sovereign immunity claimed by Plaintiff does

13  not apply to actions for money damages.  In seeking monetary relief, Plaintiff does not appear to

14  distinguish between the claims against the individual Defendants in their personal capacities and

15  the claims against the United States, ATF, and the individual Defendants in their official

16  capacities.  See Compl. ¶¶ 50, 56 (alleging that Plaintiff has suffered damages "[a]s a direct and

17  proximate result of the foregoing law, policy, practice and/or procedure, as enacted and

18  promulgated by the Defendants"); ¶ 59 ("The Defendants, and each of them, acted in concert to

19  deprive the Plaintiff of her Second and Fifth Amendment rights . . . ." (emphasis added)); ¶ 60

20  ("As a direct and proximate result of the Defendants' above-described actions, the Plaintiff has

21  suffered and continues to suffer damages . . . .").  Nor does she identify the specific parties from

22  whom she seeks "compensatory and punitive damages" in her prayer for relief.  Id. at 10, ¶ 4.

23          The United States, as a sovereign, is immune from suit unless it has waived its immunity.

24  Dep't of Army v. Blue Fox, Inc., 525 U.S. 255, 260 (1999); Levin v. United States, 663 F.3d

25  1059, 1061 (9th Cir. 2011).  The immunity applies regardless of whether a plaintiff sues the

26  United States, one of its agencies, or one of its officers acting in an official capacity.  See Balser

27

28

                                                        30

1  <u>v. Dep't of Justice, Office of U.S. Tr.</u>, 327 F.3d 903, 907 (9th Cir. 2003) ("In sovereign

2  immunity analysis, any lawsuit against an agency of the United States or against an officer of the

3  United States in his or her official capacity is considered an action against the United States.").

4  In particular, the United States has not waived its sovereign immunity for damages claims based

5  on constitutional violations.  <u>See</u> <u>Dyer v. United States</u>, 166 F. App'x 908, 909 (9th Cir. 2006)

6  ("To the extent [plaintiff] sought damages from the United States for allegedly violating his

7  constitutional rights, his claim was barred by sovereign immunity."); <u>Hamrick v. Brusseau</u>, 80 F.

8  App'x 116, 116 (D.C. Cir. 2003) ("[T]he United States has not waived sovereign immunity with

9  respect to actions for damages based on violations of constitutional rights by federal officials,

10  whether brought against the United States directly . . . or against officers sued in their official

11  capacities . . . .") (internal citations omitted).  "A waiver of the Federal Government's sovereign

12  immunity must be unequivocally expressed in statutory text." <u>Lane v. Peña</u>, 518 U.S. 187, 192

13  (1996).

14      Plaintiff seeks to avail herself of the waiver of sovereign immunity contained in Section

15  702 of the Administrative Procedure Act.  Compl. ¶ 11 (alleging that the United States "is a

16  proper defendant in this action pursuant to 5 U.S.C. § 702").  But this waiver only applies to

17  constitutional claims for non-monetary relief.  <u>See</u> 5 U.S.C. § 702 ("An action in a court of the

18  United States seeking relief <u>other than monetary damages</u> . . ." (emphasis added)); <u>Tucson</u>

19  <u>Airport Auth. v. Gen. Dynamics Corp.</u>, 136 F.3d 641, 645 (9th Cir. 1998) ("By its own terms,

20  § 702 does not apply to claims for 'money damages . . . .'").  Accordingly, all claims seeking

21  monetary relief from the United States, ATF, or the individual defendants in their official

22  capacity must be dismissed.

23  **IV.   PLAINTIFF'S CONSPIRACY CLAIM AGAINST THE UNITED STATES MUST**
24  **BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.**

25      In addition, to the extent that Plaintiff intends to pursue a common-law conspiracy claim

26  against the United States, this Court should dismiss the claim for Plaintiff's failure to exhaust her

27

28

31

1   administrative remedies, as well as under the "due care" exception to the Federal Torts Claim

2   Act's waiver of sovereign immunity.  Plaintiff asserts a claim for "conspiracy" under Nevada tort

3   law.  See Comp. ¶¶ 58-61.  Though Plaintiff's claim is against "all Defendants," only the United

4   States will remain as a party to the conspiracy claim following substitution under the Federal

5   Employees Liability Reform and Tort Compensation Act (the "Westfall Act").  As set forth in

6   the accompanying memorandum by the individual defendants, see Memo of Individual

7   Defendants at 13-14, under the Westfall Act, once the Attorney General or his designee certifies

8   that an employee was acting within the scope of employment when the claim arose, the action

9   against the employee in his or her individual capacity "shall be deemed an action against the

10  United States . . . , and the United States shall be substituted as the party defendant."  28 U.S.C.

11  § 2679(d)(1).  The Attorney General's designee in this case has made this certification.  See Att.

12  A to Memo of Individual Defendants.  Therefore, the only remaining party to Plaintiff's tort

13  claim is the United States.

14       This Court should dismiss the conspiracy claim for lack of subject matter jurisdiction

15  once the United States is substituted as a party. [15]  Under the Federal Torts Claim Act, a plaintiff

16  cannot proceed in tort against the United States without first seeking administrative resolution of

17  the claim.  28 U.S.C. § 2675(a).  The exhaustion requirement of § 2675(a) is a jurisdictional

18  limitation.  See Wilson v. Drake, 87 F.3d 1073, 1076 (9th Cir. 1996).  Here, Plaintiff does not

19  allege that she exhausted her administrative remedies.  Therefore, Plaintiff's conspiracy claim

20  against the United States must be dismissed for lack of subject matter jurisdiction.  Id. (finding

21  jurisdiction lacking where plaintiff failed to exhaust administrative remedies in tort claim against

22  the United States as Westfall Act substitute).  In addition, to the extent that Plaintiff's conspiracy

23  claim challenges the enforcement of 18 U.S.C. §§ 922(d)(3) and (g)(3) and the accompanying

24  provisions of the Code of Federal Regulations, Plaintiff's claim is expressly excluded from

25  ────────────────
    [15] The fact that a claim against the United States must immediately fail following substitution
26  under the Westfall Act does not preclude substitution.  See United States v. Smith, 499 U.S. 160,
    165-66 (1991); Levin v. United States, 663 F.3d 1059, 1064 (9th Cir. 2011).

27

28
                                        32

**42**

1  coverage under the "due care" exception to the FTCA's waiver of sovereign immunity.  See 28

2  U.S.C. 2680(a) (preserving immunity for "[a]ny claim based upon an act or omission of an

3  employee of the Government, exercising due care, in the execution of a statute or regulation,

4  whether or not such statute or regulation be valid").[16]

5  **CONCLUSION**

6  For the reasons stated herein, Plaintiff's Complaint should be dismissed in its entirety or,

7  in the alternative, summary judgment should be entered in the favor the United States on all of

8  Plaintiff's claims.

9  Dated: February 3, 2012                          Respectfully submitted,

10                                                   TONY WEST
                                                     Assistant Attorney General

11
                                                     DANIEL G. BOGDEN
12                                                   United States Attorney

13                                                   SANDRA SCHRAIBMAN
                                                     Assistant Director
14
                                                     _/s/ Alicia N. Ellington_
15                                                   ALICIA N. ELLINGTON
                                                     JOHN K. THEIS
16                                                   Trial Attorneys
                                                     United States Department of Justice
17                                                   Civil Division, Federal Programs Branch
                                                     20 Massachusetts Ave., N.W., Rm. 7226
18

19  [16] Beyond the jurisdictional bar, Plaintiff's claim must fail under Nevada tort law.  In Nevada, a
    conspiracy requires "the commission of an underlying tort."  Boorman v. Nev. Mem'l Cremation
20  Soc'y, Inc., 772 F. Supp. 2d 1309, 1315 (D. Nev. 2011) (citing Jordan v. State ex rel. Dep't of
    Motor Vehicles & Pub. Safety, 110 P.3d 30, 51 (Nev. 2005) (per curiam), abrogated on other
21  grounds by Buzz Stew, LLC v. City of N. Las Vegas, 181 P.3d 670, 672 n.6 (Nev. 2008)).  As
    demonstrated herein, see supra at Argument Parts I-II, and in the individual defendants'
22  memorandum, neither the United States nor any of its employees have committed any actionable
    constitutional tort.  In addition, under Nevada law, a plaintiff must prove "an explicit or tacit
23  agreement between the tortfeasors." Azpilcueta v. State of Nev. ex rel. Transp. Auth., 2010 WL
    2871073, at *3 (D. Nev. 2010) (citing GES, Inc. v. Corbitt, 21 P.3d 11, 15 (Nev. 2001)).  Here,
24  Plaintiff has not alleged any facts to support her conclusory assertion that the Defendants "acted
    in concert to deprive Plaintiff of her [constitutional] rights."  Compl. ¶ 59. The claim fails to rise
25  above mere speculation and accordingly must be dismissed.  See Bell Atlantic Corp. v.
    Twombly, 550 U.S. 544, 555 (2007).

26

27

28
33

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Washington, D.C.  20530
Telephone: (202) 305-8550
Facsimile: (202) 616-8460
Alicia.N.Ellington@usdoj.gov
John.K.Theis@usdoj.gov

*Attorneys for Defendants the United States of America, ATF, U.S. Attorney General Eric Holder, Acting ATF Director B. Todd Jones, and Assistant ATF Director Arthur Herbert,*
*in their official capacities (collectively, the United States)*

34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**PROOF OF SERVICE**</u>

    I, Alicia N. Ellington, Trial Attorney with the United States Department of Justice, certify that the following individuals were served with **THE UNITED STATES' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** on this date by the below identified method of service:

    <u>**Electronic Case Filing**</u>:

Charles C. Rainey
Rainey Devine, Attorneys at Law
2245 W. Horizon Ridge Pkwy., Ste. 110
Henderson, NV 89052
chaz@raineydevine.com

*Attorney for Plaintiff*


Zachary Richter
Trial Attorney, Constitutional Torts Staff
United States Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Zachary.Richter@usdoj.gov

*Attorney for Defendants Eric Holder, B. Todd Jones,*
*and Arthur Herbert in their individual capacities*



DATED this 3rd day of February 2012.

                              */s/ Alicia N. Ellington*
                                ALICIA N. ELLINGTON
                                Trial Attorney
                                United States Department of Justice

1  CHARLES C. RAINEY, ESQ.
   Nevada Bar No. 10723
2  RAINEY  •  DEVINE
   8915 S. Pecos Road, Ste. 20
3  Henderson, Nevada 89052
   Telephone:  (702) 425.5100
4  Facsimile:  (888) 867.5734
   chaz@raineydevine.com
5  *Attorney for Plaintiff*

6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF NEVADA**

8
   S. ROWAN WILSON, an individual,
9                                              Case No.  2:11-cv-1679-GMN-(PAL)
                            Plaintiff,
10
   v.
11
   ERIC HOLDER, Attorney General of the United   **PLAINTIFF'S RESPONSE TO THE UNITED**
12 States, et al.,                               **STATES' MOTION TO DISMISS OR, IN**
                                                 **THE   ALTERNATIVE   FOR   SUMMARY**
13                          Defendants.          **JUDGMENT, AND PLAINTIFF'S CROSS-**
                                                 **MOTION FOR SUMMARY JUDGMENT**
14

15        COMES NOW Plaintiff S. ROWAN WILSON (the "Plaintiff") by and through her counsel

16 Charles C. Rainey of the THE LAW FIRM OF RAINEY DEVINE, and hereby submits her OPPOSITION TO

17 THE  UNITED  STATES'S  MOTION  TO  DISMISS  OR,  IN  THE  ALTERNATIVE,  FOR  SUMMARY

18 JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT. This Opposition and

19 Cross-motion is made and based upon the Memorandum of Points and Authorities attached

20 hereto, the pleadings and papers on file herein, and any arguments to be had at the hearing of

21 this matter.

22 DATED: March 9, 2012.                     Respectfully submitted:

23                                           THE LAW FIRM OF RAINEY DEVINE

                                  By:       /s/ *Chaz Rainey*
24                                          _____
                                            Charles C. Rainey, Esq.
25                                          Nevada Bar No. 10723
                                            8915 South Pecos Road, Ste. 20
26                                          Henderson, Nevada 89052
                                            Telephone:  +1.702.425.5100
27                                          Facsimile:  +1.888.867.5734
                                            chaz@raineydevine.com
28                                          *Attorney for Plaintiff*

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ...................................................................... i

INTRODUCTION ................................................................................ 1

STATEMENT OF FACTS .................................................................... 2

LEGAL STANDARDS .......................................................................... 2

ARGUMENT ....................................................................................... 3

I.     DEFENDANTS HAVE VIOLATED PLAINTIFF'S RIGHT TO DUE PROCESS. ....................... 3

    A.   Defendants Have Violated Plaintiff's Right to Procedural Due Process by Depriving her of a Fundamental Constitutional Right Without Any Notice, Hearing or Opportunity to Comment.................................................. 3

    B.   Defendants Have Violated Plaintiff's Right to Substantive Due Process Because the Government's Interest is Outweighed by the Plaintiff's Right to Treat her Medical Condition in Accordance with her Doctor's Recommendation . ................................................................................ 5

II.   DEFENDANTS HAVE VIOLATED PLAINTIFF'S RIGHT TO EQUAL PROTECTION BY TREATING HER DIFFERENTLY THAN SIMILARY SITUATED INDIVIDUALS................... 8

III.  DEFENDANTS HAVE VIOLATED PLAINTIFF'S SECOND AMENDMENT RIGHTS. ......... 10

    A.   Plaintiff is Not an "Unlawful User" of or "Addicted To" a Controlled Substance Because Congress Did Not Intend to Include Medical Cannabis Patients in those Categories. .......................................... 10

    B.   18 U.S.C. § 922(g)(3) is Unconstitutional. ..................................... 14

         1.   The Ninth Circuit's Opinion in *Dugan* is Wrong and Must be Overturned ........................................................................ 16

         2.   The Constitutionality of 18 U.S.C. § 922(g)(3) Must be Examined Under a Strict Scrutiny Standard Because it Seeks to Deprive Individuals of a Fundamental Constitutional Right ............................ 17

         3.   18 U.S.C. § 922(g)(3) is Unconstitutional, Under a Strict Scrutiny Standard, Because the Law is Not Narrowly Tailored to Satisfy a Compelling Government Interest and the Government has Far Less Restrictive Means of Achieving its Goals. .................................. 19

         4.   Even Under an Intermediate Scrutiny Analysis, 18 U.S.C. § 922(g)(3) is Unconstitutional, Because the Expansive Scope of the Law, Covering More than Half of the U.S. Population, is Not Substantially Related to Any Important Government Interest. .......... 20

    C.   18 U.S.C. § 922(d)(3) is Similarly Unconstitutional Under Both a Strict Scrutiny or Intermediate Scrutiny Analysis.. ................................... 24

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-i-

IV.   PLAINTIFF'S MAIN PURPOSE IN THIS ACTION IS TO PROCURE DECLARATORY AND INJUNCTIVE RELIEF RATHER THAN MONETARY DAMAGES. ........................... 25

CONCLUSION.................................................................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-ii-

**TABLE OF AUTHORITIES**

**U.S. SUPREME COURT CASES**                                                                 PAGE

*Albright v. Oliver*, 510 U.S. 266 (1994) ................................................................. 6

*Armstrong v. Manzo*, 380 U.S. 545 (1965). .......................................................... 4

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986). ...................................... 2

*Bolling v. Sharpe*, 347 U.S. 497 (1954) ................................................................ 8

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985) ......... 8

*Central Hudson Gas v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557(1980) .................... 21

*Clark v. Jeter*, 486 U.S. 456 (1988) ...................................................................... 18

*Consolidated Edison Co. v. Public Service Comm'n of N.Y.*, 447 U.S. 530 (1980). ..................... 21

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ........................................ 6

*Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261 (1990) ......................... 6,7

*Dickerson v. New Banner, Inc.*, 460 U.S. 103 (1983). ....................................... 19

*District of Columbia v. Heller*, 128 S.Ct. 2783 (2008). ........................................ *passim*

*Ex Parte Wall*, 107 U.S. 265 (1883). ..................................................................... 3

*Goldberg v. Kelly*, 397 U.S. 254 (1970). ............................................................... 4

*Gonzalez v. Raich*, 545 U.S. 1 (2005) .................................................................. 12

*Graham v. Richardson Sailer v. Leger*, 403 U.S. 365 (1971) ........................... 18

*Grannis v. Ordean*, 234 U.S. 385 (1914). ............................................................ 4

*Griswold v. Connecticut*, 381 U.S. 479 (1965). ............................................... 5,19

*Huddleston v. United States*, 415 U.S. 814 (1974). .......................................... 11

*Joint Anti-Fascist Refugee Comm. V. McGrath*, 341 U.S. 123 (1951). .................... 3,4

*Kramer v. Union Free School District*, 395 U. S. 621 (1969) ........................... 19

*Lawrence v. Texas*, 539 U.S. 558 (2003). ........................................................... 5,6

*Margan v. United States*, 304 U.S. 1 (1938). ...................................................... 4

*McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010) .................................... 17, 20

*Meyer v. Nebraska*, 262 U.S. 390 (1923). ............................................................ 5

*Mills v. Rogers*, 457 U.S. 291 (1982) ................................................................... 6

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

1    *Nordlinger v. Hahn*, 505 U.S. 1 (1992) ................................................................. 8

2    *Opp Cotton Mills v. Administrator*, 312 U.S. 126 (1941). .................................... 3, 4

3    *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ................................................. 5

4    *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992). .............. 6, 18

5    *Poe v. Ullman*, 367 U.S. 497 (1961) ...................................................................... 6

6    *Robertson v. Baldwin*, 165 U. S. 275 (1897) ..................................................... 17, 18

7    *Roe v. Wade*, 410 U.S. 113 (1973) .................................................................. 18, 19

8    *Schneider v. State*, 308 U.S. 147 (1939). .......................................................... 18

9    *Shelton v. Tucker Carr v. Young*, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). ........... 18

10    *United States v. Oakland Cannabis Buyer's Cooperative*, 532 U.S. 483 (2001) ....................... 12

11    *United States v. Virginia*, 518 U.S. 515 (1996) ..................................................... 18

12    *Wong Yang Sung v. McGrath*, 339 U.S. 33 (1950) ................................................... 4

13    *Youngberg v. Romeo*, 457 U.S. 307 (1982) ......................................................... 6

14    **FEDERAL CIRCUIT COURT CASES**

15    *Association of Nat. Advertisers, Inc. v. Lungren*, 44 F.3d 726 (9th Cir. 1994) .................. 20, 21

16    *Compassion in Dying v. State of Washington*, 79 F.3d 790 (9th Cir. 1996). .................. 6, 15

17    *Coral Const. Co. v. King County*, 941 F.2d 910 (9th Cir. 1991) ............................... 20, 21

18    *Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037 (9th Cir. 2002). .............................. 8

19    *Jacobs v. Clark County School Dist.,* 526 F.3d 419 (9th Cir. 2008). ........................... 21

20    *United States v. Dugan.* 657 F.3d 998 (9th Cir 2011). ....................................... *passim*

21    *United States v. Oakland Cannabis Buyer's Cooperative*, 190 F.3d 1109 (9th Cir. 1999) ........... 12

22    *United States v. Purdy*, 264 F.3d 809 (9th Cir. 2001) ........................................ 11, 12

23    *United States v. Seay*, 620 F.3d 919 (8th Cir 2010) ......................................... 17, 20

24    *United States. v Yancey*, 621 F.3d 681 (7th Cir 2010). ...................................... 17, 20

25    **FEDERAL DISTRICT COURT CASES**

26    *United States v. Williams*, 216 F.Supp.2d 568 (E.D. Va. 2002) ................................. 12

27    **STATE CASES**

28    *Willis v. Winters*, 350 Or. 299, 253 P.3d 1058 (Or. 2011). .................................... 13

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-iv-

**UNITED STATES CONSTITUTION**

U.S. Const. Amend. II ............................................................................................*passim*

U.S. Const. Amend. V ............................................................................................*passim*

U.S. Const. Amend. XIV .........................................................................................*passim*

**STATUTES**

5 U.S.C § 702 ................................................................................................................. 25

18 U.S.C. § 922(g)(3). ............................................................................................*passim*

18 U.S.C. § 922(d)(3). ............................................................................................*passim*

21 U.S.C. § 802(1) ..................................................................................................*passim*

21 U.S.C. § 802(6) ......................................................................................................... 14

21 USC § 812. ................................................................................................................ 15

28 U.S.C. § 2412 ............................................................................................................ 25

**FEDERAL RULES AND REGULATIONS**

27 C.F.R. § 478.11. .................................................................................................. 10, 16

21 C.F.R. §§ 1308.01 – 1308.49. ................................................................................... 15

Fed. R. Civ. Pro. 12(d) ..................................................................................................... 2

Fed. R. Civ. Pro. 12(b)(1). ............................................................................................... 2

Fed. R. Civ. Pro. 12(b)(6) ................................................................................................ 2

Fed. R. Civ. Pro. 56 ......................................................................................................... 2

**LEGISLATIVE MATERIAL**

132 Cong. Rec. H1689-03 (April 9, 1986) ............................................................... 10, 11

Firearms Owners' Protection Act, H.R. Rep. No. 495, 99th Cong., 2d Sess, 1986 ...................... 11

Firearms Owners' Protection Act, Pub. L. 99-308 § 102(6)(B) (H.R. 4332, 99th Congress) ......... 11

S.Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968) ....................................................... 11

U.S. Code Cong. & Admin. News 1968 p. 4410 ............................................................ 11

**MISCELLANEOUS**

16 Legal Medical Marijuana States and DC – Laws, Fees, and Possession Limits
(http://medicalmarijuana.procon.org/view.resource.php?resourceID=000881 ......................... 7

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-v-

18 States with Pending Legislation to Legalize Medical Marijuana (as of Mar. 8, 2012) (http://medicalmarijuana.procon.org/view.resource.php?resourceID=002481) ...................... 7

2010 United States Health Report, as compiled by the National Center for Health Statistics (http://www.cdc.gov/nchs/data/hus/hus10.pdf) ....................................................... 14

American Law Institute Model Penal Code, Commentary (1955) ................................................. 6

FBI Violent Crime Report http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/violent-crime/violent-crime .................................................. 20

"Medical" Marijuana – The Facts (www.justice.gov/dea/ongoing/marinol.html) ...................... 7

Memorandum of Deputy Attorney General David W. Ogden (http://blogs.usdog.gov/archives/192) ......................................................................... 13

National Institute on Alcohol Abuse and Alcoholism No. 38 October 1997, available at http://pubs.niaaa.nih.gov/publications/aa38.htm ................................................................... 21

Order List: 565 U.S. (http://www.supremecourt.gov/orders/courtorders/010912zor.pdf) ..... 13

Types of Illicit Drug Use in Lifetime, Past Year, and Past Month - Table 1.1A, compiled in 2010 by the Substance Abuse and Mental Health Services Administration (http://www.samhsa.gov/data/NSDUH/2k10ResultsTables/Web/HTML/Sect1peTabs1to46.htm#Tab1.1A) ............................................................................................ 14, 15, 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

**INTRODUCTION**

Granting the Defendant's current motion would undermine the fundamental individual liberties guaranteed by the United States Constitution and merely serve to bolster the ignorant misperceptions and prejudices held against medical cannabis patients.

The Defendants admit to deliberately seeking to deprive all medical cannabis patients of their constitutional right to keep and bear arms. The Defendants admit that BATFE issued a letter to each and every federally licensed firearms dealer, specifically banning the sale of firearms to any person possessing a state issued medical marijuana registry card.  This letter was issued without providing any notice to or consultation with medical marijuana patients. The Defendants provided no hearing to adjudicate whether the Plaintiff, or any other medical cannabis patient, was, in fact, an "unlawful user" of a controlled substance.  The Defendants failed to provide any meaningful opportunity for the Plaintiff or any other medical cannabis patent to be heard on the matter.  Instead, the Government simply denied the Plaintiff her constitutional rights.

The Government has taken the untenable position that even within a State like Nevada, where a patient's right to grow and use medical cannabis is guaranteed by the State's Constitution, any law-abiding holder of a state-issued medical marijuana registry card is automatically prohibited from exercising her Second Amendment rights.

The Defendants violated the Plaintiffs right to procedural due process, depriving her of her constitutional rights without any notice, hearing or opportunity to comment. The Defendants violated the Plaintiff's right to equal protection, by treating her and others with certain medical ailments differently than similarly situated persons. The Defendant violated the Plaintiff's Second Amendment rights by wrongfully categorizing her as an "unlawful user" of a controlled substance and refusing her the right to purchase or possess a firearm. Meanwhile, the very law that the Defendants seek to promulgate is itself an unconstitutional abuse of individual rights.

The facts of this case are not in dispute; and the Plaintiff is entitled to judgment as a matter of law.   Therefore, the Plaintiff respectfully requests that this Court DENY the

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-1-

1   Defendants' motion to dismiss, DENY the Defendant's motion for summary judgment, and

2   properly GRANT summary judgment for the Plaintiff.

3                           **STATEMENT OF FACTS**

4        There are no material facts in dispute in this matter. The Defendants' Motion does not

5   dispute any of the factual allegations contained in Plaintiff's Complaint. Instead, the

6   Defendants' Motion only argues the legal conclusions reached in Plaintiff's Complaint. A

7   statement of undisputed facts is filed concurrently herewith.

8                            **LEGAL STANDARDS**

9        The Defendants' Motion purports to be a Motion to Dismiss made pursuant to Federal

10  Rules of Civil Procedure 12(b)(1)[1] and 12(b)(6) and, in the alternative, a Motion for Summary

11  Judgment made pursuant to Federal Rule of Civil Procedure 56. However, Defendants' Motion

12  does not contain a statement of the legal standards applicable to either Rule 12(b) motions to

13  dismiss or Rule 56 motions for summary judgment.

14       Rules 12(b)(1) and 12(b)(6) provide, respectively, that defenses of lack of subject matter

15  jurisdiction and failure to state a claim upon which relief can be granted can be raised by

16  motion before a responsive pleading is filed. Fed. R. Civ. Pro. 12(b). Generally, in considering a

17  Rule 12(b)(6) motion to dismiss, the Court may only look to the face of the plaintiff's complaint

18  and must accept all factual allegations as true and draw all reasonable inferences in favor of

19  plaintiff. "If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to

20  and not excluded by the court, the motion must be treated as one for summary judgment

21  under Rule 56." Fed. R. Civ. Pro. 12(d).

22       Rule 56 provides that "[a] party may move for summary judgment, identifying each

23  claim or defense . . . on which summary judgment is sought." Fed. R. Civ. Pro. 56(a). Rule 56

24  further provides that "[t]he court shall grant summary judgment if the movant shows that there

25  is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

26  of law." *Id*. Material facts are only those facts "that might affect the outcome of the suit under

27  _____

28  [1] The only claim to which Rule 12(b)(1) applies is Plaintiff's conspiracy claim. As will be discussed subsequently,
    Plaintiff will agree to the dismissal of her conspiracy claim.

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-2-

1  the governing law." *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 247, 106 S.Ct. 2505 (1986).

2  Disputes as to non-material facts and disputes as to legal questions cannot preclude summary

3  judgment. *See id*.

4      Here, the Defendants' Motion should be considered as a motion for summary judgment

5  rather than a motion to dismiss because the Defendants rely on matters outside of the

6  Complaint throughout the Motion. These extrinsic matters cannot be separated from the

7  Motion so as to allow the Court to consider the Motion under Rule 12(b). Furthermore, the

8  Defendants Motion does not even attempt to argue that Plaintiff's Complaint is deficient on its

9  face; the Motion only argues that Defendants are entitled to judgment as a matter of law based

10 on previous court decisions. As such, the Defendants' Motion is, for all intents and purposes, a

11 motion for summary judgment and not Rule 12(b)(6).

12                                  **ARGUMENT**

13 I.      **DEFENDANTS VIOLATED PLAINTIFF'S RIGHT TO DUE PROCESS.**

14      The Fifth Amendment of the United States Constitution provides, in relevant part

15 that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law."

16 U.S. Const. Amend. V. Although the Defendants' Motion only addresses the Plaintiff's Equal

17 Protection claims, the Plaintiff's Complaint also sets forth both procedural and substantive due

18 process claims pursuant to the Fifth Amendment.

19           **A. Defendants Have Violated Plaintiff's Right to Procedural Due Process by
             Depriving her of a Fundamental Constitutional Right Without Any Notice,
20           Hearing or Opportunity to Comment.**

21      The United States Constitution requires that whenever a governmental body acts to

22 injure an individual, that act must be consonant with due process of law. The minimum

23 procedural requirements necessary to satisfy due process depend upon the circumstances and

24 the interests of the parties involved. "In all cases, that kind of procedure is due process of law

25 which is suitable and proper to the nature of the case, and sanctioned by the established

26 customs and usages of the courts.'' *Ex Parte Wall*, 107 U.S. 265, 289 (1883).[2]  With respect to

27 _____

28 [2] Justice Frankfurter's concurring opinion in *Joint Anti-Fascist Refugee Comm. V. McGrath*, 341 U.S. 123, 163 (1951), further elaborated upon this understanding as follows:

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-3-

1  action taken by administrative agencies, the Supreme Court has held that notice must be given

2  and a hearing must be held before a final order becomes effective. *Opp Cotton Mills v.*

3  *Administrator*, 312 U.S. 126, 152, 153 (1941).

4        For example, the Supreme Court has held that "due process requires an adequate

5  hearing before termination of welfare benefits." *Goldberg v. Kelly*, 397 U.S. 254, 261 (1970).

6  "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v.*

7  *Ordean*, 234 U.S. 385, 394 (1914). When the Constitution requires a hearing, the hearing must

8  be "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552

9  (1965). Generally, these provisions require that the hearing be held before a tribunal which

10  meets currently prevailing standards of impartiality and a party must be given an opportunity

11  not only to present evidence, but also to know the claims of the opposing party and to meet

12  them. *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950); *see also Goldberg*, 397 U.S. at 267-

13  268. Furthermore, those who are brought into contest with the government in a quasi-judicial

14  proceeding aimed at control of their activities are entitled to be fairly advised of what the

15  government proposes and to be heard upon the proposal before the final command is issued.

16  *Margan v. United States*, 304 U.S. 1, 18-19 (1938).

17        Here, the Defendants have deprived the Plaintiff of a fundamental right without any

18  notice or opportunity to be heard. The Defendants have adopted and are enforcing a policy,

19  through their Open Letter, whereby a distinct group of individuals are automatically precluded

20  from exercising their fundamental rights under the U.S. Constitution based solely upon an FFLs

21  reasonable belief that these persons are exercising their State granted rights. As will be

22  discussed in more detail below, the Supreme Court recently held that the Second Amendment

23  includes a fundamental individual right to possess a handgun in one's home for self-defense.

24  *See District of Columbia v. Heller*, 128 S.Ct. 2783 (2008). The Defendants have conclusively

25

26        "The precise nature of the interest that has been adversely affected, the manner in
   which this was done, the reasons for doing it, the available alternatives to the procedure

27  that was followed, the protection implicit in the office of the functionary whose conduct
   is challenged, the balance of hurt complained of and good accomplished - these are

28  some of the considerations that must enter into the judicial judgment."

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-4-

1  determined that the mere fact that an FFL is aware a "potential transferee is in possession of a

2  card authorizing the possession and use of marijuana under State law, then [the FFL has]

3  'reasonable cause to believe' that the person is an unlawful user of a controlled substance" and

4  **must** deny the transfer of firearms or ammunition to that person. *Open Letter*.

5  However, as will be discussed in more detail subsequently, medical marijuana users

6  do not fit the intended definition of "unlawful users." Here, the Plaintiff obtained a valid state

7  medical marijuana registry card in May of 2011, approximately four months before the

8  Defendants issued their Open Letter. Prior to the issuance of the Open Letter, Plaintiff was not

9  given any opportunity to comment on the policy set forth in the Open Letter. Additionally,

10  Defendants have not even provided a post-termination procedure whereby persons who hold

11  medical marijuana registry cards can argue that they are not "unlawful users of or addicted to"

12  a controlled substance. While the exact number of medical marijuana users is uncertain, it is

13  estimated that roughly 600,000 persons in the U.S. are using medical marijuana in the nine

14  states where registration is mandatory. By virtue of their issuance and enforcement of the

15  policy set forth in the Open Letter, the Defendants have willfully deprived a large class of U.S.

16  citizens, including the Plaintiff, of their fundamental rights in direct violation of the procedural

17  requirements of the Due Process Clause.

18       **B.  Defendants Have Violated Plaintiff's Right to Substantive Due Process Because
          the Government's Interest is Outweighed by the Plaintiff's Right to Treat her
19        Medical Condition in Accordance with her Doctor's Recommendation.**

20  The right to substantive due process concerns the right to "liberty" under the Fifth and

21  Fourteenth Amendments. Essentially, the question of substantive due process asks whether a

22  person is free to engage in certain conduct in the exercise of their liberty under the Due Process

23  Clause. *See Lawrence v. Texas*, 539 U.S. 558, 564 (2003). The broad substantive reach of liberty

24  under the Due Process Clause has been noted in a number of U.S. Supreme Court Cases. *Id.*; *see*

25  *also Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923);

26  and *Griswold v. Connecticut*, 381 U.S. 479 (1965). "[T]he Due Process Clause has a substantive

27  dimension of fundamental significance in defining the rights of the person." *Lawrence*, 539 U.S.

28  at 565. "[T]he full scope of the liberty guaranteed by the Due Process Clause . . . is not a series

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-5-

1  of isolated points. . . . It is a rational continuum which, broadly speaking, includes a freedom

2  from all substantial arbitrary impositions and purposeless restraints." *Albright v. Oliver*, 510 U.S.

3  266, 287 (1994) (concurring opinion), *quoting Poe v. Ullman*, 367 U.S. 497, 543 (1961) (internal

4  quotations omitted).

5       The U.S. Supreme Court has found that:

6       "[Matters] involving the most intimate and personal choices a person
        may make in a lifetime, choices central to personal dignity and
7       autonomy, are central to the liberty protected by the Fourteenth
        Amendment. At the heart of liberty is the right to define one's own
8       concept of existence, of meaning, of the universe, and of the mystery of
        human life. Beliefs about these matters could not define the attributes of
9       personhood were they formed under compulsion of the State."

10  *Lawrence*, 539 U.S. at 574, *quoting Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S.

11  833 (1992). "History and tradition are the starting point but not in all cases the ending point of

12  the substantive due process inquiry." *Id.* at 572, *quoting County of Sacramento v. Lewis*, 523

13  U.S. 833, 857 (1998) (Kennedy, J., concurring). For example, in 1955 the American Law

14  Institute's Model Penal Code made it clear its position that criminal penalties should not be

15  imposed on consensual sexual relations conducted in private. *Id*.  The ALI based its decision on

16  the grounds that: "(1) [t]he prohibitions undermined respect for the law by penalizing conduct

17  many people engaged in; (2) the statutes regulated private conduct not harmful to others; and

18  (3) the laws were arbitrarily enforced and thus invited the danger of blackmail." *Id*. *quoting* ALI,

19  Model Penal Code, Commentary 277-280 (Tent. Draft No. 4, 1955).

20       "In determining whether a substantive right protected by the Due Process Clause has

21  been violated, it is necessary to balance the liberty of the individual and the demands of

22  organized society." *Youngberg v. Romeo*, 457 U.S. 307, 320 (1982) *see also Mills v. Rogers*, 457

23  U.S. 291, 299, (1982). "[T]he ultimate question is whether sufficient justification exists for the

24  intrusion by the government into the realm of a person's 'liberty, dignity, and freedom.'"

25  *Compassion in Dying v. State of Washington*, 79 F.3d 790, 799 (9th Cir. 1996), *quoting Cruzan v.*

26  *Director, Missouri Dept. of Health*, 497 U.S. 261, 287, 289, 110 S.Ct. 2841, 2856, 2857 (1990)

27  (O'Connor, J., concurring). "If the balance favors the state, then the given statute--whether it

28  regulates the exercise of a due process liberty interest or prohibits that exercise to some

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-6-

degree--is constitutional. If the balance favors the individual, then the statute--whatever its justifications--violates the individual's due process liberty rights and must be declared unconstitutional, either on its face or as applied." *Id.*

Here, the Plaintiff has a substantive right to treat her medical condition in the manner recommended by her physician and which she and her physician agree is the beat course of treatment for her. The right to choose a course of medical treatment is one of the most intimate and personal choices a person can make. Furthermore, the ability to choose a course of medical treatment is central to the fundamental rights of personal dignity and autonomy. Although the Defendants will argue that cannabis has no accepted medical value and thus is not a treatment option available to Plaintiff, a majority of states have adopted or are in the process of adopting legislation which recognizes the medicinal values of cannabis and legalizes its use for the treatment of various health conditions. Currently, sixteen (16) states and the District of Columbia have legalized the use of medical cannabis.[3] As of February 13, 2012, an additional eighteen (18) states have pending legislation that would legalize the use of medicinal cannabis.[4] Despite the Defendants' refusal to recognize the medical benefits of cannabis, the growing trend indicates that physicians believe cannabis has medicinal value and the public believes medical cannabis is a viable course of treatment. Even the Drug Enforcement Agency has admitted that the active ingredient in marijuana, THC, is valuable for relieving nausea and vomiting and providing pain management.[5] Marinol, a pharmaceutical derived from cannabis, is available by prescription in the U.S. *Id.* The federal government even assisted in the research on Marinol. Marinol, which has been available since 1985, was originally classified as a Schedule II substance but was moved to Schedule III in 1999. Based upon the FDA and DEA's approval of the use of Marinol, the argument that cannabis has no medical use is without merit. Pursuant to the substantive liberty rights imparted by the Due Process Clause, the Defendants cannot deny the Plaintiff her right to choose a viable course of treatment recommended by her

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

---

[3] *See* 16 Legal Medical Marijuana States and DC – Laws, Fees, and Possession Limits, available at http://medicalmarijuana.procon.org/view.resource.php?resourceID=000881.
[4] *See* 18 States with Pending Legislation to Legalize Medical Marijuana (as of Mar. 8, 2012), available at http://medicalmarijuana.procon.org/view.resource.php?resourceID=002481.
[5] *See* "Medical" Marijuana – The Facts, available at www.justice.gov/dea/ongoing/marinol.html.

1   physician.

2       Additionally, the same factors that militated against the criminalization private

3   consensual sexual conduct of adults support the understanding that a person's fundamental

4   rights should not be deprived based solely upon her use of a medical treatment prescribed by

5   her physician. The policies adopted and implemented by the Defendants, as set forth in their

6   Open Letter undermined respect for the law by penalizing conduct many people engage in. As

7   noted above, it is estimated that roughly 600,000 were using medical marijuana as of January

8   2009. The policies also regulate private conduct not harmful to others. It does not appear that

9   there is any scientific research indicating that persons using medical marijuana are any more

10  likely that non-users to commit any crimes, let alone gun crimes. Indeed, Defendants have cited

11  to no evidence indicating that holders of medical marijuana registry cards are likely to commit

12  the types of crimes the Gun Control Act seeks to prevent or any other crimes for that matter.

13  The Defendants policies are also arbitrarily enforced and thus invited the danger of blackmail,

14  among other things. An organized society does not require that all holders of medical marijuana

15  registry cards be prohibited from purchasing firearms and ammunition. The Defendants have

16  failed to show that sufficient justification exists for the intrusion by the government into the

17  realm of Plaintiff's liberty, dignity, and freedom to follow a course of medical treatment

18  recommended by her physician. As such, the Defendants policies violate the Plaintiff's

19  substantive liberty interests granted by the Due Process Clause of the Fifth Amendment.

20  **II.  DEFENDANTS HAVE VIOLATED PLAINTIFF'S RIGHT TO EQUAL PROTECTION BY
        TREATING HER DIFFERENTLY THAN SIMILARLY SITUATED INDIVIDUALS.**

21      The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person

22  within its jurisdiction the equal protection of the law." This provision of the Fourteenth

23  Amendment has been held by the United States Supreme Court to apply to the federal

24  government by virtue of the Due Process Clause of the Fifth Amendment. *Bolling v. Sharpe*, 347

25  U.S. 497, 74 S.Ct. 693 (1954). The equal protection component of the Due Process Clause "is

26  essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v.*

27  *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause "keeps

28  governmental decision makers from treating differently persons who are in all relevant aspects

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-8-

1  alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see also Honolulu Weekly, Inc. v. Harris*, 298

2  F.3d 1037, 1047 (9th Cir. 2002) ("The Equal Protection Clause directs that all persons similarly

3  circumstanced shall be treated alike.") It does not appear that any federal appellate court has

4  yet determined whether users of drugs which are lawful pursuant to state law but unlawful

5  pursuant to federal law are similarly situated to person who use drugs other than those

6  prohibited by the federal law.

7      Here, Defendants have violated Plaintiff's equal protection rights by treating Plaintiff

8  differently from persons to whom she is similarly situated. The Plaintiff is similarly situated to

9  other law-abiding citizens who are attempting to follow a course of treatment prescribed by

10  their doctors for a chronic medical condition. Defendants attempt to argue that the class of

11  individuals holding state-issued medical marijuana registry cards is not similarly situated to

12  other law abiding citizens because the government may infer that holders of medical marijuana

13  registry cards are "unlawful users of or addicted to" illegal substances. However, persons who

14  obtain a valid state registry card by obtaining a physician's recommendation and use medicinal

15  marijuana solely as recommended by the physician and within the limitations of state law are

16  fundamentally different that other unlawful drug users. Additionally, medical marijuana registry

17  cardholders should be considered as similarly situated to users of the FDA-approved drug

18  Marinol, which contains the same active ingredient as marijuana. It does not appear that the

19  Defendants have issued any letters to FFLs indicating that an awareness that a person is taking

20  Marinol is grounds for the denial of the purchase of a firearm or ammunition.

21      Furthermore, even if medical marijuana registry cardholders are not considered

22  similarly situated to non-registry cardholders because of presumption that registry cardholders

23  are violating federal law, it is undeniable that registry cardholders are similarly situated to

24  persons using medical marijuana in states where registry is not required. Several states, such as

25  California, have provided for the legal use of medicinal marijuana without the necessity of

26  registering with the state or obtaining a state-issued registry identification card. The

27  Defendants' policy set forth in the Open Letter thus discriminates against persons who live in a

28  state that requires a registry identification card because any knowledge of the person's

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-9-

possession of that card can be used as conclusive evidence to deny their attempt to purchase

firearms and/or ammunition. Meanwhile, persons using medical marijuana in a state that does

not issue registry identification cards will avoid the policies set forth in the Open Letter simply

because their state does not issue registry identification cards. As such, the policies adopted

and promulgated by the Defendants, as set forth in the Open Letter, violate the Plaintiff's right

to equal protection.

III.    **DEFENDANTS HAVE VIOLATED PLAINTIFF'S SECOND AMENDMENT RIGHTS.**

        **A.  Plaintiff is Not an "Unlawful User" of or "Addicted To" a Controlled Substance Because Congress Did Not Intend to Include Medical Cannabis Patients in those Categories.**

Persons holding validly issued state registry cards do not fall within the meaning of

"unlawful user of or addicted to" a controlled substance as that phrase was understood by

Congress. The Controlled Substances Act, 21 U.S.C. § 802, defines the term "addict" as "any

individual who habitually uses any narcotic drug so as to endanger the public morals, health,

safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the

power of self-control with reference to his addiction." 21 U.S.C. § 802(1). However, the

Controlled Substances Act does not define the term "unlawful user." *See* 21 U.S.C. § 802. The

ATF has adopted a regulation, codified at 27 C.F.R. § 478.11, which defines the term "unlawful

user" and which also attempts to expand the definition of "addict." However, the text and

context of the statute itself are insufficient to provide the necessary explanation for the term.

As such, it is appropriate to review the legislative history to discern the intent of the legislature.

Nothing in the legislative history of the Controlled Substances Act specifically addresses

whether medical cannabis patients were intended to be considered "unlawful users." However,

the prevention of crime theme that is prevalent in the legislative history of 18 U.S.C. § 922(g)

indicates that Congress did not intend for law-abiding medical cannabis patients to be included

in the definition of "unlawful user." Congress enacted the Gun Control Act in 1968 with the

explicit purpose of "provid[ing] support to Federal, State, and local law enforcement officials in

their fight against crime and violence." The Gun Control Act, Pub.L. 90-618, Sec. 101 (1968).

Specifically, the Act and its subsequent amendments were aimed at combating gun crimes and

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

narcotics trafficking. To achieve this end, Congress intended to prevent drug addicts and other criminals from having access to firearms. *See* e.g. 132 Cong. Rec. H1689-03 (April 9, 1986) ("What the bill will do is make it a little harder for drug addicts, muggers, deranged individuals, and other criminal elements to procure handguns."). Congress has also made it very clear that the purpose of this legislation is not to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms. The Gun Control Act, Pub.L. 90-618, Sec. 101 (1968). As such, an interpretation of 18 U.S.C. § 922(d) and (g) that extends the firearm prohibition to lawful medical cannabis use violates Congressional intent.

"The principal purpose of the federal gun control legislation . . . was to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Huddleston v. United States*, 415 U.S. 814, 824 (1974), quoting S.Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968). U.S. Code Cong. & Admin. News 1968, p. 4410. Prior to amendment in 1986, subsection (g)(3) against possessing firearms or ammunition applied to a person "who is an unlawful user of or addicted to marijuana or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 473(a) of the Internal Revenue Code of 1954." In 1986, the 99th Congress emended the language of subsection (g)(3) as part of the Firearms Owners' Protection Act, Pub.L. 99-308, § 102(6)(B) (H.R. 4332, 99th Congress), removing the provision's direct reference to "marijuana" and made subsection (g)(3) applicable to a person "who is an unlawful user of or addicted to a controlled substance as defined in the Controlled Substances Act." The House Judiciary Committee Report details the purpose of this change. Firearms Owners' Protection Act, H.R. Rep. No. 495, 99th Cong., 2nd Sess, 1986 (Mar. 14, 1986). Congress "modernized" 18 U.S.C. § 922(g) by closing loopholes for users of new drugs that had become prevalent in the 1980s.

Federal courts have not yet ruled on whether a medical marijuana patient may possess a handgun. However, the Ninth Circuit has held that in order to sustain a conviction under 18 U.S.C. § 922(g)(3), the government must prove "that the defendant took drugs with regularity,

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-11-

over an extended period of time, and contemporaneously with his purchase or possession of a firearm." *United States v. Purdy*, 264 F.3d 809, 812-813 (9th Cir. 2001). In *Purdy*, the defendant had used cocaine, non-medicinal marijuana, and methamphetamines over the course of four years and contemporaneously with his possession of a firearm. *Id*. at 810-11.  In *United States v. Williams*, 216 F.Supp.2d 568 (E.D. Va. 2002), the defendant was found to have possessed a firearm after smoking half of a marijuana cigarette, which was also in his possession. The court concluded that Williams was not guilty of violating 18 U.S.C. 922(g) even though he had obviously used a controlled substance at the same time that he had possessed a firearm because the government must prove that a defendant has a pattern of use, continuous use, or prolonged use of a controlled substance while in possession of a firearm. *Id*. at 576. The  court concluded that the government must prove that, while in possession of a firearm, the defendant used narcotics so frequently that his use was an addiction and in such quantities as to lose the power of self-control and pose a danger to the public. *Id*. at 573.

In *Gonzalez v. Raich*, the United States Supreme Court held that application of the Controlled Substances Act's provisions criminalizing the manufacture, distribution, or possession of marijuana to intrastate growers and users of marijuana for medical purposes does not violate the Commerce Clause. 545 U.S. 1, 125 S.Ct. 2195 (2005). As such, *Raich* merely ruled on the narrow issue of whether the federal government had the power to regulate intrastate activity under the Commerce Clause. In *United States v. Oakland Cannabis Buyer's Cooperative*, the Ninth Circuit reversed an injunction of distribution of medical cannabis under the Controlled Substances Act holding that the distributors had a medical necessity defense. 190 F.3d 1109 (1999). Although the Supreme Court ultimately reversed the Ninth Circuit, the concurring opinion points out that "[m]ost notably, whether the defense might be available to a seriously ill patient for whom there is no alternative means of avoiding starvation or extraordinary suffering is a difficult issue that is not presented here." *United States v. Oakland Cannabis Buyer's Cooperative*, 532 U.S. 483, 501 (2001).

Furthermore, the Federal Government has conceded that persons complying with state medical marijuana laws are not "unlawful users" and Defendants are estopped from asserting

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-12-

1   otherwise. On October 19, 2009, United States Deputy Attorney General David W. Ogden issued

2   a memorandum to all United States attorneys in those Federal Districts where the States have

3   enacted medical marijuana laws entitled "Investigations and Prosecutions in States Authorizing

4   the Medical Use of Marijuana."[6] The Ogden memorandum, which was specifically issued to

5   Defendant B. Todd Jones, states in relevant part that the attorneys "should not focus federal

6   resources in [their] States on individuals whose actions are in clear and unambiguous

7   compliance with existing state laws providing for the medical use of marijuana." Subsequently,

8   then Attorney General Ashcroft relied upon the position set forth in the Ogden memorandum

9   to reach a stipulation and dismissal in a case filed by the County of Santa Cruz, California.

10  Having asserted that the federal government would no longer interfere with medical cannabis

11  patients who are in compliance with state medical marijuana laws in that case, the federal

12  government would be estopped from claiming otherwise here.

13      Additionally, the United States Supreme Court recently denied certiorari to the Oregon

14  case of *Willis v. Winters*, 350 Or. 299, 253 P.3d 1058 (Or. 2011). *See* Order List: 565 U.S.[7] In

15  *Willis*, the Oregon Supreme Court found that Oregon sheriffs could not deny concealed

16  handgun permits to medical marijuana users despite 18 U.S.C. § 922. The Supreme Court's

17  decision not to review this decision indicates that the Oregon court's decision and reasoning

18  should stand.

19      The overwhelming majority of the evidence indicates that Plaintiff, as a holder of a

20  medical marijuana registry card issued by her state, is not the type of person intended to be

21  precluded from obtaining a firearm under 18 U.S.C. § 922(g)(3). Plaintiff is not a dangerous

22  criminal, but rather a woman who has suffered from chronic and debilitating pain for the last

23  thirty (30) years. Plaintiff cannot automatically be presumed to be an "unlawful user of or

24  addicted to" a controlled substance. The mere fact that the Plaintiff possesses a state issued

25  marijuana registry card issued by her state does not meet the government's burden of proof for

26  a criminal conviction yet alone a deprivation of her fundamental rights. Even if the Defendants

27

28  [6] Available at http://blogs.usdoj.gov/blog/archives/192.
    [7] Available at (http://www.supremecourt.gov/orders/courtorders/010912zor.pdf)

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

1   met the required level of prove and showed that Plaintiff took illegal drugs with regularity, over

2   an extended period of time, and contemporaneously with her purchase or possession of a

3   firearm, the Defendants should be estopped from asserting their position that her registry card

4   deems her an "unlawful user of or addicted to marijuana" based upon the federal government's

5   affirmation of the Ogden memorandum in a previous case. As such, Plaintiff should not be

6   considered an unlawful user of or addicted to a controlled substance.

7         **B.   18 U.S.C. § 922(g)(3) is Unconstitutional.**

8         18 USC § 922(g)(3) is an exceptionally over-broad statute that, if actually enforced to its

9   full effect, would preclude roughly half of adult-aged US citizens (more than one hundred fifty

10  million people) from possessing, purchasing, transporting or even receiving any firearm or

11  ammunition.[8]  In effect, the law, if fully enforced, would deprive more than half of our adult-

12  aged citizens of their fundamental constitutional right to keep and bear arms.    The

13  extraordinary breadth of this law renders it unenforceable and wholly unconstitutional.

14        18 USC § 922(g)(3) reads as follows:

15              (g) It shall be unlawful for any person—
                [...]
16                      (3) who is an unlawful user of or addicted to any
                        controlled substance (as defined in section 102 of the
17                      Controlled Substances Act (21 USC § 802));
                [...]
18              to ship or transport in interstate or foreign commerce, or possess
                in or affecting commerce, any firearm or ammunition; or to
19              receive any firearm or ammunition which has been shipped or
                transported in interstate or foreign commerce.
20
        Meanwhile, 21 USC § 802(6), the law defining "controlled substances," reads as follows:
21
                The term "controlled substance" means a drug or other
22              substance, or immediate precursor, included in schedule I, II, III,
                IV, or V of part B of this subchapter. The term does not include
23              distilled spirits, wine, malt beverages, or tobacco, as those terms

24
_____

25  [8] *See* TABLE 1.1A – TYPES OF ILLICIT DRUG USE IN LIFETIME, PAST YEAR, AND PAST MONTH, compiled in 2010 by the Substance
    Abuse and Mental Health Services Administration, available at:
26  http://www.samhsa.gov/data/NSDUH/2k10ResultsTables/Web/HTML/Sect1peTabs1to46.htm#Tab1.1A
    *See* (states that 38,806,000 Americans had taken illicit drugs within the last twelve months and 119,508,000
27  Americans had taken illicit drugs within the last twelve months); *see also* 2010 UNITED STATES HEALTH REPORT, as
    compiled by the National Center for Health Statistics, available at http://www.cdc.gov/nchs/data/hus/hus10.pdf
28  (reporting that nearly half of all persons within the United States have taken prescription drugs within the last 30
    days).

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-14-

are defined or used in subtitle E of the Internal Revenue Code of 1986.

Accordingly, under 18 USC § 922(g)(3), any person that is an "unlawful user of or addicted to" any drug within Schedules I, II, III, IV or V is prohibited from exercising his/her Second Amendment rights. Those schedules encompass not only illegal narcotics, but also ANY prescription drug and even some over the counter medicines, such as Robitussin. *See* 21 USC § 812; *see also* 21 CFR §§ 1308.01 – 1308.49.

The phrase "unlawful user of or addicted to" is disturbingly broad and fails to state with reasonable particularity the specific group of persons targeted.  If carried to its extreme, the phrase could include roughly half of the US population.  Even if narrowly read, the category of person includes, at the very least, thirty-eight million people,[9] more than twelve percent of the total United States population.

Moreover, the statutory definition of "addict," already broadly drawn under 21 USC § 802(1), is stretched to its absolute limits through ATF regulation.  Under 21 USC § 802(1), the term "addict" is defined as any individual who either (1) habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or (2) who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction. Notice that the second category of "addict" is actually quite broad and could even include persons addicted to lawfully prescribed medicines.  For instance, a person taking Ritalin to treat his/her Attention Deficit Disorder would likely fall within this category.  Ritalin is a physically addictive substance that may be prescribed for daily ongoing use.[10]  If taken for a prolonged period of time, the physical addiction to Ritalin could be such that the person taking the drug is no longer able to control the addiction, thereby falling within the second category of addict, defined under 21 USC § 802(1).  As evidenced by the Ritalin example above, this definition of "addict" can be very broadly interpreted to include many tens of millions of Americans who lawfully take prescribed pharmaceuticals.

---

[9] *Id.*

[10] Methylphenidate, the systematic name for Ritalin, is a Schedule II controlled substance, due to its high likelihood for addictive potential. *See* 21 CFR §§ 1308; Data reported by the DEA, and collected by IMS Health (a national prescription auditing firm) shows that as of 2000, doctors in the United States were writing approximately 11 million prescriptions for Ritalin annually.

-15-

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

Surprisingly, the ATF's regulations employ this much broader definition of addiction from § 802(1), then go even further to deliberately push the interpretation of the definition as far as it can go.  Under 27 C.F.R. § 478.11, the term "[u]nlawful user of or addicted to any controlled substance" is defined as follows:

> A person who uses a controlled substance and has lost the power of self-control with reference to the use of the controlled substance; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician. Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct. A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm. An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time [...].

In the following pages, the Plaintiff will provide the analysis necessary to demonstrate that the expansive scope of 18 U.S.C. § 922(g)(3) renders it unenforceable and unconstitutional. First, the Plaintiff will highlight the deeply flawed aspects of *United States v. Dugan*, the case principally relied on by the Defendants.  Second, the Plaintiff will show how existing Supreme Court case law requires that § 922(g)(3) be analyzed under a strict scrutiny analysis.  Then, in applying that strict scrutiny analysis, the Plaintiff will demonstrate how the subject law falls far short of being constitutional.    Finally, the Plaintiff will demonstrate how, even if this Court were to apply the lesser intermediate scrutiny, § 922(g)(3) still fails to pass constitutional muster.

   **1.   The Ninth Circuit's Opinion in *Dugan* is Wrong and Must be Overturned.**

In seeking to validate the constitutionality of § 922(g)(3), the Defendants rely heavily, almost exclusively, upon the Ninth Circuit case *United States v. Dugan*.  657 F.3d 998 (9th Cir 2011). However, *Dugan* is a deeply flawed opinion that must be overturned.  Consisting of just four short paragraphs, *Dugan* makes the sweeping assertion that § 922(g)(3) is constitutional, without even bothering to examine the law under a strict scrutiny, intermediate scrutiny or even rational basis analysis. Indeed, *Dugan* provides no substantive analysis of the law's

RAINEY   •   DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

constitutionality and appears to base its entire decision upon two similarly brief and similarly flawed opinions from sister circuit courts.[11]

Meanwhile, the facts of *Dugan* are so prejudicial that they fail to provide a proper framework for analyzing the constitutionality of § 922(g)(3).  In *Dugan,* the party challenging the law's constitutionality, Kevin Dugan, was arrested during a domestic violence complaint, when officers discovered an illegal marijuana "operation" in Mr. Dugan's home.  Mr. Dugan was the very sort of person that  § 922(g)(3) was designed for—a dangerous criminal.  Based on the facts represented in the *Dugan* opinion, Kevin Dugan was possibly a wife beating, drug dealing, drug using, arms dealer.  As the old saying goes: "Bad facts make bad law."

Indeed, § 922(g)(3) doesn't just affect the rights of the Kevin Dugans of this world; this law threatens the fundamental constitutional rights of nearly half of the U.S. population.[12] Even though § 922(g)(3) is intended to keep guns out of the hands of a small subset of the population, the law radically over-reaches such that it poses a substantial threat to any person who is a chronic user of any drug, from marijuana to Robitussin, a group of people that constitute anywhere from twelve percent (12%) to fifty percent (50%) of the total U.S. population. For the foregoing reasons, the *Dugan* Opinion is simply wrong and MUST be overturned.[13]

> **2.   The Constitutionality of 18 U.S.C. § 922(g)(3) Must be Examined Under a Strict Scrutiny Standard Because it Seeks to Deprive Individuals of a Fundamental Constitutional Right.**

In *DC v. Heller*, the Supreme Court finally made clear that the Second Amendment is a "fundamental" individual right. *District of Columbia v. Heller,* 554 US 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).[14]  Recently considering the applicability of the Second Amendment to the States, the Supreme Court reiterated this notion in *McDonald v. City of Chicago*, where it stated

---

[11] *Dugan* cites to only two cases in support of its proposition that 922(g)(3) is constitutional, *U.S v. Seay*, 620 F.3d 919 (8th Cir 2010), and *U.S. v Yancey*, 621 F.3d 681 (7th Cir 2010).

[12] *Supra* note 8.

[13] The Plaintiff acknowledges and understands that, in accordance with the principle of *stare decisis*, this Court is somewhat limited in its ability to overturn *Dugan*.  Nevertheless, in the event of any appeal of this matter, the Plaintiff will be seeking to overturn the *Dugan* decision.

[14] Specifically, the Court stated that "By the time of the founding [of the United States], the right to have arms had become fundamental for English subjects" then further states that the Second Amendment was "a codified right 'inherited from our English ancestors,'" 128 S. Ct. 2783  (*quoting  Robertson v. Baldwin*, 165 U. S. 275, 281 (1897)).

RAINEY   •   DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

"[i]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those <u>fundamental</u> rights necessary to our system of ordered liberty." 130 S.Ct. 3020, 3042 (2010) (*emphasis added*).

Although the *Heller* court failed to state the specific standard of analysis, prior Court precedent makes clear that where the government seeks to deprive individuals of a fundamental right, as is the case with § 922 (g)(3), the constitutionality of the law must be examined under a strict scrutiny analysis, ensuring that the law is narrowly tailored to effectuate a compelling government interest and that no less restrictive means exists. *See e.g.*, *Graham v. Richardson Sailer v. Leger*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Clark v. Jeter*, 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988); *United States v. Virginia*, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (*Scalia dissenting* notes that "strict scrutiny will be applied to the deprivation of whatever sort of right we consider 'fundamental.'"). "Even though the governmental purpose [may] be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker Carr v. Young*, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). "Where legislative abridgment of 'fundamental personal rights and liberties' is asserted, 'the courts should be astute to examine the effect of the challenged legislation." *Id.* (*quoting Schneider v. State*, 308 U.S. 147, 161, 60 S.Ct. 146, 151 (1939). "Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions.'" *Schneider*, 308 U.S. at 161.

Here, 18 USC § 922(g)(3) seeks to deprive individuals of their Second Amendment right to keep and bear arms. This federal criminal statute renders it a crime for any person that is an "unlawful user of or addicted to" a "controlled substance" to possess a firearm.  It is a direct attack on a fundamental constitutional right.  As such, the law's constitutionality must be examined under a strict scrutiny standard.

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-18-

**3. 18 U.S.C. § 922(g)(3) is Unconstitutional, Under a Strict Scrutiny Standard, Because the Law is Not Narrowly Tailored to Satisfy a Compelling Government Interest and the Government has Far Less Restrictive Means of Achieving its Goals.**

18 USC § 922(g)(3) plainly fails to survive a strict scrutiny analysis.  To survive a strict scrutiny analysis, the law must:

(1) further a compelling government interest;

(2) be narrowly tailored to achieve that compelling government interest; and

(3) be the least restrictive means for achieving that compelling government interest.

*See e.g. Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Kramer v. Union Free School District*, 395 U. S. 621, 395 U. S. 627 (1969); *Griswold v. Connecticut*, 381 U.S. at 381 U. S. 485 (1965).

Section 922(d)(3) fails on prongs two and three of the above-cited test: the law is not narrowly tailored to achieve the intended government interest, nor is it the least restrictive means of achieving the intended government interest.

As noted by the Defendants, in their most recent Motion, § 922(d)(3) was drafted with the intent of keeping firearms "out of the hands of presumptively risky people." DEF MOTION TO DISMISS, p. 3, line 24 (*quoting Dickerson v. New Banner, Inc.,* 460 U.S. 103, 112, n. 6 (1983).  At the heart of § 922(g)(3) is a desire to keep firearms out of the hands of dangerous individuals – individuals that might use guns in a dangerous manner that could harm others.  However, in its attempt to deter firearm possession amongst dangerous persons, § 922(g)(3) takes a scorched earth approach, seeking to deprive Second Amendment rights to a phenomenally large contingent of the American population.

18 USC § 922(g)(3) is just too impossibly broad to survive strict scrutiny (or intermediate scrutiny for that matter).  The law aims to deprive tens of millions of people of their constitutional right to keep and bear arms, just to target an infinitesimal subset of potentially dangerous individuals.  Even if § 922(g)(3) was solely concerned with illicit substance abuse (which it is not) and even if we were to assume that every single person who committed a violent crime within the last year was an illicit substance abuser (which is a quantum leap of an

-19-

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

1    assumption), the violent persons targeted by § 922(g)(3) would <u>still</u> only account for 3.2% of the

2    total people affected by § 922(g)(3).[15]   This is like leveling the entire rainforest just to take

3    down a single tree.

4            This law seeks to deprive an extraordinary number of people of their fundamental

5    constitutional rights, without the remotest attempt at narrowly tailoring the scope of its

6    impact.  As evidenced by the statistical analysis provided above and further supported by the

7    accompanying footnote, a basic examination of drug use and violent crime in this country

8    shows that this law attacks the constitutional rights of more than thirty times the number of

9    people that it is intended to affect. This law is flawed at its very core and must be declared

10   unconstitutional.

11                    **4.    Even Under an Intermediate Scrutiny Analysis, 18 U.S.C. § 922(g)(3) is
                            Unconstitutional Because the Expansive Scope of the Law, Covering**
12                        **More than Half of the U.S. Population, is Not Substantially Related to
                            Any Important Government Interest.**
13

14           Even though the United States Supreme Court has made it clear in its opinions from

15   *Heller* and *McDonald* that the Second Amendment is a "fundamental" individual right, some

16   Circuit Courts have erroneously sought to apply an intermediate scrutiny standard in their

17   examinations of the constitutionality of § 922(g)(3). *See U.S v. Seay*, 620 F.3d 919 (8th Cir 2010);

18   *U.S. v Yancey*, 621 F.3d 681 (7th Cir 2010).   While the fundamental nature of Second

19   Amendment Rights calls for and requires a strict scrutiny analysis, even when properly analyzed

20   under intermediate scrutiny, the law fails to pass constitutional muster.

21           To overcome intermediate scrutiny, the asserted governmental interest must be

22   "substantial," rather than "compelling," and the regulation adopted must "be a direct,

23   substantial relationship between the objective and the means chosen to accomplish the

24   

25   [15] This statistic is based on a combination of two statistical sources.  First, and as noted earlier, the Substance
     Abuse and Mental Health Services Administration calculates that 38,806,000 Americans had taken illicit drugs

26   within the last twelve months. *Supra* at note 20. Second, statistics compiled by the Federal Bureau of Investigation
     estimate that in that same year there were approximately 1,240,000 instances of violent crime. *See* CRIME IN THE

27   UNITED STATES, available at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-
     2010/violent-crime/violent-crime.   Taken together, if we assume that each instance of violent crime was

28   committed by a separate and distinct individual, and that each and every violent assailant was an illicit drug user,
     then only 3.2% of illicit drug users account for all violent crimes committed in the United States.

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-20-

objective." *Coral Const. Co. v. King County*, 941 F.2d 910 (9th Cir. 1991); *See also Association of Nat. Advertisers, Inc. v. Lungren*, 44 F.3d 726, 729 (9th Cir. 1994) (*citing Central Hudson Gas v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980); *Consolidated Edison Co. v. Public Service Comm'n of N.Y.,* 447 U.S. 530, 540, 100 S.Ct. 2326, 2334-35, 65 L.Ed.2d 319 (1980).   As noted by the Ninth Circuit, "[i]ntermediate scrutiny's precise contours vary slightly depending upon which constitutional right is at issue." *Jacobs v. Clark County School Dist.,* 526 F.3d 419, fn 23 (9th Cir. 2008).   Neither the Ninth Circuit, nor the Supreme Court has set down a system of intermediate scrutiny as applied to Second Amendment issues.

Here, the Plaintiff does not argue or even question whether § 922(g)(3) is intended to further a "substantial" government interest.  As previously noted, the underlying purpose of § 922(g)(3) is to keep firearms out of the hands of potentially dangerous people.  This underlying goal is perfectly valid and addresses a genuine policy concern. However, due to the extraordinary breadth and scope of § 922(g)(3), the law fails to provide a direct, substantial relationship between the law's objective and the means chosen to accomplish that objective.

As noted earlier, § 922(g)(3) takes a scorched earth approach, seeking to deprive huge swaths of the American populace of their Second Amendment rights in an over zealous attempt to curtail gun ownership amongst a much smaller subset of individuals.  The overwhelming impact of the law falls on the shoulders of non-violent, harmless individuals, depriving those individuals of a fundamental constitutional right to keep and bear arms.  The law does not merely apply to thieving, violent scoundrels.  As written, § 922(g)(3) prohibits the sick, the elderly[16], and millions others.

Meanwhile, the law allows a specific exception for alcohol abuse.  Curiously, alcoholism, a condition that is widely known to increase aggression and violent tendencies[17] is exempted from prosecution under § 922(g)(3).  If the law were truly constructed for the purpose of

---

[16] *See supra* note 8 (90.1% of persons over the age of 65 report having taken prescription medications within the last thirty days).

[17] *See* NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM NO. 38 OCTOBER 1997, available at http://pubs.niaaa.nih.gov/publications/aa38.htm

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

curtailing the ownership of firearms amongst potentially violent people, then why would it provide a specific exclusion for alcoholics?  In a 1997 report from the National Institute of Health, it was noted that, as a direct effect of the consumption of alcohol, "[a]lcohol may encourage aggression or violence by disrupting normal brain function."[18]  Nevertheless, § 922(g)(3), a law allegedly designed to keep firearms out of the hands of potentially dangerous people makes no attempt to keep guns from alcoholics.

Meanwhile, there is no viable evidence to suggest that marijuana use is correlated with violent crime (or any other crime beyond illegal drug use). While the Government makes a feeble attempt to tie drug use to criminal behavior, the statistics that the Government points to fail to take into account the large number of non-criminal drug users.  The statistics cited by the Government merely analyze the number of prison inmates who admit to having been on narcotic substances at the time of arrest.  However, those individuals account for a miniscule fraction of the total number of drug users in the United States.

At the end of 2010, state and federal prison populations totaled 1,518,104. Correctional Population in the United States, 2011. Bureau of Justice Statistics. This figure equals approximately 0.5% of the U.S. population. *Id.*; 2010 Census. Federal prisons housed 206,968 prisoners while state prisons housed 1,311,136. The 2004 DOJ study relied upon by Defendants indicates that 32% of state prisoners and 26% of federal prisoners committed their current offense while under the influence of drugs.[19] However, only 15% of state prisoners and 14% of federal prisoners used marijuana at the time of their offense.[20] Thus, approximately 196,670 state inmates and 28,975 federal inmates committed their crimes while using marijuana.  This equates to approximately 0.07% of the U.S. population having committed a crime while under the influence of marijuana. When this number is compared with the total number of Americans who report using marijuana, it is clear that marijuana use has no causal link to crime. Approximately 106,232,000 Americans (or 34.4% of the total U.S. population) report having

---

[18] *Id.*
[19] *See* http://bjs.ojp.usdoj.gov/content/dcf/duc.cfm.
[20] *Id.*

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

using marijuana in their lifetime.[21] Approximately 17,373,000 Americans (or 5.6% of the total U.S. population) report having used marijuana in the past month. Thus, the number of incarcerated persons who were using marijuana at the time of their crime equals only 0.2% of all persons who have used marijuana and 1.2% of all persons who are habitual users of marijuana.

Additionally, the 2004 DOJ study reports that violent offenders were less likely than other offenders to have used drugs in the month prior to their offense.[22] The report states "Violent offenders in State prison (50%) were less likely than drug (72%) and property (64%) offenders to have used drugs in the month prior to their offense." *Id* at p. 1.

The Defendants also rely on a 2010 report by the Office of National Drug Control Policy. However, this report is not a good indicator of any supposed link between marijuana and crime because it only reports incidents of marijuana use in males arrested in 10 cities. Additionally, the ONDCP is not an independent research organization but rather a cabinet level component of the Executive Office with the stated objective of eradicating drug use. As such, any studies conducted by the ONDCP are inherently biased.

There is no viable link between the use of cannabis and violent behavior; meanwhile, there is clear and well-established evidence that alcohol is directly linked with violent behavior. Nevertheless, 18 USC § 922(g)(3) arbitrarily precludes users of cannabis (or any other controlled substance for that matter) from exercising their fundamental constitutional rights. Section 922(g)(3) does not provide a direct, substantial relationship between the law's objective and the means chosen to accomplish the objective.   As such, the law must be declared unconstitutional.

/ / /

/ / /

/ / /

/ / /

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

---

[21] *See* http://www.samhsa.gov/data/NSDUH/2k10ResultsTables/Web/HTML/Sect1peTabs1to46.htm#Tab1.1A.
[22] *See* http://bjs.ojp.usdoj.gov/content/pub/pdf/dudsfp04.pdf.

-23-

**C. 18 U.S.C. § 922(d)(3) is Similarly Unconstitutional Under Both a Strict Scrutiny or Intermediate Scrutiny Analysis.**

18 USC § 922(d)(3), drafted as a counterpart to 18 USC § 922(g)(3), is similarly unconstitutional under both a strict and intermediate scrutiny analysis, since § 922(d)(3) is neither narrowly tailed to effect a compelling government interest, nor directly related to a substantial government interest.

18 USC § 922(d)(3) reads as follows:

> (d) It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person—
> [...]
> (3) is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))

Much of the analysis devoted to § 922(g)(3) can be equally applied to § 922(d)(3), since the provisions virtually mirror each other.  However, there is another distinct consideration with § 922(d)(3) – the law places an exceptional burden and liability upon firearms sellers. Unlike a ban on the sale of firearms to felons, this ban is generally difficult, if not impossible to police.   A simple background check will typically reveal whether a person is a convicted felon. However, the standard imposed by § 922(d)(3), if effectively policed, would require gun sellers to conduct an extensive investigation of the private behaviors and habits of their customers (an investigation that might itself violate the privacy protections of the Constitution).

Meanwhile, the law raises a multitude of nearly unanswerable questions: To what extent is the seller required to investigate the drug habits of the buyer? If the seller knows that the buyer once took an illicit substance, is that a complete bar to any sale of a firearm?  What if the instance of substance abuse was a year ago?  What if it was six months ago?  How long ago must the drug use be in order to allow the sale of a firearm?  What if the buyer only smoked marijuana once at a party?  What if the party was last week?  What if the buyer is a recovered drug addict, who has relapsed numerous times?  What if the last relapse was a year ago?  What if the last relapse was ten years ago?  Where do we draw the line?

This law is untenable, unenforceable, unconstitutional and utterly unrealistic.

/ / /

RAINEY   •   DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

1

**IV.    PLAINTIFF'S PRIMARY PURPOSE IN THIS ACTION IS TO PROCURE DECLARATORY AND INJUNCTIVE RELIEF RATHER THAN MONETARY DAMAGES.**

As noted above, Plaintiff has voluntarily dismissed her claims against the Defendants in their individual capacities. Plaintiff does not dispute that 5 U.S.C § 702 does not provide for monetary damages against the United States, the ATF or the individual Defendants in their official capacities. The primary purpose of Plaintiff's Complaint is, and has always been, to obtain declaratory and injunctive relief against the Defendants. To the extent that the Prayer for Relief contained in Plaintiff's Complaint seeks monetary damages, Plaintiff agrees that 5 U.S.C § 702 does not provide for such damages. Further, based upon the Plaintiff's prior dismissal of the Defendants in their individual capacities, the Plaintiff does not object to the dismissal of her conspiracy claim. Notwithstanding the foregoing, Plaintiff does not waive her right to pursue various fees and costs associated with pursuing this case as provided for in 28 U.S.C. § 2412 and similar statutes.

**CONCLUSION**

As set forth above, there are no disputed material facts in this matter. Based upon the authorities set forth herein, Plaintiff is entitled to summary judgment on her claims for violations of the Second and Fifth Amendment against the Defendants. Plaintiff respectfully requests that Defendants' Motion be DENIED as to the Plaintiff's Second and Fifth Amendment claims and that summary judgment be GRANTED in Plaintiff's favor as to these claims.

Dated this 9th day of March 2012.

Respectfully Submitted by:

RAINEY DEVINE, ATTORNEYS AT LAW

By:    /s/ Chaz Rainey
Charles C. Rainey, Esq.
Nevada Bar No. 10723
2445 W. Horizon Ridge Pkwy, Ste. 110
Henderson, Nevada 89052
Telephone: +1.702.425.5100
Facsimile: +1.888.867.5734
*Attorney for Plaintiff*

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-25-

1          **PROOF OF SERVICE**

2          I, Jennifer J. Hurley, an employee of The Law Firm of Rainey Devine, certify that the

3   following individuals were served with PLAINTIFF'S RESPONSE TO THE UNITED STATES' MOTION

4   TO DISMISS OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT, AND PLAINTIFF'S CROSS-

5   MOTION FOR SUMMARY JUDGMENT, on this date by the below identified method of service:

6          **Electronic Case Filing**

7          TONY WEST
           DANIEL G. BOGDEN
8          SANDRA SCHRAIBMAN
           ALICIA N. ELLINGTON
9          JOHN K. THEIS
           Trial Attorneys, Federal Programs Branch
10         United States Department of Justice, Civil Division
           20 Massachusetts Ave, N.W. Rm 7226
11         Washington, DC 20530

12         Zachary Richter
           Trial Attorney, Constitutional Torts Staff
13         United States Department of Justice, Civil Division
           P.O. Box 7146, Ben Franklin Station
14         Washington, DC 20044

15

16  DATED this 9th day of March 2012.

17

18                            /s/Jennifer J. Hurley
                              An employee of The Law Firm of Rainey Devine.

19

20

21

22

23

24

25

26

27

28

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-26-

STUART F. DELERY
Acting Assistant Attorney General

DANIEL G. BOGDEN
United States Attorney

SANDRA M. SCHRAIBMAN
Assistant Director, Federal Programs Branch

JOHN K. THEIS
Trial Attorney, Federal Programs Branch
United States Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Rm. 6701
Washington, D.C.  20530
Telephone: (202) 305-7632
Facsimile: (202) 616-8460
John.K.Theis@usdoj.gov

*Attorneys for Defendants the United States of America,
ATF, U.S. Attorney General Eric Holder,
Acting ATF Director B. Todd Jones, and
Assistant ATF Director Arthur Herbert,
in their official capacities (collectively, the United States)*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| S. ROWAN WILSON, | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 2:11-CV-1679-GMN-(PAL) |
| ERIC HOLDER, Attorney General of the United States et al., | ) |
| Defendants. | ) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**(HEARING REQUESTED)**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................2

  I.    DEFENDANTS HAVE MOVED TO DISMISS UNDER RULE 12(b)(6),
      OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT. .........................3

  II.   PLAINTIFF HAS NOT ESTABLISHED A SECOND AMENDMENT
      VIOLATION..............................................................................................4

      A.    <u>United States v. Dugan</u>, Which Is Controlling, Requires Dismissal of
           Plaintiff's Second Amendment Claim. ...................................................4

      B.    Unlawful Drug Users, Including Those Who Comply with State Medical
           Marijuana Laws, Fall Outside the Scope of the Second Amendment .........5

           1.    Federal Law Does Not Recognize "Law-Abiding" Users of
                Marijuana, and § 922(g)(3) Plainly Prohibits Use of
                Marijuana for "Medical Purposes." ...................................................7

           2.    The Ogden Memo Does Not Estop the Government from
                Treating Medical Marijuana Users as Violators of Federal Law.....9

      C.    Under an Independent Constitutional Analysis, Section 922(g)(3)
           Survives the Appropriate Level of Scrutiny. ............................................12

           1.    No More than Intermediate Scrutiny Should Apply. ...................12

           2.    Section 922(g)(3) Substantially Relates to the Important
                 Government Interest in Protecting Public Safety and
                 Combating Violent Crime.................................................................13

  III.  SECTION 922(d)(3), AS APPLIED TO PLAINTIFF, DOES NOT
      VIOLATE THE SECOND AMENDMENT .........................................................17

  IV.  PLAINTIFF'S EQUAL PROTECTION CLAIM MUST FAIL............................17

  V.   DEFENDANTS HAVE NOT VIOLATED PLAINTIFF'S RIGHT TO
      SUBSTANTIVE OR PROCEDURAL DUE PROCESS. ....................................20

      A.    There is No Substantive Due Process Right to Use Marijuana for
           Medical Purposes.................................................................................20

      B.    Plaintiff's Procedural Due Process "Claim" Must Fail, as She Has Not
           Been Deprived of a Constitutionally-Protected Liberty or Property
           Interest................................................................................................22

  VI.  PLAINTIFF'S CONSPIRACY AND DAMAGES CLAIMS SHOULD BE
      DISMISSED ....................................................................................................23

CONCLUSION.........................................................................................................24

i

1
2

## TABLE OF AUTHORITIES

### CASES

3

Albright v. Oliver,
   510 U.S. 266 (1994) ...........................................................................................20

4
5

Alt. Cmty. Health Care Coop., Inc. v. Holder,
   No. 11cv2585-DMS (BGS), 2012 WL 707154 (S.D. Cal. March 5, 2012) ...........17

6

Am. Rivers v. FERC,
   201 F.3d 1186 (9th Cir. 1999) ...............................................................................8

7

Ashcroft v. Iqbal,
   556 U.S. 662, 129 S. Ct. 1937 (2009) ....................................................................3

8
9

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007) ...............................................................................................3

10

Broam v. Bogan,
   320 F.3d 1023 (9th Cir. 2003) .......................................................................18, 20

11
12

Buckley v. Valeo,
   424 U.S. 1 (1976) .................................................................................................16

13

Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,
   467 U.S. 837 (1984) ...............................................................................................9

14
15

Citizens for Better Forestry v. USDA,
   567 F.3d 1128 (9th Cir. 2009) ...............................................................................5

16

City of Ladue v. Gilleo,
   512 U.S. 43 (1994) ...............................................................................................16

17
18

Clark K. v. Willden,
   616 F. Supp. 2d 1038 (D. Nev. 2007) ...................................................................23

19

District of Columbia v. Heller,
   554 U.S. 570 (2008) .................................................................................6, 14, 17

20
21

Erickson v. United States,
   67 F.3d 858 (9th Cir. 1995) ..................................................................................23

22

Ezell v. City of Chicago,
   651 F.3d 684 (7th Cir. 2011) ...........................................................................5, 13

23
24

Ferguson v. Skrupa,
   372 U.S. 726 (1963) .............................................................................................16

25

Freeman v. City of Santa Ana,
   68 F.3d 1180 (9th Cir. 1995) ................................................................................18

26
27
28

ii

Gonzales v. Raich,
    545 U.S. 1 (2005)..................................................................................................7

Gonzalez-Medina v. Holder,
    641 F.3d 333 (9th Cir. 2011) ...........................................................................17

Graham v. Connor,
    490 U.S. 386 (1989)..........................................................................................20

Hearn v. W. Conference of Teamsters Pension Trust Fund,
    68 F.3d 301 (9th Cir. 1995) ................................................................................8

Heckler v. Cmty. Health Servs., Inc.,
    467 U.S. 51 (1984)............................................................................................10

Heller v. District of Columbia,
    698 F. Supp. 2d 179 (2010) ..............................................................................14

Heller v. District of Columbia,
    --- F.3d ----, 2011 WL 4551558 (D.C. Cir. Oct. 4, 2011).......................5, 6, 12, 13

Hopfmann v. Connolly,
    471 U.S. 459 (1985)............................................................................................8

Kildare v. Saenz,
    325 F.3d 1078 (9th Cir. 2003) ..........................................................................23

Kyung Park v. Holder,
    572 F.3d 619 (9th Cir. 2009) ............................................................................17

Lamie v. U.S. Trustee,
    540 U.S. 526 (2004)............................................................................................8

Marin Alliance for Med. Marijuana v. Holder,
    --- F. Supp. 2d ---, No. C 11-05349-SBA, 2011 WL 5914031
    (N.D. Cal. Nov. 28, 2011)............................................................................11, 22

McDonald v. City of Chicago,
    130 S. Ct. 3020 (2010)......................................................................................12

Montana Caregivers Ass'n, LLC v. United States,
    --- F.Supp.2d ----, No. CV 11-74-M-DWM, 2012 WL 169771
    (D. Mont. Jan. 20, 2012) ..................................................................................11

New Hampshire v. Maine,
    532 U.S. 742 (2001)..........................................................................................11

Olympic Arms v. Buckles,
    301 F.3d 384 (6th Cir. 2002) ............................................................................16

Peruta v. County of San Diego,
    758 F. Supp. 2d 1106 (S.D. Cal. 2010) ............................................................12

iii

Raich v. Gonzales,
   500 F.3d 850 (9th Cir. 2007) ...........................................................21, 22

Ruiz v. Laguna,
   No. 05-CV-1871, 2007 WL 1120350 (S.D. Cal. March 28, 2007) ...................18, 20

Richards v. Cnty. Of Yolo.,
   ---F. Supp. 2d---, No. 2:09-CV-01235, 2011 WL 1885641 (E.D. Cal. May 16, 2011)..........20

S.F. Baykeeper v. Cargill Salt Div.,
   481 F.3d 700 (9th Cir. 2007) ...............................................................9

Sabri v. United States,
   541 U.S. 600 (2004) ..........................................................................6

Sacramento Nonprofit Collective v. Holder,
   No. 2:11-cv-02939, 2012 WL 662460 (E.D. Cal. Feb. 28, 2012) ...........................11

Schall v. Martin,
   467 U.S. 253 (1984) .........................................................................13

Stormans, Inc. v. Selecky,
   586 F.3d 1109 (9th Cir. 2009) .............................................................13

Suzlon Energy Ltd. V. Microsoft Corp.,
   ---F.3d---, No. 10-35793, 2011 WL 4537843, (9th Cir. Oct. 3, 2011) ....................8

Town of Castle Rock, Colo. v. Gonzales,
   545 U.S. 748 (2005) .........................................................................5

Turner Broad. Sys. v. FCC,
   512 U.S. 622 (1994) ........................................................................16

United States v. Carter,
   669 F.3d 411 (4th Cir. 2012) ........................................................11, 12, 13, 14

United States v. Chafin,
   423 F. App'x 342 (4th Cir. 2011) .........................................................17

United States v. Chester,
   628 F.3d 673 (4th Cir. 2010) ...........................................................5, 12

United States v. Dugan,
   657 F.3d 998 (9th Cir. 2011) ..........................................................2, 3, 4

United States v. Hendrickson,
   664 F. Supp. 2d 793 (E.D. Mich. 2009)......................................................19

United States v. Katz,
   No. 09-50619, 2010 WL 183863 (9th Cir. Jan. 19, 2010) ................................7

iv

United States v. Lanier,
    520 U.S. 259 (1997) ...................................................................................20

United States v. Lewitzke,
    176 F.3d 1022 (7th Cir. 1999) ...................................................................16

United States v. Marzzarella,
    614 F.3d 85 (3d Cir. 2010)...................................................................6, 12

United States v. Masciandaro,
    638 F.3d 458 (4th Cir. 2011) .......................................................................6

United States v. Oakland Cannabis Buyers' Coop.,
    190 F.3d 1109 (1999) ...................................................................................8

United States v. Oakland Cannabis Buyers' Coop.,
    532 U.S. 483 (2001) ................................................................7, 8, 15, 22

United States v. Purdy,
    264 F.3d 809 (9th Cir. 2001) .....................................................................11

United States v. Reese,
    627 F.3d 792 (10th Cir. 2010) ..............................................................6, 12

United States v. Salerno,
    481 U.S. 739 (1987) ..............................................................................6, 13

United States v. Scarmazzo,
    554 F. Supp. 2d 1102 (E.D. Cal. 2008)........................................................7

United States v. Skoien,
    614 F.3d 638 (7th Cir. 2010) ................................................................6, 14

United States v. Stacy,
    No. 09-cr-3695, 2010 WL 4117276 (S.D. Cal. Oct. 18, 2010) ....................5, 9, 11

United States v. Tooley,
    717 F. Supp. 2d 580 (S.D. W. Va. 2010)....................................................14

United States v. Virginia,
    518 U.S. 515 (1996).....................................................................................15

United States v. Weaver,
    No. 2:09-cr-00222, 2012 WL 727488 (S.D. W. Va. March 6, 2012) ....................6

United States v. Yancey,
    621 F.3d 681 (7th Cir. 2010) ..........................................................12, 13, 14

Ward v. Rock Against Racism,
    491 U.S. 781 (1989) ...................................................................................12

v

Washington v. Glucksberg,
    521 U.S. 702 (1997) ................................................................. 21

Wash., Dep't of Ecology v. U.S. EPA,
    752 F.2d 1465 (9th Cir. 1985) ..................................................... 9

Willis v. Winters,
    253 P.3d 1058 (Or. 2011) ............................................................. 8

**STATUTES**

27 C.F.R. § 478.11 ..............................................................................2, 15

18 U.S.C. § 922(g)(3) ...................................................................2, 5, 6, 15

18 U.S.C. §§ 922(d)(3) ............................................................................2

21 U.S.C. § 802 .......................................................................................8

21 U.S.C. § 812(b)(1) ..........................................................................9, 22

21 U.S.C. § 829 .....................................................................................15

**LEGISTLATIVE MATERIAL**

H.R. Rep. No. 99-495 (1986) ....................................................................8

**MISCELLANEOUS**

Adam Winkler, Scrutinizing the Second Amendment,
    105 Mich. L. Rev. 683, 697-98, 700 (2007) ...............................................12

vi

1

**INTRODUCTION**

2   As explained in Defendants' opening brief, Plaintiff's constitutional challenges to

3 18 U.S.C. §§ 922(d)(3) and (g)(3), 27 C.F.R. § 478.11, and the September 2011 Letter issued by

4 the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") have no merit.  The Ninth

5 Circuit's decision in United States v. Dugan squarely forecloses Plaintiff's Second Amendment

6 claim.  Even if the Court were to engage in the independent Second Amendment analysis that

7 Plaintiff seeks, Plaintiff's claim would fail, as unlawful drug users are not within the class of

8 law-abiding, responsible citizens historically protected by the Second Amendment, and

9 § 922(g)(3) survives any level of scrutiny.  In addition, § 922(d)(3) does not violate Plaintiff's

10 Second Amendment rights, as there is no recognized constitutional right to sell firearms.

11 Plaintiff's equal protection claim fails to allege a proper classification of a group against whom

12 Defendants have discriminated.  Plaintiff's responsive brief does nothing to diminish these

13 arguments.  Furthermore, Plaintiff's procedural and substantive due process claims—raised for

14 the first time in her response—must fail, as Plaintiff cannot amend her Complaint by adding new

15 claims in her opposition brief.  Even if the Court were to address these "claims," there is no

16 substantive due process right to use marijuana for medical purposes, and Defendants have not

17 deprived Plaintiff of a constitutionally-protected liberty or property interest.  Accordingly, this

18 Court should dismiss this action (or enter judgment for Defendants) and deny Plaintiff's cross-

19 motion for summary judgment.[1]

20

21

22

23

_____

24 [1] Plaintiff voluntarily dismissed her claims against the named defendants in their individual

25 capacities.  See Stipulation of Dismissal of Individual Defendants (Dkt. 14).  The remaining
 defendants are the United States, ATF, and U.S. Attorney General Eric Holder, Acting ATF

26 Director B. Todd Jones, and Assistant ATF Director Arthur Herbert in their official capacities.

27

28

1

## I.    DEFENDANTS HAVE MOVED TO DISMISS UNDER RULE 12(b)(6), OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT.

2    Plaintiff misconstrues the posture of Defendants' motion.  Defendants moved to dismiss

3    the Complaint under Federal Rule of Civil Procedure 12(b)(6),[2] which requires dismissal if the

4    Complaint fails to state a claim upon which relief can be granted.  See Ashcroft v. Iqbal, 556

5    U.S. 662, 129 S.Ct. 1937, 1949 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

6    As argued in Section I.A.1 of Defendants' Motion, Plaintiff's Second Amendment claim should

7    be dismissed under United States v. Dugan because it fails to state a claim, even assuming the

8    facts alleged in the Complaint are true.  The Court need not reach any other arguments to dismiss

9    the Second Amendment claim.  However, in Sections I.A.2 and I.A.3 of the Motion, Defendants

10   argued that the Second Amendment claim should be dismissed because unlawful drug users fall

11   outside the scope of the Second Amendment as understood at the adoption of the Bill of Rights,

12   and that § 922(g)(3) survives intermediate scrutiny.  See Memorandum in Support of the United

13   States's Motion to Dismiss, or, in the Alternative, for Summary Judgment ("Def. Mot.") at 15-27

14   (Dkt. 10).  In the course of that argument, Defendants presented some extrinsic sources that the

15   Court may consider, such as a government report on the association between cognitive

16   functioning and marijuana use.  If the Court determines that it can only dismiss the Complaint by

17   relying on those extrinsic sources, then the Court should treat Defendants' motion as a Motion

18   for Summary Judgment under Rule 56.  To facilitate that, Defendants attached to their motion a

19   Statement of Undisputed Facts in compliance with Local Rule 56-1.

20   Rather than responding to Defendants' Rule 56 Statement, Plaintiff baldly asserts that

21   Defendants failed to dispute the factual allegations in the Complaint, and then submits her own

22   Rule 56 statement (Dkt. 17-1).  This Statement should be rejected.  The majority of the asserted

23   _____

24   [2] Defendants also moved to dismiss the common law conspiracy claim for lack of subject matter jurisdiction under Rule 12(b)(1).  Plaintiff has agreed to dismiss the conspiracy claim in its entirety.  See Plaintiff's Response to the United States' Motion to Dismiss or, in the Alternative for Summary Judgment, and Plaintiff's Cross-Motion for Summary Judgment ("Pl's Op."), at 2, 25 (Dkt. 17).

25

26

27

28

3

1   "facts" in the Statement fail to comply with Local Rule 56-1's requirement that each material

2   fact contain a citation to the "particular portions of any pleading, affidavit, deposition,

3   interrogatory, answer, admission, or other evidence upon which the party relies." See Dkt. 17-1,

4   ¶¶ 1-28.  The Statement also contains multiple conclusions of law, which do not qualify as

5   "facts."  See, e.g., id. at ¶ 29 ("No evidence exists that Ms. Wilson has ever been an 'an unlawful

6   user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other

7   controlled substance' and Plaintiff maintains that she is not an unlawful user of or addicted to

8   marijuana or any other controlled substance."); see also ¶¶ 2, 16, 42.  In any event, Plaintiff's

9   Statement essentially restates the allegations in her Complaint.  To be clear, the facts alleged in

10  Plaintiff's Complaint are accepted as true for purposes of the Motion to Dismiss only.  See Def.

11  Mot. at 10 n.7.  Defendants dispute many facts in the Complaint, but those disputes are

12  immaterial to the arguments being raised before the Court in Defendants' Motion.

13  **II.     PLAINTIFF HAS NOT ESTABLISHED A SECOND AMENDMENT VIOLATION**

14         **A.     United States v. Dugan, Which Is Controlling, Requires Dismissal of**
15                **Plaintiff's Second Amendment Claim.**

16         Plaintiff's Second Amendment claim is foreclosed by United States v. Dugan, 657 F.3d

17  998 (9th Cir. 2011).  There, the Ninth Circuit upheld § 922(g)(3) against a Second Amendment

18  challenge, holding that "[b]ecause Congress may constitutionally deprive felons and mentally ill

19  people of the right to possess and carry weapons, . . . Congress may also prohibit illegal drug

20  users from possessing firearms."  Id. at 999-1000.  Dugan, who was licensed to grow and use

21  medical marijuana, argued that many marijuana users, including those in compliance with state

22  medical marijuana laws, do not "engag[e] in any behavior that would provide a legitimate basis

23  for excluding them from the reach of the Second Amendment."  See Brief for Appellant at 59,

24  United States v. Dugan, 657 F.3d 998 (2011) (No. 08-10579), ECF No. 57.  In rejecting Dugan's

25  challenge, the court of appeals did not distinguish between Dugan's status as a medical

26  marijuana cardholder and any other user of marijuana.  Dugan's holding—that the prohibition on

27
28                                                      4

1   illegal drug users from possessing firearms does not violate the Second Amendment—applies

2   equally to all unlawful users of marijuana.  See United States v. Stacy, No. 09-cr-3695, 2010 WL

3   4117276, at *7 (S.D. Cal. Oct. 18, 2010) (noting, in the course of rejecting a Second Amendment

4   challenge to § 922(g)(3), that "[t]he fact that this particular case involves the alleged lawful use

5   of marijuana under state law does not have any bearing on the presumptively lawful nature of the

6   restriction").  Accordingly, under Dugan, Plaintiff's Second Amendment challenge to § 922(g)(3)

7   must fail.

8        In response, Plaintiff argues that Dugan "is a deeply flawed opinion that must be

9   overturned."  Pl's Op. at 16.  Of course, Dugan is binding authority on this Court, and this Court

10  is not empowered to overrule the Ninth Circuit's decision.  See, e.g., Citizens for Better Forestry

11  v. USDA, 567 F.3d 1128, 1134 (9th Cir. 2009) (court of appeals precedent is binding on district

12  court).  Plaintiff's grounds for overturning Dugan—the alleged brevity of the court's analysis and

13  an allegation that the "facts of Dugan are so prejudicial that they fail to provide a proper

14  framework for analyzing the constitutionality of § 922(g)(3)" (Pl's Op. at 16-17)—even if true,

15  are not proper grounds for ignoring Ninth Circuit precedent.

16        **B.      Unlawful Drug Users, Including Those Who Comply with State Medical
                    Marijuana Laws, Fall Outside the Scope of the Second Amendment.**
17

18        Because Dugan resolves Plaintiff's Second Amendment claim, the Court need not

19  undergo an "independent" constitutional analysis of § 922(g)(3).  See Town of Castle Rock,

20  Colo. v. Gonzales, 545 U.S. 748, 778 (2005) (longstanding doctrine of constitutional avoidance

21  cautions courts to avoid making unnecessary constitutional determinations).  Nonetheless, were

22  the Court to engage in such an analysis, Plaintiff's claim would still fail.  As set forth in

23  Defendants' Motion (Def. Mot. at 15-27), several courts have established a two-step approach to

24  Second Amendment challenges to federal statutes and regulations.  See, e.g., Heller v. District of

25  Columbia, --- F.3d ----, 2011 WL 4551558, at *5 (D.C. Cir. Oct. 4, 2011) ("Heller II"); Ezell v.

26  City of Chicago, 651 F.3d 684, 701–04 (7th Cir. 2011); United States v. Chester, 628 F.3d 673,

27

28

5

1   680 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 800–01 (10th Cir. 2010); United

2   States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010).  Under this approach, "[w]e ask first

3   whether a particular provision impinges upon a right protected by the Second Amendment; if it

4   does, then we go on to determine whether the provision passes muster under the appropriate level

5   of constitutional scrutiny."  Heller II, 2011 WL 4551558 at *5.  Plaintiff's claim fails both parts

6   of the analysis, as unlawful drug users are not within the class of law-abiding, responsible

7   citizens historically protected by the Second Amendment, and § 922(g)(3) survives the

8   appropriate level of scrutiny.[3]

9        In the opening brief, Defendants demonstrated that unlawful drug users fall outside the

10   scope of the Second Amendment as understood at the adoption of the Bill of Rights.  Def. Mot.

11   at 15-20.  Heller recognized the "core" Second Amendment right of "law-abiding, responsible

12   citizens to use arms in defense of hearth and home."  District of Columbia v. Heller, 554 U.S.

13   570, 634-35 (2008) (emphasis added).  This articulation acknowledges that the Anglo-American

14

_____

15   [3] Plaintiff appears to frame her Second Amendment argument as an overbreadth challenge.  See
     Pl's Op. at 16 ("[Plaintiff's Second Amendment analysis will] demonstrate that the expansive

16   scope of 18 U.S.C. § 922(g)(3) renders it unenforceable and unconstitutional."); see also id. at 14
     ("18 USC § 922(g)(3) is an exceptionally over-broad statute . . ."); id. ("The extraordinary

17   breadth of this law renders it unenforceable and wholly unconstitutional.").  This is not a proper
     Second Amendment challenge.  The overbreadth doctrine permits courts to relax the usual rules

18   of standing in the First Amendment context and in a few other settings.  Sabri v. United States,
     541 U.S. 600, 609-10 (2004); see also United States v. Salerno, 481 U.S. 739, 745 (1987) ("[W]e

19   have not recognized an 'overbreadth' doctrine outside the limited context of the First

20   Amendment.").  Plaintiff has identified no basis on which that doctrine could be applied here.
     See United States v. Masciandaro, 638 F.3d 458, 474 (4th Cir. 2011) (rejecting a Second

21   Amendment overbreadth challenge); United States v. Weaver, No. 2:09–cr–00222, 2012 WL
     727488, at *9-10 (S.D. W. Va. March 6, 2012) (finding no authority to extend the overbreadth

22   doctrine to the Second Amendment).  This is because in the Second Amendment context, "[a]

23   person to whom a statute properly applies can't obtain relief based on arguments that a
     differently situated person might present."  United States v. Skoien, 614 F.3d 638, 645 (7th Cir.

24   2010) (en banc) (citing Salerno, 481 U.S. at 745).  Because Plaintiff cannot bring a constitutional

25   challenge that asserts the rights of others, any argument based on the alleged "overbreadth" of

26   § 922(g)(3) must be rejected.

27

28                                                          6

1  right to arms incorporated into the Second Amendment excluded certain categories of

2  individuals, including non-law-abiding citizens.   Def. Mot. at 15-19.  Therefore, violators of the

3  Controlled Substances Act fall outside of the Second Amendment's scope.  Plaintiff apparently

4  does not dispute this point.  She does not offer any historical analysis of the Second Amendment

5  and effectively concedes that violators of the law are disqualified from exercising their Second

6  Amendment rights.

**1. Federal Law Does Not Recognize "Law-Abiding" Users of Marijuana, and § 922(g)(3) Plainly Prohibits Use of Marijuana for "Medical Purposes."**

9       Plaintiff instead contends that users of medical marijuana are not "unlawful users" of a

10  controlled substance.  Pl's Op. at 10-14.  According to Plaintiff, "Congress did not intend for

11  law-abiding medical cannabis patients to be included in the definition of 'unlawful user.'"  Id. at

12  10.  The underlying assumption of Plaintiff's argument—indeed, the apparent central contention

13  of her entire case—is that users of medical marijuana do not violate federal law.  But there are no

14  "law-abiding medical cannabis patients" under federal law.  See Gonzales v. Raich, 545 U.S. 1,

15  27 (2005) (explaining that even if marijuana is used "for personal medical purposes on the

16  advice of a physician," it is still considered contraband under the CSA, which designates

17  marijuana as contraband "for any purpose") (emphasis in original); United States v. Oakland

18  Cannabis Buyers' Coop., 532 U.S. 483, 491 (2001) ("Whereas some other drugs can be

19  dispensed and prescribed for medical use, . . . the same is not true for marijuana."); United States

20  v. Katz, No. 09-50619, 2010 WL 183863, at * 1 (9th Cir. Jan. 19, 2010) (vacating pretrial

21  detention order, which modified defendant's bond order to permit defendant to use and possess

22  marijuana for medical purposes in compliance with California law, because it is illegal to possess

23  marijuana under federal law); United States v. Scarmazzo, 554 F. Supp. 2d 1102, 1105 (E.D.

24  Cal. 2008) ("The use of medical marijuana remains unlawful [under federal law].").[4]

_____

[4] Plaintiff's attempts to distinguish Raich and Oakland Cannabis fall flat.  Pl's Op. at 12.  Raich did indeed rule on whether Congress could, under the Commerce Clause, criminalize the

*(Footnote continued on following page.)*

7

1    Notwithstanding this well-settled law, Plaintiff contends that the legislative history of

2    § 922(g)(3) reflects an intent to exclude medical marijuana users from the statute's reach.  But

3    the plain language of the statute is clear on its face, which means that this Court need not delve

4    into § 922(g)(3)'s legislative history and policies, although they may still be instructive.  See

5    Suzlon Energy Ltd. v. Microsoft Corp., --- F.3d ----, No. 10-35793, 2011 WL 4537843, at *1

6    (9th Cir. Oct. 3, 2011) (citing Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (finding it

7    "unnecessary to rely on the legislative history" when the plain language of the statute was clear,

8    but finding it an "instructive" way to "lend support" to its holding)); Am. Rivers v. FERC, 201

9    F.3d 1186, 1204 (9th Cir. 1999) ("[W]e are mindful that this Court steadfastly abides by the

10   principle that 'legislative history—no matter how clear—can't override statutory text.'")

11   (quoting Hearn v. W. Conference of Teamsters Pension Trust Fund, 68 F.3d 301, 304 (9th Cir.

12   1995)).[5]  Section 922(g)(3) references an "unlawful user of . . . any controlled substance" as

13
_____

14   manufacture, distribution, or possession of marijuana by intrastate growers and users of
     marijuana for medical purposes.  But in so doing, the court observed that "[b]y classifying

15   marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture,
     distribution, or possession of marijuana became a criminal offense, with the sole exception being

16   use of the drug as part of a Food and Drug Administration preapproved research study."  545
     U.S. at 14 (citing the CSA and Oakland Cannabis, 532 U.S. at 490).  As for Oakland Cannabis,

17   Plaintiff's reference to the reversed Ninth Circuit opinion, 190 F.3d 1109 (1999), and Justice
     Stevens's concurrence notwithstanding, the majority expressly held that marijuana cannot be

18   prescribed for medical use under federal law.  532 U.S. at 491.  Nor can Plaintiff rely on the
     Supreme Court's denial of certiorari from Willis v. Winters, 253 P.3d 1058 (Or. 2011).  Pl's Op.

19   at 13 ("The Supreme Court's decision not to review this decision indicates that the Oregon
     court's decision and reasoning should stand.").  A denial of certiorari has no precedential effect,

20   see Hopfmann v. Connolly, 471 U.S. 459, 461 (1985), and the holding of the Court—that
     § 922(g)(3) does not preempt a state concealed handgun licensing statute—has no bearing on this

21   case.

22
23   [5] Regardless, Plaintiff draws untenable conclusions from the legislative history.  Plaintiff
     suggests that by removing the direct reference to "marijuana" in 1986, Congress somehow

24   sanctioned its use.  As noted in Defendants' Motion (Def. Mot. at 23, n.12), Congress passed the
     amendment in 1986 to close a loophole and to expand the category of those prohibited.  See H.R.

25   Rep. No. 99-495, at 23 (1986) ("Current law does not include hallucinogenic drugs that were
     controlled by the Controlled Substances Act, including the violence-inducing drug phencyclidine

26
27                                              (Footnote continued on following page.)

28                                              8

1    defined by the Controlled Substances Act (CSA) (21 U.S.C. § 802).  Under the terms of the

2    CSA, marijuana "has no currently accepted medical use in treatment in the United States," and

3    "[t]here is a lack of accepted safety for use of [marijuana] under medical supervision."  21

4    U.S.C. § 812(b)(1).  Under a plain reading of the text, if an individual uses marijuana in violation

5    of the CSA, he would qualify as an "unlawful user" under § 922(g)(3).  See Stacy, 2010 WL

6    4117276, at *6 ("Because § 922(g)(3) is a federal statute that refers to being an unlawful user of

7    any controlled substance as defined by the federal Controlled Substances Act, the Court

8    concludes that an ordinary person would understand that if he used marijuana in violation of

9    federal law, he would qualify as an 'unlawful user' within the meaning of § 922(g)(3), regardless

10   of whether he could be prosecuted under state law." (emphasis in original)).[6]

### 2. The Ogden Memo Does Not Estop the Government from Treating Medical Marijuana Users as Violators of Federal Law.

13       In her opposition, Plaintiff erroneously attempts to invoke the equitable doctrine of

14   judicial estoppel to contend that Defendants are estopped from arguing that persons complying

15   with state medical marijuana laws are "unlawful users" of a controlled substance.  Pl's Op. at 12-

---

17   (PCP), various tranquilizers, designer drugs and other substances that have been added to the
     schedules of controlled substances.").

19   [6] To the extent that Plaintiff may be challenging ATF's interpretation of the term "unlawful
     user," this interpretation should be entitled to deference.  "[A] court may not substitute its own
20   construction of a statutory provision for a reasonable interpretation made by the administrator of
     an agency."  Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984);
21   Wash., Dep't of Ecology v. U.S. EPA, 752 F.2d 1465, 1469 (9th Cir. 1985) (finding that an
     agency's reasonable interpretation of a statute is entitled to deference "even if [the court] would
22   have reached a different result had [it] construed the statute initially").  This principle applies
     with particular force where, as here, "statutory construction involves reconciling conflicting
23   policies, and a full understanding of the force of the statutory policy in the given situation
24   (depends) upon more than ordinary knowledge respecting the matters subjected to agency
     regulations."  S.F. Baykeeper v. Cargill Salt Div., 481 F.3d 700, 705 (9th Cir. 2007) (quoting
25   Wash., Dep't of Ecology, 752 F.2d at 1469)).

9

13.  In doing so, Plaintiff appears to rely on the Joint Stipulation of Dismissal Without Prejudice, filed in January 2010 by the parties to another case, County of Santa Cruz et al. v. Holder et al., No. 03-1802 (N.D. Cal.), to suggest that the "Federal Government has conceded that persons complying with state medical marijuana laws are not 'unlawful users.'"  Pl's Op. at 12.

The government has made no such concession.  The stipulation in Santa Cruz incorporates a guidance memorandum issued by then-Deputy Attorney General David Ogden to U. S. Attorneys (the "Ogden Memo"), indicating that, in order to make "efficient and rational use of [the Department's] limited investigative and prosecutorial resources," federal prosecutors "should not," as a general matter, "focus federal resources . . . on individuals whose actions are in clear and unambiguous compliance with existing state laws providing for the medical use of marijuana"—such as "individuals with cancer or other serious illnesses who use marijuana as part of a recommended treatment regimen consistent with applicable state law," or their caregivers who, consistent with state law, provide them with marijuana for medicinal purposes. See Ogden Mem. (attached hereto as Exhibit A), at 1-2.  However, the memorandum further states that "[t]he prosecution of significant traffickers of illegal drugs, including marijuana . . . continues to be a core priority" of the Department.  Id. at 1 (emphasis added).  By its express terms, the memorandum "d[id] not alter in any way the Department's authority to enforce federal law," "d[id] not 'legalize' marijuana or provide a legal defense to a violation of federal law," and did not "create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, party or witness in any administrative, civil, or criminal matter." Id. at 2.  Instead, the memorandum made clear that it was "intended solely as a guide to the exercise of investigative and prosecutorial discretion." Id.

Contrary to Plaintiff's assertions, the doctrine of judicial estoppel has no application in this case.[7]  Judicial estoppel only applies if "a party's later position [is] 'clearly inconsistent'

_____

[7] It is unlikely that the doctrine of estoppel would apply to Defendants, given the policy questions presented here.  See Heckler v. Cmty. Health Servs., Inc., 467 U.S. 51, 60 (1984) ("[I]t is well settled that the Government may not be estopped on the same terms as any other

(*Footnote continued on following page.*)

10

1    with its earlier position."  New Hampshire v. Maine, 532 U.S. 742, 749-51 (2001).  As courts

2    have repeatedly recognized, nothing in the Ogden Memo made marijuana possession legal or

3    prevented the federal government from enforcing the CSA as it sees fit.  See Sacramento

4    Nonprofit Collective v. Holder, No. 2:11-cv-02939, 2012 WL 662460, at *9 (E.D. Cal. Feb. 28,

5    2012) ("A reasonable person, having read the entirety of the Ogden Memo, could not conclude

6    that the federal government was somehow authorizing the production and consumption of

7    marijuana for medical purposes.  Any suggestion to the contrary defies the plain language of the

8    Memo.") (quoting Montana Caregivers Ass'n, LLC v. United States, --- F.Supp.2d ----, No. CV

9    11-74-M-DWM, 2012 WL 169771, at *1-2 (D. Mont. Jan. 20, 2012)); see also United States v.

10    Stacy, 734 F. Supp. 2d 1074, 1080-81 (S.D. Cal. 2010) (recognizing that the memo "provid[es]

11    'guidance regarding resource allocation' and 'does not 'legalize' marijuana or provide a legal

12    defense to a violation of federal law'") (quoting Ogden Memo).  Therefore, because the federal

13    government has never taken an inconsistent position on this issue, Plaintiff's estoppel argument

14    should be rejected.  See Marin Alliance for Medical Marijuana v. Holder, --- F. Supp. 2d ---, No.

15    C 11-05349-SBA, 2011 WL 5914031, at *8-9 (N.D. Cal. Nov. 28, 2011); Sacramento Nonprofit,

16    2012 WL 662460, at *8-9.[8]

17

18

19

20

21

22    litigant."); New Hampshire v. Maine, 532 U.S. 742, 755 (2001) ("[B]road interests of public

23    policy may make it important to allow a change of positions that might seem inappropriate as a
     matter of merely private interests.") (citation and internal quotation marks omitted).

24    [8] Plaintiff can also not avail herself of the burden of proof for a criminal prosecution under

25    § 922(g)(3) to argue that marijuana registry cardholders are not "unlawful users" of a controlled
     substance.  See Pl's Op. at 12-13 (citing United States v. Purdy, 264 F.3d 809 (9th Cir. 2001)).

26    That burden is not relevant to Plaintiff's constitutional challenge.

27

28                      11

**C.    Under an Independent Constitutional Analysis, Section 922(g)(3) Survives the Appropriate Level of Scrutiny.**

**1.  No More than Intermediate Scrutiny Should Apply.**

As set forth in Defendants' opening brief (Def. Mot. at 20-27), though the Ninth Circuit has not directly addressed the question of the appropriate level of scrutiny applicable to Second Amendment claims, other courts of appeals to reach this issue have uniformly applied intermediate scrutiny. See United States v. Carter, 669 F.3d 411, 416 (4th Cir. 2012) (applying intermediate scrutiny in evaluating challenge to § 922(g)(3)); United States v. Yancey, 621 F.3d 681, 683 (7th Cir. 2010) (same); see also Marzzarella, 614 F.3d at 96-97 (applying intermediate scrutiny to challenge to § 922(k)); United States v. Reese, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny to challenge to § 922(g)(8)); Heller II, 2011 WL 4551558, at *9 (applying intermediate scrutiny to review novel gun registration laws).  The weight of this authority confirms that, if Plaintiff's Second Amendment claim is to be reviewed independently by the Court, no more than intermediate scrutiny should apply.

Plaintiff contends that strict scrutiny should apply because the right protected by the Second Amendment has been held to be a fundamental right.  Pl's Op. at 17-18.  "The [Supreme] Court has not said, however, and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake."  Heller II, 2011 WL 4551558, at *8 (citing Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); Marzzarella, 614 F.3d at 96; United States v. Chester, 628 F.3d 673, 682 (4th Cir. 2010); and Adam Winkler, Scrutinizing the Second Amendment, 105 Mich. L. Rev. 683, 697-98, 700 (2007)).  Therefore, that the Second Amendment protects rights that are "fundamental," McDonald v. City of Chicago, 130 S. Ct. 3020, 3036-42 (2010), does not mandate application of strict scrutiny to Plaintiff's claim.  See Peruta v. County of San Diego, 758 F. Supp. 2d 1106, 1115-16 (S.D. Cal. 2010) (applying intermediate scrutiny to a Second Amendment challenge, as "fundamental constitutional rights are not invariably subject to strict scrutiny").

12

Applying intermediate scrutiny is especially appropriate in the present case.  Plaintiff, as an unlawful user of a controlled substance, does not fall into the category of "law-abiding, responsible citizens" whose rights are at the core of the Second Amendment.  See Carter, 669 F.3d at 416 (rejecting the application of strict scrutiny to § 922(g)(3), as "[an unlawful drug user] cannot claim to be a law-abiding citizen, and therefore his asserted Second Amendment claim cannot be a core right"); Ezell, 651 F.3d at 703 (level of scrutiny "will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right").  In addition, because Plaintiff can avoid the restriction of § 922(g)(3) by simply relinquishing her marijuana registry card and refraining from using marijuana, the severity of the restriction is not particularly substantial.  See Heller II, 2011 WL 4551558, at *9 ("[A] regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify."); Yancey, 621 F.3d at 687-688 ("[A]s § 922(g)(3) prohibits only current drug users from possessing firearms, it is far less restrictive than [the 1968 Act's] provision affecting felons and the mentally ill.") (emphasis in original).

### 2. Section 922(g)(3) Substantially Relates to the Important Government Interest in Protecting Public Safety and Combating Violent Crime.

Under intermediate scrutiny, "a regulation must be substantially related to an important governmental objective."  Stormans, Inc. v. Selecky, 586 F.3d 1109, 1134 (9th Cir. 2009).  Applying intermediate scrutiny, the law restricting the possession of firearms by unlawful drug users relates substantially to the important government objective of reducing violent crime and protecting public safety.  See Def. Mot. at 20-27.

Plaintiff concedes that § 922(g)(3) is intended to further a "substantial government interest" in "keep[ing] firearms out of the hands of potentially dangerous people."  Pl's Op. at 21.  Indeed, the Supreme Court has characterized the relevant interest as "compelling."  Salerno, 481 U.S. at 750; Schall v. Martin, 467 U.S. 253, 264 (1984).  However, Plaintiff contends that

13

1    the law fails to provide a direct, substantial relationship between the objective and the chosen

2    means.  Plaintiff is incorrect.  In the Defendants' opening brief (Def. Mot. at 22-27), Defendants

3    presented a wide range of sources supporting the conclusion that a substantial relationship exists

4    between § 922(g)(3) as applied to drug users and Congress's goal of protecting public safety and

5    combating violent crime, including the legislative history of § 922(g)(3), similar state

6    restrictions, and academic and empirical studies.  In addition, the limited temporal scope of the

7    statute—tailoring the restriction to <u>current</u> unlawful users—ensures that the statute bears a

8    reasonable fit to the end it serves.  <u>See</u> <u>Carter</u>, 669 F.3d at 419; <u>Yancey</u>, 621 F.3d at 687 ("[T]he

9    Second Amendment . . . does not require Congress to allow [an unlawful user] to simultaneously

10   choose both gun possession and drug abuse.").  In response, Plaintiff makes three primary

11   arguments as to why § 922(g)(3) is not substantially related to the government interest in

12   protecting public safety, each of which is baseless.

13       First, Plaintiff contends that § 922(g)(3) bears no substantial relationship to its end

14   because of the statute's "extraordinary breadth and scope."  Pl's Op. at 21-22.  According to

15   Plaintiff, "[t]he overwhelming impact of the law falls on the shoulders of non-violent, harmless

16   individuals."  <u>Id.</u> at 21.  However, the fact that certain individuals who may theoretically pose a

17   lesser threat to public safety fall within the ambit of § 922(g)(3) does not render the statute

18   unconstitutional.  This is implicit in <u>Heller</u>'s recognition of the validity of categorical limitations

19   on the Second Amendment's scope.  554 U.S. at 626-27, n.26; <u>see also</u> <u>Skoien</u>, 614 F.3d at 641;

20   <u>Tooley</u>, 717 F. Supp. 2d at 597.  Moreover, "intermediate scrutiny, by definition, permits

21   legislative bodies to paint with a broader brush than strict scrutiny. . . . As a consequence, the

22   degree of fit between [§ 922(g)(3)] and the well-established goal of promoting public safety need

23   not be perfect; it must only be substantial."  <u>Heller II</u>, 698 F. Supp. 2d at 191 (citations and

24   internal punctuation omitted).  Plaintiff nevertheless argues that "huge swaths of the American

25   populace" are deprived of their Second Amendment rights by § 922(g)(3) and the ATF

26   regulation, because, according to Plaintiff, the restriction applies to all individuals who have

27

28
                                    14

1    reported using marijuana at some point in their lifetime and individuals who use prescription

2    drugs. Pl's Op. at 21. Plaintiff misreads the statute. The vast majority of these individuals are

3    not restricted by § 922(g)(3). Congress tailored § 922(g)(3) by focusing on only "current" users

4    of controlled substances, not individuals who have admitted to using marijuana at some point in

5    their past. As for prescription drugs, 27 C.F.R. § 478.11 defines "unlawful user of or addicted to

6    any controlled substance" as the use of a controlled substance "in a manner other than as

7    prescribed by a licensed physician."[9] Lawful prescription drug users are therefore not "unlawful

8    users" of controlled substances.

9         Second, Plaintiff mistakenly contends that the fact that § 922(g)(3) does not prohibit

10   users or abusers of alcohol from possessing firearms renders the statute unconstitutional. This

11   underinclusivity argument has been expressly rejected by at least one court of appeals. See

12   Carter, 669 F.3d at 421 ("Carter faults § 922(g)(3) for its under-inclusiveness by targeting

13   irresponsible users of some mind altering substances, such as marijuana, but not users of other

14   substances, such as alcohol. But this argument simply amounts to a disagreement with

15   Congress' policy decision to link the firearms prohibition in § 922(g)(3) to the Controlled

16   Substances Act, 21 U.S.C. § 802."). Additionally, the underinclusivity doctrine applies primarily

17   in the First Amendment context, and Plaintiff cites no authority for the proposition that the

18   doctrine should apply to her claim. Because it is used in strict scrutiny analysis, the First

19   Amendment underinclusivity doctrine is a poor fit to the Second Amendment issue here. See

20   United States v. Virginia, 518 U.S. 515, 573 (1996) (Scalia, J., dissenting) ("Intermediate

21   scrutiny has never required a least-restrictive-means analysis, but only a 'substantial relation'

22   between the classification and the state interests that it serves."). Furthermore, because the

23   doctrine's purpose is to prevent "governmental attempt[s] to give one side of a debatable public

24   question an advantage in expressing its views to the people" or government attempts to "select

25   ─────────────
     [9] As noted, marijuana, a Schedule I drug, cannot be legally prescribed for medical use. See 21
     U.S.C. § 829; Oakland Cannabis, 532 U.S. at 491.

26

27

28                                              15

                                                99

1   the permissible subjects for public debate and thereby to control the search for political truth,"

2   City of Ladue v. Gilleo, 512 U.S. 43,  51 (1994) (internal citations and punctuation omitted), it is

3   difficult to apply outside the First Amendment context, where content-based regulations of

4   expression receive the most exacting scrutiny.[10]

5       Third, Plaintiff attempts to cast doubt on Congress's determination that marijuana use is

6   linked to crime.  Pl's Op. at 22-23 ("There is no viable link between the use of cannabis and

7   violent behavior.").  Plaintiff's argument is policy-based, and is intended to support her opinion

8   that the majority of marijuana users are "non-violent, harmless individuals."  Id. at 21.

9   Plaintiff's contentions would be better addressed to a legislative body, as "[u]nder the system of

10  government created by our Constitution, it is up to legislatures, not courts, to decide on the

11  wisdom and utility of legislation."  Ferguson v. Skrupa, 372 U.S. 726, 729 (1963); see also

12  Turner Broad. Sys. v. FCC, 512 U.S. 622, 665-66 (1994) (noting that "Congress is far better

13  equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon"

14  complex and dynamic issues).  In any event, there are sound reasons why Plaintiff's policy

15  arguments are not persuasive here.  See Def. Mot. at 23-25.

16      In sum, § 922(g)(3) does not violate the Second Amendment, as it is substantially related

17  to the compelling government interest of reducing violent crime and protecting public safety.

18  _____

19  [10] Moreover, in analyzing the constitutional propriety of the limitations of a statute, courts are
    "guided by the familiar principles that a statute is not invalid under the Constitution because it
20  might have gone farther than it did, that a legislature need not strike at all evils at the same time,
    and that reform may take one step at a time, addressing itself to the phase of the problem which
21  seems most acute to the legislative mind."  Buckley v. Valeo, 424 U.S. 1, 105 (1976) (internal
    citations and punctuation omitted); see also United States v. Lewitzke, 176 F.3d 1022, 1027 (7th
22  Cir. 1999) (Congress did not act irrationally in imposing firearms disability solely upon persons
    convicted of domestic violence misdemeanors, despite the fact that "persons convicted of other
23  sorts of misdemeanors [may] pose a danger to society if armed," because "Congress is free to
    take 'one step at a time'"); Olympic Arms v. Buckles, 301 F.3d 384, 390 (6th Cir. 2002)
24  (rejecting argument that import ban of certain semi-automatic weapons was irrational because it
    prohibited firearms with more than one of four enumerated features, but allowed weapons with
25  one of the features, because "Congress may work incrementally in protecting public safety" and
    its "decision first to target weapons commonly used for criminal activity or, likewise, those most
26  heavily loaded with dangerous features is within their legislative authority").

27

28                                          16

**III.   SECTION 922(d)(3), AS APPLIED TO PLAINTIFF, DOES NOT VIOLATE THE SECOND AMENDMENT.**

Plaintiff's challenge to § 922(d)(3)'s restriction on the sale of firearms is similarly meritless.  Heller neither recognized a right to sell firearms nor called into question "laws imposing conditions and qualifications on the commercial sale of arms."  554 U.S. at 626–27.  In addition, for the same reasons that the Second Amendment does not preclude Congress from forbidding unlawful drug users from possessing firearms, Congress may also forbid that same group from acquiring firearms.  See Def. Mot. at 27-28; United States v. Chafin, 423 F. App'x 342, 344 (4th Cir. Apr. 13, 2011) (unpublished).

Plaintiff's only argument in rebuttal is that § 922(d)(3) allegedly "places an exceptional burden and liability upon firearms sellers" and is therefore unenforceable.  Pl's Op. at 24.  But Plaintiff lacks standing to challenge the burden on federal firearms licensees ("FFLs").  Kyung Park v. Holder, 572 F.3d 619, 625 (9th Cir. 2009) ("As a general rule, a third party does not [have] standing to bring a claim asserting a violation of someone else's rights.") (citation omitted).  Even if she did have standing, the alleged "burden" on FFLs is irrelevant here.  The only relevant burden in this case would be a burden on a constitutional right, and as stated, there is no constitutional right to sell a firearm.  See Def. Mot. at 27-28; Chafin, 423 F. App'x at 344.

**IV.   PLAINTIFF'S EQUAL PROTECTION CLAIM MUST FAIL.**

Plaintiff has also failed to adequately articulate an equal protection claim because users of marijuana for medical purposes are not, as Plaintiff claims, "law-abiding citizens."  Pl's Op. at 9; Compl. at ¶ 3-4.  In order to state an equal protection claim, Plaintiff "must show that she is being treated differently from similarly situated individuals."  Gonzalez-Medina v. Holder, 641 F.3d 333, 336 (9th Cir. 2011).  Despite Plaintiff's repeated assertions that she is a "law-abiding citizen," federal law does not recognize a difference between medical marijuana users and other marijuana users.  See Alternative Community Health Care Co-op., Inc. v. Holder, 2012 WL 707154, at *5 (S.D. Cal. March 5, 2012) (finding that users of marijuana for medicinal purposes

17

1    in violation of the Controlled Substances Act are not similarly situated to law-abiding citizens);

2    see also supra at 7-9 and Def. Mot. at 5, 29-30.  Because it is reasonable for the government to

3    infer that individuals holding state-issued medical marijuana registry cards use marijuana, and

4    because marijuana users violate federal law, Plaintiff fails to identify any similarly situated to

5    citizens who do not violate federal law.[11]

6         Plaintiff also claims—for the first time in her opposition brief—that "registry cardholders

7    are similarly situated to persons using medical marijuana in states where registry is not

8    required."  Pl's Op. at 9.  Plaintiff argues that because some states allow medical marijuana use

9    without issuing registry identification cards, some medical marijuana users will be able to buy

10   guns more easily than people who live in states that require medical marijuana registry cards.

11   Pl's Op. at 10.  This argument fails to state a claim and should be dismissed as well.

12        As an initial matter, the facts underlying this argument were not set forth in the

13   Complaint and therefore are not properly before this Court.  See Broam v. Bogan, 320 F.3d

14   1023, 1026 n.2 (9th Cir. 2003) (noting that a court may not look beyond the complaint to

15   plaintiff's briefs when determining the propriety of a motion to dismiss for failure to state a

16   claim); Ruiz v. Laguna, No. 05-CV-1871, 2007 WL 1120350, at *26 (S.D. Cal. March 28, 2007)

17   ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion

18   to dismiss.") (citation and internal quotation marks omitted).  In particular, Plaintiff provides no

19   citation or support for the bare assertion in her Opposition that "[s]everal states, such as

20   California, have provided for the legal use of medical marijuana without the necessity of

21   registering with the state or obtaining a state-issued registry identification card."  Pl's Op. at 9.

22

23   _____

24   [11] Plaintiff also erroneously argues that she is similarly situated to "users of the FDA-approved
     drug Marinol, which contains the same active ingredient as marijuana."  Pl's Op. at 9.  But
25   Marinol is not a Schedule I controlled substance under the CSA, and therefore its use with a
     prescription does not violate federal law.
26

27                                              18

28

Even if the Court overlooks this pleading defect, Plaintiff does not claim (because she cannot) that the "law is applied in a discriminatory manner or imposes different burdens on different classes of people."  Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th Cir. 1995). The law applies equally to all users of medical marijuana, and nothing in § 922(g)(3), 27 C.F.R. § 478.11, or the Open Letter suggests otherwise.  Instead, Plaintiff's argument is that medical marijuana users in certain states may more easily evade the law by purchasing firearms without notifying sellers that they use marijuana.  This is not a proper equal protection claim, as the law facially applies to every marijuana user, even if some people are able—through deceit or fraud—to avoid prosecution or obtain a firearm.  See United States v. Hendrickson, 664 F. Supp. 2d 793, 798 (E.D. Mich. 2009) ("There is no right under the Constitution to have the law go unenforced against you, even if you are the first person against whom it is enforced . . . . The law does not need to be enforced everywhere to be legitimately enforced somewhere." (internal quotation omitted)).

Furthermore, a marijuana registration card is only one of many pieces of evidence that an FFL located in any state can consider in determining whether a particular buyer is an "unlawful user of or addicted to a controlled substance."  As set forth in the Open Letter, it is incumbent upon FFLs to consider "evidence of a recent use or possession of a controlled substance" during a potential sale of a firearm.  The Letter notes that § 922(d)(3) "makes it unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any persons knowing or **having reasonable cause to believe** that such person is an unlawful user of or addicted to a controlled substance." See Compl., Ex. 2-B. (emphasis in original).  Citing 27 C.F.R. § 478.11, the Letter further states that "[a]n inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time." Id.  A marijuana registry card is simply an example of the evidence that the FFL may consider, regardless of the state in which the sale takes place.  Id.

19

**V.   DEFENDANTS HAVE NOT VIOLATED PLAINTIFF'S RIGHT TO SUBSTANTIVE OR PROCEDURAL DUE PROCESS.**

Plaintiff argues in her opposition brief that Defendants have violated her right to procedural and substantive due process.  Pl's Op. at 3-10.  Neither of these claims was properly set forth in her Complaint.  Though Plaintiff brings a claim under the Due Process Clause of the Fifth Amendment, this claim is unambiguously an equal protection claim, and not a claim based on procedural or substantive due process.  See Compl. ¶¶ 52-57; Compl. Prayer for Relief, ¶ 2 (seeking a declaration that §§ 922(g)(3) and 922(d)(3) violate the Due Process Clause "by denying equal protection of the laws to law-abiding, qualified adults").  Accordingly, the Court should not address these "claims."  See Broam, 320 F.3d at 1026 n.2; Ruiz, 2007 WL 1120350, at *26.

**A.  There is No Substantive Due Process Right to Use Marijuana for Medical Purposes.**

In the event that the Court addresses the substantive or due process claims raised for the first time in Plaintiff's opposition brief, these claims have no merit.  Plaintiff posits that she has a "substantive right to treat her medical condition in the manner recommended by her physician and which she and her physician agree is the [best] course of treatment for her."  Pl's Op. at 7. Plaintiff appears to aim her substantive due process challenge at the Controlled Substances Act and its classification of marijuana as a Schedule I drug.[12]  21 U.S.C. § 812(c), Schedule I(c)(10).

---

[12] To the extent that Plaintiff's substantive due process "claim" may be read to implicate her Second Amendment rights, such a claim should be rejected.  "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing' such a claim." Albright v. Oliver, 510 U.S. 266, 266 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).  Accordingly, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272, n.7 (1997); see also Richards v. County of Yolo, --- F.Supp.2d ----, No. 2:09-CV-01235, 2011 WL 1885641, at *6 n.8 (E.D. Cal. May 16, 2011) ("Though the right to keep and bear arms for self-defense is a

*(Footnote continued on following page.)*

20

1    No matter how Plaintiff attempts to frame the right that she seeks to vindicate, the argument is

2    foreclosed by <u>Raich v. Gonzales</u>, 500 F.3d 850, 861-66 (9th Cir. 2007) ("<u>Raich II</u>"), in which the

3    Ninth Circuit rejected a nearly identical attempt to establish a fundamental right to use marijuana

4    for medical reasons.

5          Substantive due process protects asserted rights only if they are "'deeply rooted in this

6    Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither

7    liberty nor justice would exist if they were sacrificed.'" <u>Id.</u> at 864 (quoting <u>Washington v.</u>

8    <u>Glucksberg</u>, 521 U.S. 702, 720-21 (1997)).  Under <u>Glucksberg</u>, a court is obligated to "carefully

9    formulat[e]" a "narrow definition of the interest at stake," instead of accepting a plaintiff's broad

10   rhetorical flourishes, before deciding whether substantive due process protects that interest.  <u>Id.</u>

11   at 863.

12         Here, though Plaintiff attempts to describe the substantial right at issue in terms of the

13   right to seek medical treatment, she omits the central component of the right she seeks to

14   vindicate: the use of <u>marijuana</u> in the course of her treatment.  Plaintiff's articulation of her right

15   is similar to the alleged right that the <u>Raich II</u> plaintiff sought to establish.  <u>Id.</u> at 864 (noting that

16   plaintiff's "carefully crafted interest" was "a fundamental right to 'mak[e] life-shaping medical

17   decisions that are necessary to preserve the integrity of her body, avoid intolerable physical pain,

18   and preserve her life'").  The Ninth Circuit held that Raich's framing of the fundamental right

19   was inaccurate because "[c]onspicuously missing from Raich's asserted fundamental right is its

20   centerpiece: that she seeks the right to use <u>marijuana</u> to preserve her bodily integrity, avoid pain,

21   and preserve her life." <u>Id.</u> (emphasis in original).  As in <u>Raich II</u>, the right Plaintiff seeks to

22   vindicate in this case is the right to use marijuana as the course of medical treatment.

23         With this interest in mind, Plaintiff fails the second part of the <u>Glucksberg</u> test, as the

24   Ninth Circuit has rejected the existence of a fundamental right to use marijuana for medical

25   _____

     fundamental right, that right is more appropriately analyzed under the Second Amendment.")

26   (citation and internal quotations omitted).

27

28                                      21

1   reasons.  The right to use marijuana, even by persons who claim they need to use it to alleviate

2   serious medical symptoms, does not meet the exacting standards required for the recognition of a

3   new substantive due process right.  The <u>Raich II</u> court, in analyzing whether the asserted right

4   was "deeply rooted in this nation's history and tradition" and "implicit in the concept of ordered

5   liberty," concluded that "federal law does not recognize a fundamental right to use medical

6   marijuana prescribed by a licensed physician to alleviate excruciating pain and human

7   suffering."  <u>Id.</u> at 866; <u>see also</u> <u>Marin Alliance</u>, 2011 WL 5914031, at *11 ("Finally—and

8   significantly—it is difficult to reconcile the purported existence of a fundamental right to use

9   marijuana for medical reasons with Congress' pronouncement that 'for purposes of the [CSA],

10   marijuana has no currently accepted medical use at all.'" (citing <u>United States v. Oakland</u>

11   <u>Cannabis</u>, 532 U.S. at 491)).  Accordingly, even had Plaintiff adequately raised a substantive due

12   process claim, the claim must be dismissed.[13]

13       **B. Plaintiff's Procedural Due Process "Claim" Must Fail, as She Has Not Been
         Deprived of a Constitutionally-Protected Liberty or Property Interest.**

14

15       Plaintiff further argues for the first time in her opposition brief that Defendants "deprived

16   [her of her] fundamental rights in direct violation of the procedural requirements of the Due

17   Process clause."  Pl's Op. at 5.  In the event the Court addresses this claim, Plaintiff fails to state

18   a prima facie case to establish a procedural due process claim, which requires that Plaintiff allege

19   facts showing: "(1) a deprivation of a constitutionally protected liberty or property interest, and

20

21   [13] Plaintiff cites a perceived "growing trend" in the number of states that have legalized the use
     of marijuana for medical purposes in an effort to show that "physicians believe cannabis has

22   medicinal value and the public believes medical cannabis is a viable course of treatment."  Pl's
     Op. at 7.  Plaintiff's characterization of what physicians or the public believe notwithstanding,

23   under federal law, marijuana "has no currently accepted medical use in treatment in the United

24   States." 21 U.S.C. § 812(b)(1).  More to the point, decriminalization measures in various states
     cannot retroactively create a "deeply rooted" history and tradition of a constitutional right to use

25   marijuana, nor do those measures establish that a right to use marijuana is necessary to ensure

26   that "liberty [and] justice would exist."  <u>See</u> <u>Raich II</u>, 500 F.3d at 864.

27

28
                                              22

***106***

1    (2) a denial of adequate procedural protections."   Kildare v. Saenz, 325 F.3d 1078, 1085 (9th Cir.

2    2003).  Plaintiff's claim cannot survive the threshold inquiry, as she has not been deprived of a

3    constitutionally-protected liberty or property interest.  See Erickson v. United States, 67 F.3d

4    858, 861 (9th Cir. 1995) (finding that the guarantee of procedural due process applies only when

5    a constitutionally protected liberty or property interest is at stake).  As stated, users of marijuana

6    for medical purposes, like all users of controlled substances in violation of federal law, fall

7    outside of the scope of the Second Amendment.  Plaintiff, therefore, has not shown that the

8    government has deprived her of any constitutionally-protected liberty or property interest.  See

9    Clark K. v. Willden, 616 F. Supp. 2d 1038, 1041-42 (D. Nev. 2007) (dismissing procedural due

10   process claims where plaintiffs failed to set forth a proper constitutionally-protected interest).

11   **VI.     PLAINTIFF'S CONSPIRACY AND DAMAGES CLAIMS SHOULD BE
12            DISMISSED.**

13          Defendants moved to dismiss Plaintiff's conspiracy claim for lack of subject matter

14   jurisdiction.  Def. Mot. at 31-33.  Plaintiff consents to the dismissal of this claim, Pl's Op. at 25

15   ("Plaintiff does not object to the dismissal of her conspiracy claim."), and it accordingly should

16   be dismissed.  In addition, to the extent that the Complaint could be construed otherwise,

17   Plaintiff concedes that she may not pursue monetary damages against the United States.  Def.

18   Mot. at 30-31; Pl's Op. at 25.

19                              *              *              *

20

21

22

23

24

25

26

27                                    23

28

1

## <u>CONCLUSION</u>

2      For the reasons stated above and in Defendants' opening brief, the Court should grant

3   Defendants' motion to dismiss (or in the alternative, enter summary judgment for Defendants),

4   and deny Plaintiff's cross-motion for summary judgment.

5

6   Dated: March 30, 2012                    Respectfully submitted,

7                                            STUART F. DELERY
                                             Acting Assistant Attorney General

8                                            DANIEL G. BOGDEN
9                                            United States Attorney

10                                           SANDRA M. SCHRAIBMAN
                                             Assistant Director

11                                           /s/ John K. Theis
                                             JOHN K. THEIS
12                                           Trial Attorney
                                             United States Department of Justice
13                                           Civil Division, Federal Programs Branch
                                             20 Massachusetts Ave., N.W., Rm. 6701
14                                           Washington, D.C.  20530
                                             Telephone: (202) 305-7632
15                                           Facsimile: (202) 616-8460
                                             John.K.Theis@usdoj.gov
16

17                                           *Attorneys for Defendants the United States of*
                                             *America, ATF, U.S. Attorney General Eric Holder,*
18                                           *Acting ATF Director B. Todd Jones, and*
                                             *Assistant ATF Director Arthur Herbert,*
19                                           *in their official capacities (collectively, the United*
                                             *States)*
20

21

22

23

24

25

26

27                                           24

28

**PROOF OF SERVICE**

1

2
    I, John K. Theis, Trial Attorney with the United States Department of Justice, certify that the following individual was served with **DEFENDANTS' REPLY IN SUPPORT OF THEIR**

3
**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY**

4
**JUDGMENT** on this date by the below identified method of service:

5

6
**Electronic Case Filing**:

7
Charles C. Rainey Esq. (Bar No. 10723)
The Law Firm of Rainey Devine

8
8915 S. Pecos Road, Suite 20
Henderson, NV 89074

9
chaz@raineydevine.com

10
*Attorney for Plaintiff*

11

12

13
DATED this 30th day of March 2012.

14
                                           */s/ John K. Theis*

15
                                           JOHN K. THEIS
Trial Attorney
United States Department of Justice

16

17

18

19

20

21

22

23

24

25

26

27

28

1  CHARLES C. RAINEY, ESQ.
   Nevada Bar No. 10723
2  Chaz@raineydevine.com
   JENNIFER J. HURLEY, ESQ.
3  Nevada Bar No. 11817
   Jennifer@raineydevine.com
4  RAINEY DEVINE, ATTORNEYS AT LAW
   8915 S. Pecos Road, Ste. 20A
5  Henderson, Nevada 89074
   Telephone:  (702) 425.5100
6  Facsimile:  (888) 867.5734

7  *Attorneys for Plaintiff*

8

9              UNITED STATES DISTRICT COURT

10                  DISTRICT OF NEVADA

11

12  S. ROWAN WILSON, an individual,        Case No.  2:11-cv-1679

              Plaintiff,
13

14  v.

15  ERIC HOLDER, as Attorney General of    **FIRST AMENDED COMPLAINT**
    the United States; THE U.S. BUREAU OF
16  ALCOHOL,    TOBACCO,    FIREARMS
    AND EXPLOSIVES; B. TODD JONES, as
17  Acting Director of the U.S. Bureau of
    Alcohol,    Tobacco,    Firearms    and
    Explosives;   ARTHUR   HERBERT,   as
18  Assistant Director of the U.S. Bureau of
    Alcohol,    Tobacco,    Firearms    and
19  Explosives; and THE UNITED STATES
    OF AMERICA,
20
              Defendants.
21

22        COMES NOW Plaintiff S. ROWAN WILSON (the "Plaintiff" or "Ms. Wilson") by

23  and through her counsel Charles C. Rainey and Jennifer J. Hurley of the THE LAW FIRM

24  OF RAINEY DEVINE, and hereby submits her Complaint against the Defendants

25  ATTORNEY GENERAL ERIC HOLDER, THE U.S. BUREAU OF ALCOHOL,

26  TOBACCO, FIREARMS AND EXPLOSIVES, ACTING DIRECTOR B. TODD JONES,

27  ASSISTANT DIRECTOR ARTHUR HERBERT, and THE UNITED STATES OF

28  AMERICA (collectively, the "Defendants"), inclusive, alleging as follows:

-1-

**INTRODUCTION**

1.  This is an action to uphold the Constitutional right to keep and bear arms, which extends to all law-abiding adult citizens of the United States, and includes the right to acquire such arms.

2.  The Second Amendment "guarantee[s] the individual right to possess and carry" firearms and "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 2797, 2821 (2008).

3.  However, in contravention of this fundamental constitutional right, the Defendants have prohibited a certain class of law-abiding, responsible citizens from exercising their right to keep and bear arms; the Defendants have enacted laws, policies, procedures and customs with the specific intent of denying the Second Amendment rights of persons who have registered to use medical marijuana pursuant to and in accordance with state law. The Defendants have deliberately banned such persons from purchasing handguns, or firearms of any kind, from federally licensed firearms dealers without providing any means of due process prior to depriving these persons of their rights.

4.  Based on the Defendants' interpretation of Section 922(g)(3) of the federal criminal code, the law prohibits law-abiding adults who have obtained medical marijuana cards pursuant to state law from lawfully purchasing what the Supreme Court has called "the quintessential self-defense weapon" and "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 128 S.Ct. at 2818.

5.  This blanket ban violates the constitutional rights of thousands of responsible, law-abiding American citizens and is thus invalid under the Second and Fifth Amendments.

**THE PARTIES**

6.  Plaintiff S. ROWAN WILSON is a natural person and a citizen of the United States and of the State of Nevada. Ms. Wilson presently intends to acquire a functional

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-2-

1  handgun for use within her home for self-defense but is prevented from doing so by

2  Defendants' active enforcement of the unconstitutional policies complained of in this

3  action. Ms. Wilson fears arrest, criminal prosecution, incarceration, and a fine if she

4  were to acquire the aforementioned handgun. Indeed, Ms. Wilson has been unable to

5  do so.

6      7. Defendant ATTORNEY GENERAL ERIC HOLDER heads the United States

7  Department of Justice, which is the agency of the United States government responsible

8  for enforcement of federal criminal laws. Defendant Holder, in his capacity as Attorney

9  General, is responsible for executing and administering laws, customs, practices, and

10 policies of the United States and is presently enforcing the laws, customs, practices and

11 policies complained of in this action. Defendant Holder has ultimate authority for

12 supervising all of the operations and functions of the Department of Justice.

13     8. Defendant U.S. BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND

14 EXPLOSIVES ("BATFE") is an arm of the Department of Justice responsible for the

15 investigation and prevention of federal offenses involving the use, manufacture, and

16 possession of firearms. The BATFE also regulates, via licensing, the sale, possession,

17 and transportation of firearms and ammunition in interstate commerce. The BAFTE is

18 authorized to implement and enforce the federal law challenged in this case. BATFE is

19 currently enforcing the laws, customs, practices and policies complained of in this

20 action in Plaintiff's jurisdiction.

21     9. Defendant B. TODD JONES is the Acting Director of the BATFE and, in that

22 capacity, is presently enforcing the laws, customs, practices and policies complained of

23 in this action.

24     10. Defendant ARTHUR HERBERT is the Assistant Director of the BATFE and, in

25 the capacity, is presently enforcing the laws, customs, practices and policies complained

26 of in this action.

27     11. Defendant UNITED STATES OF AMERICA is a proper defendant in this action

28 pursuant to 5 U.S.C. § 702.

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

**JURISDICTION AND VENUE**

12. This case concerns certain subject matter under the original and exclusive jurisdiction of the federal courts of the United States of America.

13. This action seeks relief pursuant to 28 U.S.C. §§ 2201, 2202, and 2412. Therefore, jurisdiction is founded on 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States.

14. The Defendants, including the BATFE, are subject to suit for relief other than money damages pursuant to 5 U.S.C. § 702.

15. This Court has authority to award costs and attorneys fees pursuant to 28 U.S.C. § 2412.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

**COMMON ALLEGATIONS**

17. On October 4, 2011, Plaintiff S. Rowan Wilson ("Ms. Wilson"), an adult-aged, law-abiding, responsible citizen, sought to purchase a handgun to use for self-defense in her home. *See* **DECLARATION OF S. ROWAN WILSON**, attached hereto as Exhibit "**1**" and incorporated herein by reference.

18. That day, Ms. Wilson visited Custom Firearms & Gunsmithing in Moundhouse, Nevada, hoping to purchase a Smith & Wesson model 686 chamber in 0.357" magnum (hereinafter referred to as the "Firearm"). *Id*. at 4:26.

19. However, when Ms. Wilson began to fill out her application paperwork for the purchase of a gun, the gun shop's proprietor, Frederick Hauser ("Mr. Hauseur"), stopped Ms. Wilson from completing question 11.e on the application.

20. Question 11.e asked whether the applicant was addicted to or an unlawful user of a controlled substance.

21. Ms. Wilson's natural inclination was to answer Question 11.e as "no."

22. However, Mr. Hauseur explained to Ms. Wilson that because Ms. Wilson was the holder of a state-issued medical marijuana registry card, Ms. Wilson was automatically deemed an unlawful user of a controlled substance and therefore not someone that he

-4-

RAINEY ● DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

1  could sell a firearm to.

2  23. Mr. Hauseur further informed Ms. Wilson that he could not sell her a firearm

3  without jeopardizing his federal firearms license. *Id.* at 5:32; *see* **DECLARATION OF**

4  **FREDERICK JOHN HAUSEUR, IV**, attached hereto as Exhibit "**2**" and incorporated

5  herein by reference.

6  24. Mr. Hauseur explained to Ms. Wilson that because of the mere fact that he was

7  aware Ms. Wilson possessed a state-issued medical marijuana registry card he was

8  prohibited from selling her the Firearm, any other firearm, or even any ammunition.

9  Exhibit 1 at 5:32; Exhibit 2 at 3:12-14.

10  25. Roughly a week prior to Ms. Wilson's visit to Custom Firearms & Gunsmithing,

11  Mr. Hauseur received notice of a letter dispatched by the BATFE to all federal firearms

12  licensees, in which the BATFE specifically forbade the sale of any firearms or

13  ammunition to any person possessing a state-issued medical marijuana registry card.

14  *See* Exhibit 2-B.

15  26. Mr. Hauseur's refusal to sell Ms. Wilson the Firearm is the direct result of laws,

16  policies, procedures and/or customs initiated and promulgated by the Defendants. *See*

17  Exhibit 2 at 2:7-8; Exhibit 2-B; *see also* 18 USC 922(g)(3).

18  27. Ms. Wilson is a medical professional, who has, for some time, researched and

19  studied the use of cannabis for medical purposes. *See* Exhibit 1 at 2-3.

20  28. Approximately three years ago, Ms. Wilson learned from a friend, who was

21  suffering from severe endometriosis, that the use of cannabis can substantially mitigate,

22  or even eliminate, the pain caused by persistent muscle spasms and other detrimental

23  medical conditions. *Id.* at 2:14. Since that time, Ms. Wilson has extensively researched

24  the efficacy of using cannabis as a medical treatment, including conducting interviews

25  with a number of licensed physicians. *Id.* at 2:15. Most recently, Ms. Wilson met with

26  Dr. Alan Shackelford, a practicing physician in Colorado and former fellow with the

27  Harvard University School of Medicine, to discuss the use of cannabis as a medical

28  treatment. *Id.* at 3:16-17.

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-5-

29. Ms. Wilson is currently a resident of Carson City, Nevada, and has resided in the State of Nevada since September 2006. Exhibit 1 at 2:4-5.

30. Ms. Wilson holds a bachelor's degree from the University of Texas, Austin, and a master's degree from Jones International University of Colorado. *Id.* at 2:6-8.

31. For the past year, Ms. Wilson has worked as a professional caregiver and medical technician, most recently accepting a position with Carson Valley Residential Care. *Id.* at 2:8.

32. For the past few months, Ms. Wilson has been actively researching medical schools and has met with and shadowed a series of doctors, as she plans to pursue a doctor of osteopathy. *Id.* at 2:9-12.

33. Ms. Wilson has additionally met with dozens of patients that have communicated to her their positive experiences with medical cannabis. *Id.* at 3:18.

34. Most of these individuals are elderly persons suffering from serious ailments, who find substantial relief and curative benefits from the use of cannabis. *Id.* Most of the individuals Ms. Wilson has encountered certainly do not fit the commonly portrayed, narrow-minded stereotype of a marijuana user. *Id.* at 3:19.

35. Ms. Wilson's interest in the medical efficacy of cannabis stems, in part, from her own struggles with severe dysmenorrhea (also referred to as severe menstrual uterine contractions), and the possible treatment options that cannabis offers. *Id.* at 3:20. Since the age of ten (10), Ms. Wilson has suffered from severe dysmenorrhea, which is often debilitating, even leading to further painful side effects, such as severe nausea and cachexia. *Id.*

36. In the fall of 2010, Ms. Wilson decided to apply for a Nevada medical marijuana registry card. *Id.* at 3:21.

37. The Nevada State Constitution states, in relevant part, at Article 4, Section 38:
> "The legislature shall provide by law for: (a) The use by a patient, upon the advice of his physician, of a plant of the genus Cannabis for the treatment or alleviation of cancer, glaucoma, acquired immunodeficiency syndrome; severe, persistent nausea of cachexia resulting from these or other chronic or debilitating medical conditions; epilepsy and other disorders characterized by seizure; multiple sclerosis

RAINEY ● DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

and other disorders characterized by muscular spasticity; or other conditions approved pursuant to law for such treatment."

38. Furthermore, Chapter 453A of the Nevada Revised Statutes provides a statutory framework specifically authorizing the issuance of medical marijuana registry cards to persons that have a doctor's recommendation for the use of medical marijuana.

39. In October 2010, in full compliance with Nevada law, Ms. Wilson obtained and submitted an application for a Nevada State-issued medical marijuana registry card. Exhibit 1 at 3:21-24; *see also* Exhibit 1-B.

40. Ms. Wilson obtained a doctor's recommendation for the use of medical marijuana, as required by Nevada law and submitted all of the appropriate paperwork to the State. *Id*. at 3:22.

41. On May 12, 2011, Ms. Wilson was issued a medical marijuana registry card from the State of Nevada. *Id*. at 3:24; *see also* Exhibit 1-B.

42. Approximately five months later, on October 4, 2011, when Ms. Wilson attempted to purchase the Firearm, the owner of the gun store, Fred Hauseur, denied Ms. Wilson's right to purchase the Firearm based solely on the fact that she possessed a valid State of Nevada medical marijuana registry card. Exhibit 2 at 3:12-13.

43. In denying Ms. Wilson's attempted purchase of the Firearm, Mr. Hauseur reasonably relied on the instructions directly provided by the BATFE. On or about September 21, 2011, the BATFE issued an open letter to all federal firearms licensees in which the BATFE specifically instructed firearms licensees to deny the sale of firearms or ammunition to any person whom the licensee is aware possesses a card authorizing such person to possess and use marijuana under state law. *Id*. at 2:7-8; *see also* Exhibit 2-B.

44. Mr. Hauseur received the BATFE open letter on or about October 1, 2011. *Id*. at 2:7. As a direct result of the open letter, Mr. Hauseur was compelled to deny Ms. Wilson's attempt to purchase the Firearm. *Id*. At 2:12-14.

45. Furthermore, each purchase of a firearm requires that the purchaser complete Form 4473, as provided by the BATFE.  Question 11(e) of Form 4473 asks, "Are you an

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-7-

unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance?" Exhibit 1 at 4:29.

46. While Ms. Wilson's natural inclination would be to answer "No" to question 11(e), Ms. Wilson was informed by Mr. Hauseur that the BATFE has promulgated a policy whereby any person holding a medical marijuana registry card is automatically considered an "unlawful user of, or addicted to marijuana." *Id.* at 4:30.

47. Because Ms. Wilson holds a valid medical marijuana registry card issued by the State of Nevada, but is clearly not an unlawful user of or addicted to marijuana, Ms. Wilson elected to leave question 11(e) on Form 4473 blank. *Id.* at 4:31.

48. Nevertheless, when Ms. Wilson provided Form 4473 to Mr. Hauseur, Mr. Hauser informed her that, even with Question 11(e) left blank, he could not sell her a firearm without jeopardizing his federal firearms license, since he had actual knowledge that Ms. Wilson possesses a state-issued medical marijuana registry card. *Id.* at 5:32; Exhibit 2 at 3:12-14.

49. Ms. Wilson has never been charged with or convicted of any drug-related offense, or any criminal offense for that matter. Indeed, no evidence exists that Ms. Wilson has ever been an "an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance." Ms. Wilson maintains that she is not an unlawful user of or addicted to marijuana or any other controlled substance. Nonetheless, Ms. Wilson was denied her Second Amendment right to keep and bear arms based solely on her possession of a valid State of Nevada medical marijuana registry card.

## I.

### FIRST CAUSE OF ACTION

### (VIOLATION OF 2nd AMENDMENT)

50. Plaintiff hereby incorporates by reference paragraphs one (1) through forty-nine (49) as though fully set forth herein.

51. Title 18, Sections 922(g)(3) and 922(d)(3) and Title 27, Section 478.11 of the Code

-8-

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

of Federal Regulations ban federally licensed firearms dealers from selling firearms to any person "who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))."

52. The Defendants have implemented and are enforcing a policy whereby any person who possesses a medical marijuana card validly issued pursuant to State law or any person who a federally licensed firearms dealer "reasonably suspects" possesses a medical marijuana card validly issued pursuant to State law is summarily and conclusively deemed to be "an unlawful user of or addicted to any controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))."

53. Thus, any person who possesses a medical marijuana card validly issued by pursuant to State law may not purchase a firearm from any federally licensed firearms dealer without committing a federal offense under Title 18, Section 922(g)(3) and Title 27, Section 478.11, and a federally licensed firearms dealer may not sell a firearm to any person who he knows or "reasonably suspects" possesses a medical marijuana card validly issued pursuant to State law without committing a federal offense under Title 18, Section 922(d)(3).

54. As a result of Title 18, Sections 922(g)(3) and 922(d)(3) and Title 27, Section 478.11 of the Code of Federal Regulations and the Defendants' ruling that any person who possesses a medical marijuana card validly issued pursuant to State law is conclusively deemed to be "an unlawful user of or addicted to any controlled substance as defined in section 102 of the Controlled Substances Act" the Plaintiff has been denied her Second Amendment right to obtain and possess a handgun.

55. These laws and policies infringe upon, and impose an impermissible burden upon, the Plaintiff's right to keep and bear arms under the Second Amendment to the United States Constitution.

56. As a direct and proximate result of the foregoing law, policy, practice and/or procedure, as enacted and promulgated by the Defendants, the Plaintiff has suffered and continues to suffer damages.

RAINEY ● DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

1   57. The Plaintiff has incurred attorney's fees and costs as a direct result of

2   prosecuting the present court action.

**II.**

**SECOND CAUSE OF ACTION**

**(VIOLATION OF EQUAL PROTECTION CLAUSE OF THE 5th AMENDMENT)**

58. Plaintiff hereby incorporates by reference paragraphs one (1) through fifty-seven

(57) as though fully set forth herein.

59. Title 18, Sections 922(g)(3) and 922(d)(3) and Title 27, Section 478.11 of the Code

of Federal Regulations ban federally licensed firearms dealers from selling firearms to

any person "who is an unlawful user of or addicted to any controlled substance (as

defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))."

60. The Defendants have implemented and are enforcing a policy whereby any

person who possesses a medical marijuana card validly issued pursuant to State law is

automatically and conclusively deemed to be "an unlawful user of or addicted to any

controlled substance as defined in section 102 of the Controlled Substances Act (21

U.S.C. 802))."

61. As a result of Title 18, Sections 922(g)(3) and 922(d)(3) and Title 27, Section 478.11

of the Code of Federal Regulations, and the Defendants' policy regarding persons who

possesses a valid medical marijuana card issued pursuant to state law, the Plaintiff is

being treated differently from similarly situated individuals.

62. Specifically, Plaintiff is being treated differently from persons who are prescribed

medical marijuana in states where the obtainment of a state-issued medical marijuana

registry card is not required. Because Plaintiff lives in a state where she is required to

obtain a medical marijuana card prior to invoking any of the rights or benefits set forth

in her state's statutes regarding medical marijuana and Plaintiff has followed such laws,

she is automatically determined by Defendants to be an "unlawful user" of marijuana

by Defendants regardless of whether or not she actually uses marijuana, and based on

the Defendants' conclusory determination is denied her second amendment rights.

-10-

*119*

RAINEY • DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

1   Meanwhile, a person who lives in a state where a registration card is not required who

2   is prescribed marijuana by his or her doctor is not automatically presumed to be an

3   "unlawful user" of marijuana by the Defendants. Thus, Plaintiff is being treated

4   differently from similarly situated persons.

5       63. Plaintiff is also being treated differently from similarly situated persons with

6   similar medical conditions to those of the Plaintiff. The Plaintiff has been denied her

7   right to purchase a handgun based on the Defendants' classification of Plaintiff as an

8   "unlawful user" of marijuana simply because she has followed state laws for the

9   obtainment of a method of treatment for her medical condition. Other similarly situated

10  individuals who likewise pursue different methods of treatment for medical conditions

11  have not been denied their ability to obtain handguns.

12      64. These laws and policies violate the Plaintiff's right to equal protection of the laws

13  guaranteed under the Equal Protection Clause of the Fifth Amendment to the United

14  States Constitution.

15      65. As a direct and proximate result of the foregoing law, policy, practice and/or

16  procedure, as enacted and promulgated by the Defendants, the Plaintiff has suffered

17  and continues to suffer damages.

18      66. The Plaintiff has incurred attorney's fees and costs as a direct result of

19  prosecuting the present court action.

20                                   **III.**

21                        **THIRD CAUSE OF ACTION**

22  **(VIOLATION OF PROCEDURAL DUE PROCESS CLAUSE OF 5th AMENDMENT)**

23      67. Plaintiff hereby incorporates by reference paragraphs one (1) through sixty-six

24  (66) as though fully set forth herein.

25      68. Plaintiff possesses a protected liberty interest, namely, her right to possess a

26  firearm under the Second Amendment.

27      69. The Defendants took legislative action by adopting a policy whereby any person

28  who possesses a medical marijuana card validly issued pursuant to State law is

RAINEY   •   DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-11-

automatically and conclusively deemed to be "an unlawful user of or addicted to any controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))" and therefore such a person cannot purchase a handgun from a federally licensed firearms dealer without committing a federal offence under Title 18, Sections 922(g)(3) and Title 27, Section 478.11 of the Code of Federal Regulations. Such policy is not merely interpretive.

70. Defendants deprived the Plaintiff of her protected liberty interest through their promulgation of their policy whereby any person who possesses a medical marijuana card validly issued pursuant to State law is automatically and conclusively deemed to be "an unlawful user of or addicted to any controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))" and therefore such a person cannot purchase a handgun from a federally licensed firearms dealer without committing a federal offence under Title 18, Sections 922(g)(3) and Title 27, Section 478.11 of the Code of Federal Regulations.

71. The Defendants have denied the Plaintiff adequate procedural protections before depriving her of her right to purchase and possess a firearm. Defendants did not issue any notice or hold any hearing prior to depriving the Plaintiff of her right. Defendants also have not offered any means for the Plaintiff to reclaim her right. In violation of the Plaintiff's right to procedural due process, the Defendants have unilaterally and conclusively determined without any reason or supporting evidence that the Plaintiff is an "unlawful user" of marijuana simply because the State of Nevada has conferred on her the right to use medical marijuana.

72. As a direct and proximate result of the Defendants' above-described actions, the Plaintiff has suffered and continues to suffer damages.

73. The Plaintiff has incurred attorney's fees and costs as a direct result of prosecuting the present court action.

/ / /

/ / /

RAINEY ● DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-12-

## IV.

## FOURTH CAUSE OF ACTION

## (VIOLATION OF SUBSTANTIVE DUE PROCESS CLAUSE OF 5th AMENDMENT)

74. Plaintiff hereby incorporates by reference paragraphs one (1) through seventy-three (73) as though fully set forth herein.

75. The Plaintiff's right to possess a handgun under the Second Amendment is objectively deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty such that neither liberty nor justice would exist if they were sacrificed.

76. While it has been recognized that the Second Amendment is not unlimited and restrictions prohibiting felons from possessing firearms are valid, the Plaintiff's mere possession of a validly issued state medical marijuana card does not make her a felon nor does it mean that the Plaintiff has ever even used marijuana.

77. At the same time, Plaintiff possesses a fundamental right to free speech under the First Amendment which includes certain non-verbal speech which, in this case, is the possession of a medical marijuana registry card validly issued pursuant to state law.

78. Through Title 18, Sections 922(g)(3) and 922(d)(3) and Title 27, Section 478.11 of the Code of Federal Regulations, and their policy whereby any person who possesses a medical marijuana card validly issued pursuant to State law is automatically and conclusively deemed to be "an unlawful user of or addicted to any controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))" and thereby prohibited from purchasing a handgun from a federally licensed firearms dealer without committing a federal offence, Defendants have deprived Plaintiff of her substantive due process.

79. As a direct and proximate result of the Defendants' above-described actions, the Plaintiff has suffered and continues to suffer damages.

80. The Plaintiff has incurred attorney's fees and costs as a direct result of prosecuting the present court action.

RAINEY ● DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-13-

V.

**FIFTH CAUSE OF ACTION**

**(VIOLATION OF 1st AMENDMENT)**

81. Plaintiff hereby incorporates by reference paragraphs one (1) through eighty (80) as though fully set forth herein.

82. Under the First Amendment, Plaintiff possesses a fundamental right to free expression in the forms of freedom of association and free speech including certain non-verbal speech and communicative conduct, which, in this case, includes, without limitation, the acquisition, possession, and acknowledgment of possession of a medical marijuana registry card validly issued pursuant to state law.

83. The legalization of marijuana for medicinal purposes has been for years, and continues to be, a matter of political debate throughout the United States,

84. Largely as a result of voter initiatives, eighteen (18) states and the District of Columbia have legalized the use of marijuana for medical purposes.

85. By acquiring, possessing, and acknowledging possession of a medical marijuana registry card, Plaintiff is exercising her First Amendment right to free speech.

86. By acquiring, possessing, and acknowledging possession of a medical marijuana registry card, Plaintiff is expressing her support for and advocacy of legalization of medical marijuana.

87. Her medical marijuana registry card is a tangible symbol of her belief and opinion that marijuana should be legal for medical use, and a symbol of her belief and opinion that her fellow citizens of Nevada were correct to have forced changes to Nevada law legalizing marijuana for medical use.

88. Her political and personal opinions about medical marijuana are inherent in her discussions with others about the fact that she has a medical marijuana card.

89. By acquiring, possessing, and acknowledging possession of a medical marijuana registry card, Plaintiff was exercising her First Amendment right to freely associate with others who support and advocate the legalization of marijuana for medical use.

RAINEY ● DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-14-

90. The Plaintiff's medical marijuana registry card is a facial and express statement of her association with a group – medical marijuana cardholders - that embodies the belief and opinion that citizens in each state have a right to decide whether marijuana should be legal for medical purposes.

91. By acquiring, possessing, and acknowledging possession of a medical marijuana registry card, Plaintiff expresses her support for medical marijuana and her deeply held beliefs that marijuana should be legal for medical use.

92. The Plaintiff is, literally, a card-carrying advocate for medical marijuana, who is associated with a distinct group, identifiable by their inclusion in the medical marijuana registry.

93. Under the First Amendment, a citizen has the right to be free from governmental action taken to retaliate against the citizen's exercise of First Amendment rights and also has the right to be free from governmental action taken to deter the citizen from exercising those rights in the future.

94. By implementing and enforcing a policy that forbids a federally licensed firearms dealer from selling a firearm to any person who possesses a medical marijuana card or to any person who a federally licensed firearms dealer "reasonably suspects" possesses a medical marijuana card, Defendants are retaliating against Plaintiff's exercise of her First Amendment rights by denying her Second Amendment right.

95. Further, Defendants are also attempting to deter her from exercising her First Amendment rights in the future by requiring that she give up her First Amendment rights in exchange for her Second Amendment rights.

96. As a direct and proximate result of the Defendants' above-described actions, the Plaintiff has suffered and continues to suffer damages.

97. The Plaintiff has incurred attorney's fees and costs as a direct result of prosecuting the present court action.

/ / /

/ / /

RAINEY  •  DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-15-

124

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the court enter judgment in her favor and against Defendants as follows:

1. Declare that 18 U.S.C. §§ 922(g)(3) and 922(d)(3) and all derivative regulations, such as 27 C.F.R. § 478.11, and the policy set forth in the Defendants' open letter to federally licensed firearms dealers dated September 21, 2011, violate the right to keep and bear arms as secured by the Second Amendment to the United States Constitution.

2. Declare that 18 U.S.C. §§ 922(g)(3) and 922(d)(3) and all derivative regulations, such as 27 C.F.R. § 478.11, and the policy set forth in the Defendants' open letter to federally licensed firearms dealers dated September 21, 2011, violate the Due Process Clause of the Fifth Amendment to the United States Constitution.

3. Declare that 18 U.S.C. §§ 922(g)(3) and 922(d)(3) and all derivative regulations, such as 27 C.F.R. § 478.11, and the policy set forth in the Defendants' open letter to federally licensed firearms dealers dated September 21, 2011, violate the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

4. Declare that 18 U.S.C. §§ 922(g)(3) and 922(d)(3) and all derivative regulations, such as 27 C.F.R. § 478.11, and the policy set forth in the Defendants' open letter to federally licensed firearms dealers dated September 21, 2011, violate the right to free speech secured by the Second Amendment to the United States Constitution.

5. Permanently enjoin the Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them from enforcing 18 U.S.C. §§ 922(g)(3) and 922(d)(3) and any and all derivative regulations, such as 27 C.F.R. § 478.11, and the policy set forth in the Defendants' open letter to federally licensed firearms dealers dated September 21, 2011, and provide such further declaratory relief as is consistent with the injunction.

6. Award the Plaintiff compensatory and punitive damages.

7. Award costs and attorneys fees and expenses to the extent permitted under 28 U.S.C. § 2412.

-16-

RAINEY ● DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

8. Grant such other and further relief as the Court deems just and proper.

Dated this 17th day of December 2012.

Respectfully Submitted by:

RAINEY DEVINE, ATTORNEYS AT LAW

By:  /s/ Chaz Rainey

Charles C. Rainey, Esq.
Nevada Bar No. 10723
Chaz@raineydevine.com
Jennifer J. Hurley, Esq.
Nevada Bar No. 11817
Jennifer@raineydevine.com
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
Telephone:  +1.702.425.5100
Facsimile:  +1.888.867.5734
*Attorneys for Plaintiff*

RAINEY   •   DEVINE
8915 S. Pecos Road, Ste. 20A
Henderson, Nevada 89074
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)

-17-

126

TRANSCRIBED FROM DIGITAL RECORDING                1

1              **UNITED STATES DISTRICT COURT**

2                **DISTRICT OF NEVADA**

3     **THE HON. GLORIA M. NAVARRO, U.S. DISTRICT JUDGE, PRESIDING**

4

5   S. Rowan Wilson,                    )
                                        )
6              Plaintiff,               )         **Case No.**
                                        )    **2:11-cv-01679-GMN-PAL**
7          vs.                          )
                                        )      **Motion Hearing**
8   Eric H. Holder, Jr., et al.,        )
                                        )
9              Defendants.              )       <u>**CERTIFIED COPY**</u>
    _____)

10

11

12

13

14

15              **TRANSCRIPTION OF PROCEEDINGS**

16              Friday, November 2, 2012

17

18

19

20  APPEARANCES:                   See Next Page

21  DIGITALLY RECORDED:            9:13:52 a.m. to 10:43:20 a.m.

22  TRANSCRIBED BY:                ELLEN L. FORD
                                   (702)366-0635
23

24

25  **Proceedings recorded by electronic sound recording, transcript
    produced by mechanical stenography and computer.**

TRANSCRIBED FROM DIGITAL RECORDING          2

```
 1  APPEARANCES:

 2  For the Plaintiff:

 3          CHARLES C. RAINEY, ESQ.
            The Law Firm of Rainey Devine
 4          8915 South Pecos Road
            Suite 20
 5          Henderson, Nevada  89074
            (702) 425-5100
 6          email: chaz.rainey@raineylegal.com

 7

 8  For the Defendant:

 9          JOHN KENNETH THEIS, ESQ.
            U.S. Department of Justice
10          Federal Programs Branch
            20 Massachusetts Avenue NW
11          Washington, DC  20530
            (202) 350-7632
12          email: john.k.theis@usdoj.gov

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      **LAS VEGAS, NEVADA; Friday, November 2, 2012; 9:13:52 a.m.**

2                              **--o0o--**

3                      **P R O C E E D I N G S**

4              THE COURT:  Thank you.  You may be seated.

5              DEPUTY CLERK:  Now calling the case of S. Rowan Wilson

6      versus Eric Holder.  Case number 2:11-cv-1679-GMN-PAL,

7      regarding motion hearing.

8              Counsel, please note your appearances for the record.

9              MR. THEIS:  Go ahead.

10             MR. RAINEY:  Chaz Rainey here on behalf of the

11     Plaintiff, S. Rowan Wilson.

12             THE COURT:  And good morning, Mr. Rainey.  And good

13     morning, Miss Wilson.

14             MR. THEIS:  John Theis on behalf of the Defendants.

15             THE COURT:  And good morning, Mr. Theis.  So it's

16     Theis?

17             MR. THEIS:  Theis.

18             THE COURT:  Not T-h, not this (phonetic).  It's

19     spelled T-h, but it's pronounced with a T.

20             MR. THEIS:  That's correct.

21             THE COURT:  All right.  Thank you, Mr. Theis.  Good

22     morning.  And did you come in from Washington, D.C.?

23             MR. THEIS:  I did.

24             THE COURT:  Okay.  Well, we're glad we were able to

25     have you here with us.  We weren't sure there for a while with

1 the hurricane if you were going to be able to be here.  So I'm

2 glad to see that you're safe and sound.

3         I appreciate that you all probably are prepared to

4 present oral arguments to me.  I'm hoping that it would be

5 helpful to you for me to explain -- go ahead and be seated --

6 my inclinations at this point.

7         I still have an open mind.  I want to know whether you

8 agree or disagree with my initial thoughts on the matter.

9 There has been some changes in the law since you all finished

10 the briefing, so that might be important for you to explain to

11 me how you think that does or does not affect your position in

12 this case.

13         So I'll just go over very briefly -- obviously, we're

14 talking about the Federal Gun Control Act and two particular

15 sections of Title 18 of the United States Code § 922(g)(3) and

16 (d)(3).

17         As to the CFR, the Code of Federal Regulation, that's

18 at issue at Title 27 § 478.11.

19         It's important to me to figure out which one of the

20 two inferences of current use apply and, of course, the ATF

21 Open Letter.

22         So first of all, looking at the Administrative

23 Procedures Act at Title 5 of the United States Code § 553,

24 which says, "Any proposed rule must undergo notice and comment

25 unless the rule is interpretative."

1          I want to know your thoughts and whether you think

2     that the particular rule at issue is interpretative.  And the

3     one we're speaking of is at Federal code -- the Federal

4     regulation that states that, "An inference of current use may

5     be drawn from evidence of a recent use or possession of a

6     controlled substance, or a pattern of use or possession that

7     reasonably covers the present time."  And so that is the

8     definition of "unlawfully user" as used in the Federal Gun

9     Control Act.

10          It appears that the question might turn on whether or

11     not this rule issued by the ATF Letter and whether it's an

12     interpretation.  Is it an interpretative rule or is it a

13     legislative rule?  If it is a legislative rule, if it's

14     something that Congress has delegated power to the Agency, and

15     the Agency is intending to use that power to promulgate the

16     rule at issue, then, obviously, it would be a legislative rule

17     and then it would require comment and notice.

18          However, if, in fact, that rule is issued by the

19     Agency just to advise the public of its own interpretation and

20     construction of the statute which -- in regards to the rule

21     which it administers, then it is an interpretative rule, and in

22     that case would not be subject to notice and comment.  It's

23     just reflecting on the construction of the statute, and it's a

24     statute which has been entrusted to the Agency to administer.

25          So looking at the Firearms Import/Export Roundtable

1  Trade Group versus Jones case, which is the D.C. District Court

2  case in 2012 recently, it -- they did determine that a

3  different ATF Letter -- not this Open Letter but a different

4  ATF Letter -- was interpretative and, thus, did not require

5  comment and notice.  So if you think that that case applies or

6  doesn't apply here in some way, please let me know.

7        I would like for, if possible, for the Plaintiff to

8  clarify whether or not she is challenging only the statute, the

9  two subsections of the statute, or also the regulation itself.

10 Is she seeking review of that ATF stated policy in the Open

11 Letter only, or is she also challenging the statutes?

12       Because I'm not -- I'm not sure they're all the same

13 thing.  You know.  They could be different things.  You could

14 say, well, the statute may be constitutional, but this

15 interpretation doesn't apply.  I don't want to put words in

16 your mouth, but I want to make sure that I'm clear on what your

17 position is.

18       If it's only the policy's affect on those two statutes

19 in the regulation that keeps her from procuring the gun, then I

20 want to know if that's -- if that's what your position is.

21       Also, if the ATF Open Letter requires notice and

22 comment or not.  Is it an interpretative rule or is it a

23 legislative rule?

24       How much deference should the Court give to the ATF's

25 interpretation?  It's their interpretation.  How binding is

1 that?  Does it have any precedential affect at all?

2            Do the answers to, you know, all of these questions

3 that I'm kind of throwing at you for the first time -- and I

4 appreciate if you can't answer them right now -- but how does

5 that affect my determination of the merits of the action?  And,

6 of course, then there's the question of jurisdiction.

7            Looking more specifically at Section 922(g)(3) which

8 is the portion of the Federal Gun Control Act that makes it

9 unlawful for users of controlled substances to actually possess

10 the guns, looking at that specifically, and the Dugan case,

11 which is a Ninth Circuit case recently in 2011 that was decided

12 after the Heller case, the Supreme Court Heller case.  In Dugan

13 they upheld Congress' ability to prohibit illegal drug users

14 from possessing firearms.

15            So it appears to me that, regardless of the state law

16 on the issue of medical marijuana, marijuana does still remain

17 unlawful under the Federal law, so it seems like this claim

18 would be barred by that Ninth Circuit precedent as issued by

19 Dugan.

20            So tell me if you disagree or why that may not be --

21 maybe that is not a complete -- doesn't completely prevent me

22 from considering the issue if there's another way for me to

23 look at it.  But it does seem to me that that is a bar.

24            As to the 922(d)(3), which is the section that

25 prohibits firearm sales to persons that the firearm seller

1  knows or has reason to believe -- reasonable cause to believe

2  is an unlawful user, that one is perhaps a little easier in a

3  sense that under the Fourth Circuit's Chavin case --

4  C-h-a-v-i-n -- the Court did know that, "The challenged law

5  will only impose a burden on the conduct that is falling within

6  the scope of the Second Amendments' guarantee if the conduct

7  was understood to be within that scope at the initial time, at

8  the original time of its ratification."

9         And so with that in mind, the Fourth Circuit

10 determined -- they analyzed that at the time of the

11 ratification of the Second Amendment, they weren't intending to

12 protect an individual's right to sell firearms as opposed to

13 possess firearms.  And so it does appear that, because Congress

14 can constitutionally preclude illegal drug users -- the key

15 there being illegal -- drug users from possessing a firearm,

16 Congress likewise could prevent sellers from selling a firearm.

17        So it looks to me -- I'm inclined to believe that the

18 Second Amendment probably does not include a right to sell

19 firearms and ammunition.  So is that a complete bar or, again,

20 is there another way of looking at it?

21        Also, I'm not sure as to that particular subsection

22 whether there's a standing question there that needs to be

23 addressed.

24        As to the constitutional analysis, obviously, we need

25 to decide which one of the levels of scrutiny apply.  Is it

 1 | rational?  Is it intermediate?  Is it strict?

 2 |         So the Government is arguing that it's the

 3 | intermediate scrutiny, and the Plaintiff is arguing it's strict

 4 | scrutiny.

 5 |         The Government did rely on a series of cases,

 6 | including the Nordyke case that was prior to the En Banc

 7 | decision.  So now we've had the En Banc decision at Nordyke, so

 8 | I'd like you to explain to me how that does or doesn't change

 9 | your position.

10 |         Let's see.  I did look at U.S. v Carter, which is a

11 | Fourth Circuit's 2012 case finding that intermediate scrutiny,

12 | not strict scrutiny, applied.

13 |         I'm not sure that I'm persuaded that it's strict

14 | scrutiny.  Most of the cases I believe do point towards

15 | intermediate scrutiny.  Of course, there is that Nordyke case

16 | which found that it was actually a rational basis, but it was

17 | county -- that was the County Code violation for possessing the

18 | firearms or ammunition on County property.  Not everywhere, but

19 | just on County property.  So maybe that's the distinction.  You

20 | can let me know what you think I should do or not do in regards

21 | to how Nordyke affects the issues here today.

22 |         Let's see.  Substantive due process.  The Fifth

23 | Amendment claims.  There's the substantive due process or

24 | procedural due process and the equal protection as to the

25 | substantive due process.

1              I think looking at the Raich -- and I'll spell that

2    for the record, R-a-i-c-h -- v Gonzales case, which is the

3    Ninth Circuit 2007 case, it does appear that the Ninth

4    Circuit's already held that there's no constitutionally

5    protected right to use marijuana for medical purposes.

6              I know there's the litany of right to abortion under

7    the Planned Parenthood case, right to use contraceptives under

8    the Eisenstadt case, right to refuse lifesaving hydration and

9    nutrition under the Cruzan case.  But the Raich case is a Ninth

10   Circuit case, so it does have direct precedential value on

11   my -- my court, you know, my jurisdiction.  As opposed to if

12   it's a different district, it's something I consider and give

13   preferential treatment to but not necessarily directly

14   controlling.  But a Ninth Circuit case is directly controlling

15   on this Court.  So tell me why you think that can be

16   distinguished, if you think it can.

17             Also, the questions regarding procedural due process

18   and equal protection.  I just think those are very weak.  If

19   you think that there's -- you know, I want you to use your time

20   wisely.  So if you think that you still want to convince me

21   that those are issues that should -- that you can explain

22   sufficiently to survive a Motion to Dismiss, go ahead and tell

23   me.  But if you don't want to spend too much time on those and

24   just spend more time on the others that seem to be probably

25   more viable at this point, that's up to you.

1          The conspiracy claim also was dismissed already

2   voluntarily by the Plaintiff so we don't need to go into that

3   at all.

4          That's kind of my inclination and those are my

5   questions.  And since this is the Defendant's Motion to

6   Dismiss, we'll go ahead and allow the defense to go ahead and

7   speak first, and then we'll have a response from the Plaintiff,

8   and then a reply from the Government, because it is your

9   motion.

10          And then I most likely will not render a decision

11   today.  I think this is as much of a decision as you probably

12   will get today as far as my -- what my inclinations are.  I'll

13   take it under submission at the end and issue a written ruling

14   as soon as I can.

15          All right.  So go ahead, Mr. Theis.

16          MR. THEIS:  All right.  Thank you, Your Honor.

17          At the outset, on your concerns about what I would

18   call sort of the APA type concerns.  Much of this issue is not

19   fully presented in the -- in the Complaint or in the briefing

20   that was submitted to the Court.  So I will give sort of our

21   initial impression to the questions that the Court's raised,

22   but if possible, I'd like to reserve -- and if the Court would

23   like this, we'd be happy to do this -- the opportunity to

24   submit for the briefing on this particular question and answer

25   the specific questions that the Court has on that issue.

1          So if I can put that to the side for the moment and

2     talk about the constitutional claims which are before the

3     Court, if that -- if that works for Your Honor.

4          THE COURT:  So which particular issue do you want to

5     supplement?

6          MR. THEIS:  What you first addressed.  The question of

7     whether or not this particular regulation and the Open Letter

8     qualifies as an interpretative rule, what level of deference is

9     required for this particular -- for the letter.

10          Those issues were -- the 7-0 -- though the APA was

11     mentioned in the Complaint, it's only the waiver of sovereign

12     immunity element of this, so there's no APA claim brought

13     before the Court in this Complaint, so that's why this issue

14     was not fully fleshed out.

15          And so that's why I'd like to hold on that particular

16     question just for now.  And in the course of this, if we get

17     further answers on this, I'd be happy to give them.

18          THE COURT:  All right.  And there's a standing issue,

19     as well.

20          MR. THEIS:  That's correct.

21          THE COURT:  Because she's not a seller, she's a

22     buyer -- a potential buyer not a seller.  So --

23          MR. THEIS:  That's correct.

24          THE COURT:  -- there's a standing question, too.

25          MR. THEIS:  On that, Your Honor, I believe there's --

TRANSCRIBED FROM DIGITAL RECORDING                13

1  we did not, you know, specifically raise that individual

2  question.  But yes, that is something that, obviously, the

3  Court needs to look to its jurisdiction first, and if that's

4  something that the Court can't find, that she is not -- doesn't

5  have standing to raise this issue, then that's -- that's where

6  we are.

7          To the constitutional issues.  First, as -- as the

8  Court correctly pointed out, the use of marijuana is prohibited

9  under Federal law.  Though certain states have -- such as

10  Nevada issued past laws that suggest that the use may be used

11  for medical purposes under state law, that is not recognized

12  under Federal law.

13          So the individual registry card that she has here,

14  which is the core of this case, does not prohibit her from

15  any -- from -- that does not give her the right to use

16  marijuana.

17          And that -- that concept sort of applies to several

18  different issues in the claims that she's raised, and so we

19  wanted to make that in the outset.

20          And as Your Honor points out, on 922(g)(3), the

21  possession of -- of a controlled substance, we believe that is

22  foreclosed by Dugan.  There's no further need to engage in

23  another constitutional analysis based on that.  It's -- Dugan

24  squarely held that Congress may prohibit the legal drug users

25  from possessing firearms and that doesn't -- the Second

1  Amendment does not change that analysis, and so that's where we

2  are on that.

3           On the independent constitutional analysis that -- the

4  Court does need to take that second step, we agree, as we

5  pointed out in our briefs, that intermediate scrutiny is

6  appropriate.

7           As to Nordyke, the original panel hearing was vacated

8  by the En Banc decision.  And so it's -- it's not exactly clear

9  where the Ninth Circuit stands on this on the level of

10 scrutiny, but I will say that every Court to address both the

11 level of scrutiny required for 922(g)(3) and for every other

12 section of 922(g) has held that intermediate scrutiny applies,

13 and that's why we've argued in our brief that intermediate

14 should apply.

15          And the reasons behind that are, one, that the level

16 of burden that we're talking about here for 922(g)(3) is

17 relatively low.  An individual who is prohibited from

18 purchasing a firearm by the -- it's a temporal scope to what is

19 included in 922(g)(3).  And so an individual can just stop

20 using unlawful drugs and that would then allow them to -- to

21 purchase a firearm.

22          Because of that temporal scope, because there's not as

23 great a burden as there would be, some courts have said that

24 that's a reason to use definitely less than strict scrutiny,

25 but that intermediate scrutiny is appropriate.

TRANSCRIBED FROM DIGITAL RECORDING                15

1          And then, two, the actual constitutional analysis

2     itself, this statute has the compelling Government interest of

3     protecting against public safety and preventing violent crime.

4     And that's -- as we've demonstrated in our brief, there's

5     reasonable fit between that compelling interest and the

6     regulations that are at issue here.

7          We cite a wide variety of sources that demonstrate

8     this -- that between those -- the interest and the regulation,

9     including the legislative history, the fact that the majority

10    of states have made the same determination, which the Yangtze

11    Court in the Seventh Circuit found important for this question.

12    And finally, the academic and empirical studies that we've

13    cited that show this connection between crime and the use of

14    marijuana.

15         So all of that in connection with the temporal scope

16    point to -- this is the reason why all these courts have used

17    intermediate scrutiny in the Court.  If it does an independent

18    constitutional analysis, it should use that, as well.

19      On (d)(3), we agree that Chavin forecloses this.  This

20    is -- no Court has recognized -- and it is clear from the

21    nature of the right -- that the laws imposing conditions and

22    qualifications on the commercial sale of arms, that there's --

23    that there's no corresponding restriction for the sale of -- or

24    I'm sorry -- protection for the sale of firearms.

25      Heller articulated the right as -- the core right as the

TRANSCRIBED FROM DIGITAL RECORDING          16

 1  right of law abiding, responsible citizens to use firearms in

 2  the hearth and home.  There's no -- as Chavin pointed out,

 3  there's no corresponding right to sell firearms in that case.

 4  So we -- on the substantive issue, separate from the standing

 5  issue, that we agree with that -- or that's the position that

 6  the Court should take.

 7       Your Honor asked about two other -- the Fifth Amendment

 8  claims.  First on the -- it's our position the Complaint does

 9  not lay out a Fifth Amendment substantive or procedural due

10  process claim, as we pointed out in our briefs.  This was

11  raised for the first time in the opposition to our Motion to

12  Dismiss, and Plaintiff can't amend their Complaint to add these

13  different claims.

14       But even if the Court were to address those claims, as the

15  Court properly pointed out, Raich -- the Ninth Circuit opinion

16  of Raich 2, has held that there is no substantive due process

17  right to use marijuana, even if it's for medical purposes,

18  under state law.  And that -- and that squarely forecloses the

19  substantive due process claim.

20       So those are the --

21            THE COURT:  Can we go back to the 922(d)(3) claim,

22  though?  Because I'm not sure if you addressed whether or not

23  you believe that the Plaintiff has standing to raise that

24  claim.

25            MR. THEIS:  If I could, Your Honor, I'd like to hold

1  on answering that specific question.  We didn't address that in

2  our briefs because there are cases that have held that the

3  denial of the right to possess -- or to use firearms and

4  possess firearms, that that right alone gives you -- that that

5  denial gives you standing, and I -- I'd like to confirm that

6  that's been used in the same context of the 922(d)(3) for the

7  sale.  So that's why we didn't raise a specific standing

8  argument in our briefs, and that's why we didn't put that as

9  our first point that we would make in this case.

10         But -- but obviously, if Plaintiff is -- so I'd like

11 to hold off and take a brief look at some notes that I have on

12 that particular question because I want to give the Court the

13 correct answer on the standing issue, essentially.

14         THE COURT:  Why don't you take a look now, because

15 that's important to me.

16         MR. THEIS:  And other -- other than those particular

17 issues, I believe I've addressed everything other than, again,

18 that APA issue which we discussed at the outset.

19         THE COURT:  Just a minute.  I just want him to have a

20 chance to look at --

21         MR. RAINEY:  Oh, I'm sorry.

22         THE COURT:  You weren't all -- were you completely

23 done, Mr. Theis, or --

24         MR. THEIS:  Other than the standing issue and the APA

25 issue which we've -- I would like to do a bit more digging on

TRANSCRIBED FROM DIGITAL RECORDING          18

1   that particular question.  I think we're done with the rest of

2   our argument, though.

3           THE COURT:  Okay.  Well, but before we go over to

4   Plaintiff --

5           MR. THEIS:  Okay.

6           THE COURT:  -- please go ahead and take a look at your

7   thoughts on standing.

8               (Pause in the proceedings.)

9           THE COURT:  Mr. Theis, since you're going to be --

10  I'll go ahead and grant your motion -- your oral motion to have

11  supplemental pleadings on the Administrative Procedures Act

12  issue.  If -- if you're going to already be doing that anyhow,

13  perhaps we'll -- I'll go ahead and allow more briefing on the

14  standing issue and that will give Plaintiff an opportunity, as

15  well, to be able to do a little research and guide the Court as

16  to whether you think that, under the APA, you know, which

17  states that if there's a rule that's proposed by an agency, if

18  it's an interpretative rule -- and I'll spell that for the

19  record again, i-n-t-e-r-p-r-e-t-a-t-i-v-e -- if it's an

20  interpretative rule -- doesn't roll off the tongue very easily,

21  does it? -- then there need not be any comment and notice.  But

22  if it is a legislative rule then there does need to be.

23          And so I think that's important to look at, and so

24  I'll go ahead and allow both parties to provide further

25  briefing on that issue, and on the issue of standing -- of the

1  Plaintiff's standing.

2          And we'll set a briefing schedule after we're done

3  here so that my -- my clerk can have a -- have some time to do

4  that calculation.

5          So is there anything else, Mr. Theis, that you want to

6  say?  And I don't mean to rush you at all.  In fact, I have the

7  entire morning set aside for this.  So I expected this would be

8  more in-depth and would take longer.  So feel free, if you have

9  other things that you want to get into.

10          MR. THEIS:  Nothing further, Your Honor, but I would

11 like to reserve any time, obviously, to rebut any specific

12 points that were made.  But we've made the majority that we'd

13 like for now, and we'll rest on our briefs on the rest.

14          THE COURT:  All right.  Thank you.  All right.

15 Mr. Rainey?

16          MR. RAINEY:  One moment, Your Honor.  Good morning,

17 Your Honor.

18          THE COURT:  Good morning.  I was very intrigued by the

19 issue.

20          MR. RAINEY:  Yes, it's a fun one.

21          THE COURT:  Yes, it is a fun one.  And there isn't

22 really anything directly on point in any other of the circuits.

23          MR. RAINEY:  No.

24          THE COURT:  So it is a very interesting one, and I

25 think a very important question.

TRANSCRIBED FROM DIGITAL RECORDING                20

1          MR. RAINEY:  Mm-hmm.

2          THE COURT:  So I am interested to hear what -- what

3    else you have to add to this so far beyond what has already

4    been provided in the briefings.

5          MR. RAINEY:  Well, Your Honor, I want to begin by --

6    by making it clear that we are challenging, not just the

7    letter, and not just the regulation, but also the statute.

8          Now, we -- as we do that, we recognize that

9    challenging the statute is a -- an uphill battle.  It's a

10   long-established -- sorry -- long-established statute.  We're

11   not -- we're not trying to deny that.

12         However, we have to begin from the fundamental

13   preposition -- proposition that, under D.C. v Heller, the

14   Second Amendment was interpreted as an individual fundamental

15   right, and that was reiterated later by the U.S. Supreme Court.

16         And prior to that -- and I think we all can agree --

17   that prior to that it was very much up in the air as to how the

18   Supreme Court would interpret the Second Amendment.  And so

19   from there we have a very different proposition.

20         THE COURT:  Well, the Court specifically held that the

21   right was not unlimited.

22         MR. RAINEY:  That's correct.

23         THE COURT:  They did say that the Government can

24   prohibit possession of weapons in some scenarios without

25   running afoul of the Second Amendment.

1          MR. RAINEY:  Mm-hmm.

2          THE COURT:  For example, prohibiting the possession of

3 firearms by felons or mentally ill persons.

4          MR. RAINEY:  Mm-hmm.

5          THE COURT:  So it sounds like this is an as-applied

6 constitutional challenge?

7          MR. RAINEY:  Mm-hmm, yes.  So the question here is, as

8 applied in those two statutes, as applied in the corresponding

9 regulations and, of course, as applied in that letter, the ATF

10 Letter, was that a constitutional application a valid

11 restriction on the right to own and purchase firearms?

12          I'd like to sort of take -- while I know that we are

13 going to do a separate briefing on the standing issue, I want

14 to point out, though -- the standing, it's not about the

15 constitutional right to sell firearms.  The problem is we're in

16 a regulated profession where there's only one way to buy a

17 firearm.  If you want one, you have to go through a Federally

18 licensed firearms -- Federally -- Federal firearms licensee.

19 And if that's the only avenue, and then you're telling, through

20 statute, that you're not allowed to sell any firearms to anyone

21 who has this card, well, you have essentially a prior restraint

22 issue where those people are now completely shut off from their

23 Second Amendment right, even though they were kind of kept out

24 of the equation all together.

25          The -- the most important thing that we have to focus

1   on here is that we're not talking about someone who has been

2   determined a user of medical marijuana, we're talking about

3   somebody who has a card that, under state law, says they have a

4   right to the use of the medical marijuana.  And that's a huge

5   distinction.

6           What the ATF is saying is that anyone who is a card

7   carrying member of the medical marijuana party must

8   automatically give up their Second Amendment rights.  That

9   they're not allowed to have a gun.

10          And as I say that, I realize, too, that there may be a

11  real dire need to amend or maybe refile the case to include a

12  First Amendment claim.  Because really, that card is a form of

13  political speech, and that's also reinforced by the cases that

14  you have here in the State court determining that there's no

15  real means of commercial access to medical marijuana, so it's

16  very possible -- in fact, it's very likely -- that most people

17  who have these cards aren't even users of medical marijuana

18  because they have no means of accessing or of acquiring it.

19  All the card says is that you have the right under state law to

20  possess a certain amount and to grow the plant.

21          THE COURT:  Okay.  Well, if you are trying to add a

22  First Amendment claim, that wouldn't be an issue on the Motion

23  to Dismiss.  The Motion to Dismiss essentially is looking at

24  the face of the Complaint --

25          MR. RAINEY:  Right.

1          THE COURT:  -- what has actually been pled -- not what

2   maybe you would have wanted to plead or might want to plead

3   later or add -- but what is actually pled and whether or not

4   any of those --

5          MR. RAINEY:  Mm-hmm.

6          THE COURT:  -- claims should be allowed to proceed,

7   whether or not they are valid or invalid.

8          MR. RAINEY:  Right, your Honor.  But actually, also

9   in --

10          THE COURT:  So I'd stick to those.  Maybe you'll amend

11   later, and maybe --

12          MR. RAINEY:  Right.

13          THE COURT:  -- it'll be dismissed and you'll want

14   to --

15          MR. RAINEY:  I understand it, but I think that also I

16   want to point out that it's really that -- that that cause of

17   action comes out of their defense.  Because what they're saying

18   is, look, it's not a big deal.  If you just get rid of the

19   card, we'll let you buy a gun again.  It's sort of saying,

20   look, you get to either have the card or you get to have the

21   gun, you don't get to have both.  You -- that's where --

22          Because there's no actual restraint on speech at this

23   point, it's just saying, you know, everybody's allowed to get

24   the card, but they're saying that once you get it, you're not

25   allowed to have any of these rights.

1          THE COURT:  Okay.  Well, this isn't what we're talking

2     about the "they", "they", "they" without really being more

3     specific.  "They" is not Congress, this is not something that's

4     been enacted by Congress --

5          MR. RAINEY:  Right, by the ATF.

6          THE COURT:  -- this is an ATF Open Letter.

7          MR. RAINEY:  Mm-hmm.

8          THE COURT:  So it either is a new rule that they are

9     either enacting under the authority of Congress, in which case

10    then you would, you know, consider it --

11         MR. RAINEY:  Right.

12         THE COURT:  -- just like a Congressional law, or is it

13    just their interpretation of how they are going to be applying

14    the law, in which case it is open to notice and comment and

15    does have a different standard that's applied, it is a

16    different kind of horse.

17         And so -- so I want to understand where it is that --

18    what it is that the Plaintiff thinks about this distinction,

19    that it's not directly from Congress --

20         MR. RAINEY:  Right.

21         THE COURT:  -- we didn't actually have a bill that was

22    proposed and passed --

23         MR. RAINEY:  Mm-hmm.

24         THE COURT:  -- and signed by the President, this is --

25    this is a rule.

TRANSCRIBED FROM DIGITAL RECORDING                25

1          MR. RAINEY:  Right.  Examining the constitutionally of

2  the -- the constitutionality of the ATF Letter.  And if we look

3  at that through the lens of legislative versus interpretative,

4  the -- and again, I reserve the right to brief on this more

5  later because it was not properly briefed in the underlying

6  pleadings -- but the fact is that the letter makes it very

7  clear, you're not to sell firearms to anyone who has this card.

8  Don't do it.

9          And if you're saying that, the ATF is essentially

10  foreclosing any further notice or hearing as to whether or not

11  these individuals are, in fact, illegal drug users.  They're

12  just saying we've made the decision, if you have the card,

13  you're automatically deemed an illegal drug user.  And as an

14  automatically deemed illegal drug user, you're not entitled to

15  a firearm and you can't sell that firearm to that person.  And

16  by making that --

17          THE COURT:  But that wasn't necessarily the rule

18  before the Open Letter was issued.

19          MR. RAINEY:  No.

20          THE COURT:  This is an interpretation analysis by an

21  administrative agency of how it is going to react to the

22  situation that it's faced with with what do we do about this

23  scenario in these particular states where medical marijuana is

24  allowed --

25          MR. RAINEY:  Mm-hmm.

TRANSCRIBED FROM DIGITAL RECORDING                26

1          THE COURT:  -- what do we want to do about it?

2          MR. RAINEY:  Mm-hmm.

3          THE COURT:  And they decide what they're going to do

4  about it, how they interpret the law, and how it should apply.

5          MR. RAINEY:  Sure.  But it forecloses any further

6  opportunity for these people to acquire a firearm.

7          And if you're a Federal firearms licensee and you read

8  that letter, you know for a fact, I am now prohibited from

9  making any further sales to these individuals.  At that point

10 you've cut off the Second Amendment rights of an entire class

11 of individuals.

12         And you've said that this fundamental individual

13 Second Amendment right is not -- is no longer offered to these

14 people simply because they went and got a card.

15         Again, if you look at the other cases in which this

16 law has been applied, and you look at those other cases, those

17 are cases where people were convicted of criminal acts, cases

18 where people were indicted for --

19         I mean, the Dugan case is a great example.  The Dugan

20 case, which by the way is only, what, two pages long and

21 doesn't really give much analysis at all -- the Dugan case is

22 about somebody who was running, essentially, a drug ring out of

23 their apartment and an illegal firearms business.

24         Where here, we're talking about a woman who went to

25 her physician, got a med -- got a prescription, essentially,

 1  for medical marijuana, went to the Government and got a

 2  State-issued card, and now says, just because you got that

 3  card, you can't own a gun.

 4          That's -- it's a completely night and day example.

 5  And it also underscores the fact that we also believe that this

 6  Court does have the --

 7          THE COURT:  Well, and I do empathize with the

 8  situation that she finds herself in.  There are plenty of

 9  legal, prescribed medications that may or may not be much more

10  dangerous --

11          MR. RAINEY:  Mm-hmm.

12          THE COURT:  -- than marijuana as far as the scientific

13  world has told us, and what they know about drugs and drug uses

14  and the effects.  You know, morphine comes to mind.  That's

15  something that's prescribed for pain, and I'm told will

16  essentially kill you if you take it for too long, right?

17          But, you know, that's -- that doesn't necessarily

18  negate someone's possession of a gun so long as there's no

19  other -- you know, if they're taking it, obviously, for a

20  mental illness, or if they're a felon, or so forth, then there

21  could be other problems.

22          So I completely sympathize with the situation, and so

23  don't want that to be lost on Miss Wilson, but this is a matter

24  of -- of, not facts, but rather a matter of law, and so we do

25  need to have -- keep that in mind that we look through the --

 1  the recent law and any of the precedent that we have for

 2  guidance --

 3            MR. RAINEY:  Mm-hmm.

 4            THE COURT:  -- and not just act out of sympathy --

 5            MR. RAINEY:  No.

 6            THE COURT:  -- but rather try to be logical about

 7  this.  So I think that your stronger argument is probably as to

 8  this ATF Open Letter.

 9            MR. RAINEY:  Oh, and I agree with that, Your Honor,

10  and we don't question that.  We think that the ATF Letter --

11  that we have a much stronger argument there, and it's a very

12  uphill battle to argue the unconstitutionality of the statute.

13            But I also think that Dugan doesn't really deal with

14  this situation and it's not really on point.  It definitely

15  discusses the statute as applied in that context, but I just

16  don't think that -- and while it does say that the Government

17  has a right -- sort of omnibus right to restrict Second

18  Amendment rights to dangerous people, it doesn't deal with this

19  situation, and it's not directly on point here.

20            And when you start taking the, sort of, broad

21  interpretation that the ATF has taken of the statute, and you

22  start seeing how it kind of gets wider and wider as you go from

23  the -- the regulations -- when you go from the statute to the

24  regulations to the letter, it sort of becomes this -- this

25  giant Pacman that envelopes all of us, where we're suddenly --

TRANSCRIBED FROM DIGITAL RECORDING                29

1  the Second Amendment rights are deprived from just an enormous

2  cross-section of people.

3          And I -- I think that's something that has to be

4  entertained by the courts and dealt with.

5          And when you look at all of these cases that are

6  cited -- and I could read them off here -- I mean, you go

7  through, you know, United States versus Marzzarella in the

8  Third Circuit.  Again, indicted for possession of firearm with

9  an obliterated serial number in violation of 922(k).

10          You have Huddleston v United States which is a

11  previously convicted felon.  You have U.S. v Reese in the 10th

12  Circuit, criminally charged with possessing firearms while

13  subject to Domestic Protection Order.  They're just -- they're

14  all way outside the scope of this.

15          Here we're saying it's a prior restraint before

16  there's been any notice, any hearing onto whether that

17  individual has been an illegal user.

18          And that's where our procedural due process claim

19  comes in, too, is that you're saying, if you're going to deny

20  them the right, you have to have some sort of notice and

21  hearing to say you are deemed an illegal user.  You can't just

22  say we think you're an illegal user.  And as -- because we

23  think that, we're now going to deprive you -- before any sort

24  of hearing or anything -- we're going to deprive you of that

25  right.

1          Now, I know the day sort of --

2          THE COURT:  Well, what the letter specifically says is

3     that if a seller believes, you know, knows, or has reasonable

4     to believe --

5          MR. RAINEY:  Right.

6          THE COURT:  -- that she's a cardholder -- and this was

7     kind of a unique situation where the seller wasn't someone who

8     was unknown to Miss Wilson, they actually knew each other, and

9     so he was aware that she was -- that she did have a card for

10    medical marijuana -- I don't think there's a question as to

11    whether or not she actually possesses marijuana, it's just the

12    possession of the card --

13         MR. RAINEY:  Right.

14         THE COURT:  -- at this point --

15         MR. RAINEY:  Right.

16         THE COURT:  -- and maybe that's an issue that's --

17         MR. RAINEY:  Mm-hmm.

18         THE COURT:  -- more important and shouldn't be

19    overlooked than the fact of, you know, whether or not she

20    actually possesses marijuana, she only possesses the card at

21    this point.

22         MR. RAINEY:  And I don't think this is a unique

23    situation.  I mean, Miss -- Miss Wilson is, in fact, I mean, a

24    medical marijuana advocate.  I mean, she's someone who's been

25    politically active in the movement to get more broad medical

1  access for patients, she works -- she's worked in the medical

2  profession, she believes that the treatment is helpful to

3  people with various ailments from cancer, to HIV, and other

4  conditions.

5          But she -- and so her presence within the community,

6  just like anybody else who happens to be a medical marijuana

7  activist who is carrying these cards, those people would be

8  known if they went to buy a firearm probably within their

9  community in the same context. I mean, we're talking about a

10 small community in rural Nevada where everybody knows

11 everybody. And so I don't think it's that unique a situation.

12         Moreover, I think where this issue came to light

13 through the ATF, and why the ATF felt -- I guess, the reason

14 they wanted to pass this rule was because people were using --

15 because when you see the state-issued cards, they look just

16 like driver's licenses. I mean, they're state-issued. And so

17 people would pull them out and use them as identification.

18         THE COURT: So it sounds like you're going beyond the

19 rule here that is the inference. I took it to mean that the

20 real concern here was not necessarily whether or not she

21 possesses marijuana or whether she intends to possess marijuana

22 and a gun both together at the same time, but the fact that

23 there's an inference being made by the ATF Letter that, just

24 because she is a card carrying member or has a card -- I guess

25 not a membership -- but carries a card, that that alone allows

1 an inference that she, in fact, is going to possess marijuana,

2 much like someone who might be an advocate for Pro Life --

3           MR. RAINEY:  Mm-hmm.

4           THE COURT:  -- and, you know, doesn't think that

5 abortions should be illegal.  Because, I mean, that person has

6 to be getting an abortion, or has got an abortion, or ever is

7 going to -- it could be a man.  You know?  It could be

8 anybody --

9           MR. RAINEY:  Absolutely.

10           THE COURT:  -- that's -- that's -- so the fact that

11 she has a medical marijuana card, I don't know whether that's

12 maybe the stronger argument here is that it's the

13 interpretation that's being given by the ATF Letter that -- the

14 authority to the seller to make an inference --

15           MR. RAINEY:  Mm-hmm.

16           THE COURT:  -- that she possesses marijuana.  And even

17 if you were to admit that, were she actually to possess

18 marijuana and a gun, that perhaps that would be a different

19 situation, a different argument for another day.  But today's

20 argument --

21           MR. RAINEY:  Mm-hmm.

22           THE COURT:  -- is that the inference itself, that just

23 because she has the card necessarily is, you know, proof

24 positive sufficient for a seller to determine that they are not

25 allowed to legally sell a gun to her.

1        MR. RAINEY:  Right.  And, Your Honor, I think that

2  goes back to, if you look at the typical application of these

3  922 statutes, it's usually in the context of a criminal case

4  where someone's already been found guilty or is being

5  prosecuted for, you know, possession of illegal drugs, you

6  know, we found in his car a kilo of cocaine under the

7  passenger's seat and the gun in the glove box, and they're

8  saying, ah-ha, now I've got an extra charge to throw at him

9  because he's not allowed to have that gun if he's got the

10  cocaine.  And so that's usually the context in which we see

11  these cases.

12        What I think has happened here, and what our argument,

13  is that the ATF has made a politically motivated statement

14  against an entire political movement, and has basically tried

15  deliberately to tweak the law to target this group and start

16  depriving rights.

17        And, of course, outside the scope of this case, there

18  are other issues where they've done similar -- similar acts,

19  but we're focused here just on the Second Amendment violation.

20        And what's happened is they're saying -- they're using

21  922 for the purpose of targeting the medical marijuana law --

22        THE COURT:  I'm not inclined to find that because

23  someone is a marijuana user, regardless whether they have a

24  card or not, that they are allowed to have a gun, when under

25  Federal law marijuana is still illegal.

1          MR. RAINEY:  That's -- and that's not the --

2          THE COURT:  So I'm just probably not going to go

3  there --

4          MR. RAINEY:  Right.  And that's --

5          THE COURT:  -- is what I'm telling you as far as

6  wisely using your time.

7          However, the fact that she has -- there's no proof to

8  the seller that she actually possesses marijuana other than

9  that she has the  medical marijuana card.  But the ATF is

10  telling the seller that's enough.

11          MR. RAINEY:  That's right.

12          THE COURT:  So I think that maybe is more of a concern

13  to the community as far as whether this is overreaching and

14  being applied incorrectly or improperly as opposed to if the

15  seller was to walk -- you know, if she was to walk in to buy a

16  firearm, and she had, you know, a bag of marijuana in one

17  hand --

18          MR. RAINEY:  Right.

19          THE COURT:  -- and the money to pay for the firearm in

20  the other, that would be different, and I think that's

21  something that probably you don't want to argue today --

22          MR. RAINEY:  No, that's not something I want to argue

23  today.

24          THE COURT:  -- because I don't think you're going to

25  win on that argument.  Here we don't know for a fact that she

TRANSCRIBED FROM DIGITAL RECORDING                    35

1  has --

2            MR. RAINEY:  Mm-hmm.

3            THE COURT:  -- any marijuana or -- and I think that's

4  probably your better argument.

5            MR. RAINEY:  Right.  And then when we get to the equal

6  protection argument, the argument there also deals with the

7  card saying that, like, well, in states where they don't

8  require a registry card, those people can just walk in and buy

9  a gun even if they are smoking weed, if they are chronic,

10  addicted users, if it is -- you know, there's medical opinion

11  that says you can't be addicted -- but that aside, even if you

12  had someone who was regularly smoking marijuana and is openly

13  smoking marijuana in that state, they could just walk in and

14  they don't even have the card.  And so the Federal firearms

15  licensee doesn't even have to take that into consideration.

16           Whereas, a similarly-situated person in the State of

17  Nevada, where you have a state-issued driver's license looking

18  card, that person is denied a Federal firearms licensee --

19  Federal firearms purchase if they -- just because of the fact

20  that they have the card.

21           THE COURT:  Okay.  So you were advocating the standard

22  of strict scrutiny.

23           MR. RAINEY:  Yes.

24           THE COURT:  So let's assume for a moment that the

25  Government is correct --

TRANSCRIBED FROM DIGITAL RECORDING                  36

```
 1            MR. RAINEY:  Mm-hmm.
 2            THE COURT:  -- when they argue that intermediate
 3  scrutiny should actually apply.
 4            MR. RAINEY:  Mm-hmm.
 5            THE COURT:  How -- and so they must show that the
 6  regulation is substantially related to an important
 7  Governmental objective.
 8            MR. RAINEY:  Right.
 9            THE COURT:  So how does this regulation not pass
10  muster?
11            MR. RAINEY:  Well, first of all, I wanted to point out
12  that the -- what the -- what the Circuit Court -- just as a
13  preliminary -- what the Circuit Courts have been saying,
14  really, is -- at least in that Seventh Court -- I think it's
15  the Seventh Circuit is the first, I think, to deal with this, I
16  could be wrong -- but what they are saying, sort of, is there's
17  this two-prong test, right?  One is, is there a
18  constitutional -- is there a Second Amendment right being
19  deprived -- which I think in this case is pretty
20  straightforward, it's a gun, you're not allowed to have it --
21  but the second prong is, depending upon the level of the
22  deprivation, what level of scrutiny we apply and the extent to
23  which -- it was sort of this weird sliding scale that I believe
24  was presented in Ezell v City of Chicago?  Is that correct?  I
25  apologize if I'm mispronouncing that.
```

 1          But it -- but the -- if we were to apply intermediate

 2  scrutiny -- because I recognize that, even though the Ninth

 3  Circuit has this, sort of, strange opinion on En Banc, that

 4  most of the courts have adopted an intermediate scrutiny

 5  standard -- if we're applying that, again, it goes back to the

 6  card versus the usage.

 7          They're saying, if you have a card, you're

 8  automatically a user.  There's no -- it's not substantially

 9  related to any Government purpose at that point.  We're just

10  saying anybody who happens to have a medical condition where

11  their doctor has advised them to do this must be denied a gun.

12          And -- and, I mean, at that point, too, I mean, you've

13  probably got people within this context who just go out, see

14  their doctor, and have no inclination towards smoking marijuana

15  or breaking the law.  And the doctor says, you know what?  I

16  recommended this treatment for you.  And they go and go through

17  the process of getting the card, and we're now going to say,

18  well, you don't get a gun because your doctor made that

19  recommendation.  There's no -- there's not even a rational

20  basis connection there.  It's just sort of saying this is --

21  it's comparing apples and bullets.  It just doesn't make any

22  sense.

23          THE COURT:  So is having a medical marijuana card

24  substantially related -- well, I guess the question is -- is

25  having a medical marijuana card -- and -- is having a medical

TRANSCRIBED FROM DIGITAL RECORDING                    38

1  marijuana card essentially the same as being an unlawful user?

2          Is having a medical marijuana card substantially

3  related to the Governmental objective, the very important

4  Governmental objective, of prohibiting weapons from individuals

5  who may not be of the best judgment in order to exercise

6  control of such a dangerous weapon --

7          MR. RAINEY:  Right.

8          THE COURT:  -- or is it to attenuate it?  Is having

9  the card alone to attenuate it and not the same as possessing

10  the actual marijuana?

11          MR. RAINEY:  Right.  And I think there we have to look

12  at the policy purpose that is adherent to -- I'm sorry --

13  inherent to the 922 statutes.  And the idea there is being like

14  someone who is addicted to a controlled substance has --

15  doesn't have the ability to judge right from wrong, I guess,

16  because they're under the throws of the substance, and then

17  those who are illegal users of a substance, I think the

18  argument there --

19          THE COURT:  Well, there's public safety --

20          MR. RAINEY:  Right.

21          THE COURT:  -- and you want to prohibit crime --

22          MR. RAINEY:  Right.

23          THE COURT:  -- that's violent from -- from --

24          MR. RAINEY:  Right.  But to get there you have to make

25  a connection between unlawful use and violent crime and all of

ELLEN L. FORD - (702) 366-0635

1 these other ills that could be inflicted on society. And I

2 think in order to get there you say, well, this person's

3 already breaking the law so they're gonna -- they're liable to

4 break the law in other ways.

5 You say that this person is under the influence of the

6 substance, so they're liable to break the law because of the

7 substance.

8 And so I think in this context you have to look at it

9 and say, well, but if we're talking about patients who have

10 been advised by their physicians to do it -- this specific

11 course of treatment -- those aren't -- those aren't law

12 breakers, these are people that are doing what their physician

13 tells them to do. These are people that are even going the

14 extra step and following the State-implemented Government

15 system to get the appropriate card to follow that treatment.

16 Now, if they -- if they don't follow the treatment

17 afterwards, if they ultimately decide, you know what, I just

18 don't want to do that, I don't want to break the law at that

19 point -- but they haven't broken the law in any way up to the

20 point of application for the card.

21 THE COURT: But they haven't broken State law, but

22 they have violated Federal law. That's the issue here is that

23 Heller is saying that there are limitations and --

24 MR. RAINEY: Right.

25 THE COURT: -- when someone is breaking the law, then

1 they're an unlawful user as opposed to a lawful user.  So I

2 realize --

3        MR. RAINEY:  Right, but there is --

4        THE COURT:  -- the State law hasn't been broken, but

5 the Federal law, you have to admit, has been broken.

6        MR. RAINEY:  No.  There's no Federal law that says you

7 can't get the card.  The Federal law doesn't say that.  The

8 Federal law says you can't use marijuana, you can't possess

9 marijuana, and it doesn't say you can't get the card.

10       So if we have, an example, a cancer patient who's told

11 by their physician --

12       THE COURT:  So again, the issue here really is the

13 ATF's interpretation of -- and let me go back and read the --

14 the actual language of the statute here in issue.

15       It starts off essentially with the 922(g)(3) portion

16 which is, "It's unlawful for a user of controlled substances to

17 possess firearms."  So it's an unlawful user of controlled

18 substance.

19       MR. RAINEY:  Yes.

20       THE COURT:  And then the 922(d)(3) is where it

21 "prohibits the firearm seller who knows or has reason to

22 believe that the person is an unlawful user".

23       So where the ATF Letter says that, "evidence of a

24 recent use or possession of a controlled substance or

25 pattern" -- I'm sorry -- going back to the definition of

1  unlawful use is one -- "An inference can occur and can be drawn

2  from evidence of a recent use or possession of a controlled

3  substance, or a pattern of using or possessing that reasonably

4  covers..."

5          So it's actually an inference within an inference at

6  this point --

7          MR. RAINEY:  Mm-hmm, yes.

8          THE COURT:  -- so it's actually a double inference.

9  So the inferences that if there is a pattern of use or

10 possession, that that could constitute unlawful use, and then

11 the inference as to whether that applies is the Open Letter

12 from the ATF that, "possession of the marijuana card

13 constitutes reasonable cause to believe that the buyer is an

14 unlawful user."

15         MR. RAINEY:  Mm-hmm.  It's really, Your Honor, in that

16 one sentence on the letter, if you read it, it says, "Further,

17 if you are aware that the potential transferee is in possession

18 of a card authorizing the possession and use of marijuana under

19 State law, then you have reasonable cause to believe that the

20 person is an unlawful user of a controlled substance."

21         And it says prior to that that if you have that reason

22 to believe, you are not to sell them a gun.

23         THE COURT:  Okay.  So under intermediate scrutiny, I

24 think we agree that there is an important Governmental

25 objective.  The question is whether or not, when this

TRANSCRIBED FROM DIGITAL RECORDING                    42

```
 1  particular new rule that's issued under the letter is
 2  substantially related to that important objective, or is it to
 3  attenuate it?
 4          MR. RAINEY:  Hmm.
 5          THE COURT:  Would you --
 6          MR. RAINEY:  That's exact --
 7          THE COURT:  -- agree with that --
 8          MR. RAINEY:  Yeah.
 9          THE COURT:  -- being your position?
10          MR. RAINEY:  That is correct, Your Honor.  Now, as I
11  say that, I don't waive the arguments that if she's --
12          THE COURT:  I know you want me to reach further, but I
13  don't think it's gonna happen.
14          MR. RAINEY:  Right.  But I also say that that is
15  our -- that is our initial proposition is that you can't just
16  say that this card is -- is -- you know, is itself
17  justification.
18          And I think that that concludes our argument here.  If
19  you have any further questions --
20          THE COURT:  And you want to reserve the right to argue
21  standing as well; is that right?
22          MR. RAINEY:  Yes, yes, I do want to -- right.
23          THE COURT:  Let's see what else I have here.  All
24  right.  So we'll allow the parties both to brief the effects of
25  the Nordyke En Banc decision as well as the standing issue.
```

1          Let's see if there was something else.  I have

2   somewhat of a question about the Court's jurisdiction.  I'm not

3   sure that I've worked myself through it yet --

4          MR. RAINEY:  Mm-hmm.

5          THE COURT:  -- in regards to the fact that she hasn't

6   actually been charged under this statute criminally.

7          MR. RAINEY:  Mm-hmm.

8          THE COURT:  It is more of an issue of her being

9   prevented from obtaining the firearm.

10          But with the understanding that if she were to obtain

11   the firearm --

12          MR. RAINEY:  Mm-hmm.

13          THE COURT:  -- then the Government's position very

14   clearly in regards to the Open Letter is that she would be

15   charged -- or, of course, they have discretion -- prosecutorial

16   discretion -- to decide whether or not to use their funding and

17   their resources and things on --

18          MR. RAINEY:  Right.

19          THE COURT:  -- an individual such as Miss Wilson, or

20   whether they would prefer to use it --

21          MR. RAINEY:  Yeah.  And, Your Honor --

22          THE COURT:  -- on other individuals.  So I'm not sure

23   whether that jurisdictional question is one that is

24   controlling.  But even if you all don't bring it up, that's the

25   Court's duty is to look at jurisdiction.  I'm reminded of the

1  case that went all the way up to the Supreme Court --

2          MR. RAINEY:  Right.

3          THE COURT:  -- many years after the case had been

4  filed, and when it got there, one of the first things the

5  Supreme Court said is this was never a Federal question.

6  There's no jurisdiction here.

7          So I definitely don't want to waste your time, if

8  that's the case, if I don't even have jurisdiction.  But, like

9  I said, I'm not sure that I've worked myself through that yet.

10          MR. RAINEY:  Right.

11          THE COURT:  Is there anything else that you want to

12  add?

13          MR. RAINEY:  You know, and Your Honor, actually, on

14  that point, and I want to point out that I recognize that

15  procedurally what we did as Plaintiffs was a little unorthodox

16  in a Cross-Motion for Summary Judgment, and maybe we were

17  rushing a bit to get this going.  But at the same time,

18  there -- there are clearly issues that you've brought up that

19  were not raised in the underlying briefs that need to be

20  addressed.  And the issue of standing being one of them.

21          The way we interpret, really, the issue of the fact

22  that she hasn't been charged, the fact that she's been deprived

23  of the firearm in the same fashion of the prior restraint case

24  in speech -- the free speech case, it's like saying you're not

25  allowed to even speak on this matter, it's very similar in that

TRANSCRIBED FROM DIGITAL RECORDING                    45

1  sense.

2            And while they have sort of -- the opposing side has

3  made some hay of how we applied First Amendment doctrine, it's

4  clear since D.C. v Heller, when you start looking at these

5  Circuit Court opinions, that they're really starting to apply

6  principles that are borrowed from First Amendment case -- case

7  law.

8            And I think the idea of the Government being able to

9  shut down a person's right to ever acquire a firearm legally

10 is, in and of itself, a violation of that constitutional

11 individual right to own and possess a firearm.

12           So thank you.

13           THE COURT:  And you said you were kind of in a hurry

14 to get -- to get this filed.  So is there some Statute of

15 Limitations that's -- that's --

16           MR. RAINEY:  No, no, Your Honor.

17           THE COURT:  -- an issue or --

18           MR. RAINEY:  I think we -- we were pretty targeted in

19 the way that we pled the case.  And I -- looking back now, I

20 think all these issues being raised, I'm thinking maybe we

21 should have just done an opposition to their Motion to Dismiss,

22 and allow more discovery, and kind of move through the case in

23 normal channels rather than do a Cross-Motion for Summary

24 Judgment.  Because there are issues that, as you sort of --

25 with any constitutional thing -- as you sort of pull at the --

TRANSCRIBED FROM DIGITAL RECORDING                46

1 the string of the sweater, you start seeing more and more items

2 that you have to address.

3        And the 20 -- what is it -- the 30-page limitation on

4 a motion that's -- doesn't really give us enough time to

5 properly vent all these issues.  So, thank you.

6        THE COURT:  All right.  Thank you.  Mr. Theis?

7        MR. THEIS:  Thank you, Your Honor.  Several points I'd

8 like to address.

9        First, I'd like to try to bring us back to the

10 controlling law and the Complaint that's before the Court,

11 because there are several policy arguments and discussions

12 about amending the Complaint, and I'd like to focus very

13 clearly about what the issues are here and what was pled in the

14 Complaint.

15        What we have here is a -- is a clear understanding

16 of -- a question about what is this inference that a seller who

17 is selling firearms can make about someone's unlawful drug use.

18 That seemed to be something the Court was concerned about.

19        And I think what is clear here is, the Plaintiff is

20 the master of the Complaint, and she's pled several facts that

21 show that she is or intends to violate the law, violate Federal

22 law.

23        As the Court repeatedly said, marijuana is against the

24 law under Federal law.  So when Plaintiff argues that this

25 is -- you know, she's not violating the law, if someone is an

 1  unlawful user, they are violating Federal law, even if it's for

 2  medical purposes under State law.

 3          So what we have here is, if someone possesses a card,

 4  there is -- that specifically allows them to use marijuana

 5  under State law, the logical inference is that they are, in

 6  fact, going to use that card and use marijuana.  So that is a

 7  completely logical inference for a seller to make.

 8          In addition to the plain fact of that, the factual

 9  pieces, what she's alleged in her Complaint make clear that she

10  had to go through several steps to aver to the State of Nevada

11  that she intended to and was going to use marijuana.

12          Those facts include she had to go -- under the statute

13  you're required to go to a physician, the physician is required

14  to diagnose you with one of the various conditions that are --

15  by statute that you can have that allows you to use marijuana

16  for medical purposes under State law.

17          And in particular, the physician also has to warn the

18  individual about the deleterious effects of marijuana, there

19  has to be -- the disease itself has to be chronic and

20  debilitating, and there has to be a clear understanding that,

21  whatever -- the use of marijuana would somehow mitigate the

22  conditions.

23          And so the Plaintiff then had to take that

24  documentation and submit it to the State in order to say, I'm

25  going to use marijuana to alleviate the symptoms of the

1  condition that I have.

2          Taking those two pieces together, it's clear, this is

3  not an unreasonable inference that a person who does that, who

4  goes through those steps to say, I'm going to use marijuana,

5  does, in fact, use marijuana.

6          And again, there's two different -- there's a temporal

7  scope to this.  Every year you have to renew your license.  You

8  have to go back to the State of Nevada and submit more

9  documentation from your physician saying, my physician is

10 telling me I need to continue to use marijuana, and that's, in

11 fact, what she did, and that's what's alleged in the Complaint.

12         So there's no allegation about, you know, these other

13 pieces or questions about why she got the card or the purpose

14 for getting the card, that's not in the Complaint.  What's in

15 the Complaint is that she wanted to use marijuana, she got a

16 card, told the State of Nevada she was going to use marijuana,

17 and then was prohibited from purchasing a firearm because of

18 the possession of the card.

19         So that -- I feel like the logic and the facts in the

20 Complaint get to that inference question that the Court is

21 concerned about.

22         And again, under (d)(3), it's just that someone needs

23 to have reasonable cause -- seller needs to have reasonable

24 cause to believe.  All of these facts show that that was

25 entirely reasonable for someone to believe that she was an

1  unlawful user.

2         I also second wanted to address this -- the

3  independent constitutional analysis.  The two steps got a

4  little bit blurred here and how we were discussing this.

5         The second -- the first step is not whether or not

6  this case generally involves the Second Amendment, but the

7  question is whether or not the restriction at issue here falls

8  within the scope or is within the historical understanding of a

9  type of restriction that the Second Amendment allows.

10        And we've cited a variety of sources in our briefs

11 that point to the understanding of the Second Amendment right,

12 as Heller described it, as reserved for law abiding,

13 responsible citizens.  That's the core right of the Second

14 Amendment.

15        So for individuals who are not law abiding, who are

16 not responsible citizens, who affirmatively tell the State of

17 Nevada that they're going to violate Federal law, the Second

18 Amendment does not apply to them.

19        So that is -- you don't even need to get to the

20 scrutiny position.  The restriction under the analysis of the

21 Second Amendment, it does not apply to those individuals.

22        Second, for the scrutiny piece, we want to make -- and

23 I would just point out on that specific point, Plaintiff

24 doesn't, in her briefs at least, challenge that assertion.  She

25 doesn't suggest that somehow the Second Amendment didn't

1 include, well, but if people have an exemption for medical

2 marijuana or medical drug use or somehow had some other

3 exemptions for violating the law, that that would be fine.

4 That's not in the briefs.

5        All that they say is that she doesn't violate State

6 law.  But again, there is no such thing as a lawful marijuana

7 user under Federal law.

8        THE COURT:  So --

9        MR. THEIS:  Yes.

10       THE COURT:  -- what would be the Governmental

11 objectives that are important and at issue here under strict

12 scrutiny?

13       MR. THEIS:  The Court -- in 922(d)(3), as in all of

14 the Gun Control Act from 1968, the Government objective was to

15 ensure that criminals do not possess firearms.  To make sure

16 that -- there was an interest in protecting public safety.

17       And every Court -- that's a compelling interest.

18 That's beyond -- this is a very substantial interest that the

19 Government has.

20       And 922(g)(3) references the Controlled Substances Act

21 in order to determine what type of drugs and what qualifies as

22 legal and not legal.

23       And that -- within the Controlled Substances Act is

24 various schedules.  Under Schedule I, marijuana has been on

25 Schedule I since the beginning.  It's clear that what -- from

1  the initial putting of marijuana on Schedule I to the continued

2  rejections of the petitions to the Attorney General and to HHS

3  to remove marijuana from Schedule I, that there's a continuing

4  judgment by the Federal Government, by the Attorney General, by

5  HHS, that there is no medical use for marijuana, one, that

6  individuals who use marijuana, as the Duty Court recognized,

7  are more likely to have -- lack self-control.

8          And in addition, there's the pharmacological or other

9  deleterious effects that are -- we point out in our briefs,

10  that someone who is under the influence might more likely

11  engage in activities that would tie back to that violent crime.

12          So that -- that's the fit that we're -- we're looking

13  for in that intermediate scrutiny analysis is between those two

14  different pieces.  So I think that answers the Government's

15  question -- or the Court's question about that particular

16  question.

17          THE COURT:  Well, the earlier cases that the Plaintiff

18  was referring to were the criminal cases where someone's

19  actually been charged with a criminal offense.  We don't have

20  that here.  In those cases, intermediate scrutiny was applied.

21          This is a different case in that she has not yet been

22  charged with a criminal offense because it's more of a -- of

23  a -- like he was saying -- perhaps a prior restraint or, not to

24  use a legal word, but at least she has been prevented from

25  committing what, in the Government's eyes, would be perhaps a

1 criminal offense.

2          So how does that affect the standard that I should

3 apply, or does it?

4          MR. THEIS:  Well, Your Honor, it's -- it supports the

5 argument that this is -- that there's no constitutional

6 violation here.

7          In criminal cases, the burden is squarely on the

8 Government.  And it's a substantial burden, it's beyond a

9 reasonable doubt.  There has to be a wide variety of facts that

10 are submitted that a finder of fact has to determine beyond a

11 reasonable doubt that that person committed this crime.

12          This is a civil pre-enforcement challenge.  The only

13 burden that's relevant here is whether or not a

14 constitutional -- a statute, or regulation, or the letter

15 violates some provision of the constitution.

16          And she has put forth in her complaint, she's averred

17 to this Court and to the State of Nevada that she is --

18 falls -- she is violating the law.  And that -- that -- so

19 that's -- there's no question here about -- you know, there

20 hasn't been a full hearing about whether or not she's an

21 unlawful user.  You don't need to do that because this is --

22 she's the master of her Complaint and she's pled facts that

23 show that she is an unlawful user and violates Federal law.

24          THE COURT:  Well, isn't that the question?  I don't

25 think that she's alleged she's an unlawful user.  If anything,

1   she's alleged that she's not an unlawful user.  What she's

2   alleged is that she has the medical marijuana card issued by

3   the State.  She hasn't admitted that she has any marijuana, or

4   even that she plans to possess any marijuana.

5           I realize that's the inference that the Government is

6   asking the seller to make and, likewise, asking the Court to

7   make now, but I don't think that the Plaintiff has admitted

8   that that inference is correct.  In fact, that's why we're here

9   is to determine whether or not, as you say, it is a logical

10  inference or is it not.

11          MR. THEIS:  Well, and I would again go back to those

12  two points.  That if someone has a card that says you can use

13  marijuana, the inference is that they are using marijuana.  If

14  someone tells the State of Nevada I'm going to use Nevada -- I

15  need to use marijuana in order to alleviate a condition that I

16  have under State law, if I -- if this person goes to the doctor

17  and says, I want to use marijuana, and the doctor prescribes

18  something that's submitted to the State of Nevada, all of

19  those -- those facts build to a very reasonable inference that

20  someone is violating Federal law.

21          THE COURT:  So you're saying, in the application

22  process to get the medical marijuana card, that she has to

23  aver, or sign, or in some way admit or declare that she plans

24  to use marijuana?

25          MR. THEIS:  Well, what the statute says is that you

1  need to have valid, written documentation from the physician

2  stating that, one, they've been diagnosed with a chronic and

3  debilitating medical condition, two, that the use of marijuana

4  may mitigate the symptoms and, three, that the attending

5  physician has explained the risks and benefits of the medical

6  use.  That's --

7           THE COURT:  So she's not declaring she's going to --

8           MR. THEIS:  Well, there's no other inference that can

9  be drawn from that.  If she submits -- she goes to her doctor

10  and asks, I have a debilitating condition, is marijuana

11  something I can use?  And the doctor says yes, and here are the

12  problems with using marijuana, here's this information, submit

13  it to the State, that's -- that's a pretty reasonable inference

14  to say that all of that leads to that one intends to use

15  marijuana to alleviate those conditions.  And that's --

16  that's -- you know --

17           THE COURT:  Are you aware -- and I realize you're from

18  D.C. so maybe you're not -- but in your research, have you

19  determined how long it takes to go through that process of

20  obtaining the medical marijuana card here?

21           MR. THEIS:  I don't, Your Honor.  I know that in this

22  particular case, I believe it was several months that she --

23  between the actual submission of the application to the time

24  that she received her -- and that it was a few months after

25  that that she then attempted to purchase the firearm in this

TRANSCRIBED FROM DIGITAL RECORDING                55

1   case.

2            THE COURT:  So the likelihood that she might be doing

3   this, getting the card just in case this -- whatever illness

4   she has becomes intolerable enough that she needs the

5   marijuana, that she's getting the card now before it's -- it's

6   too late, is that something that I should consider, or not?

7            MR. THEIS:  I don't think so, Your Honor.  Because the

8   statute makes clear that this is something that's about chronic

9   or debilitating condition.

10           THE COURT:  I mean, if her doctor told her, look, this

11  is only gonna get worse, it's not gonna get better.  I can give

12  you medications.  They're not -- they'll work at first but

13  they're not going to work long-term, and eventually, you're

14  going to need something else, do you want me to write you a

15  prescription for this?  And she says, well, I don't know.  And

16  he says, it's going to take you about seven months to get the

17  medical marijuana card so you may want to go ahead and do it

18  now just in case?

19           I mean, sometimes I go to the doctor, and the doctor

20  will give me a prescription for my son's sore throat and says,

21  if it doesn't get better in a few days, get the prescription

22  filled.  Doesn't mean I'm gonna.  I'm gonna wait and see if

23  that sore throat gets better on its own.  But if it doesn't,

24  I'm gonna get the prescription filled.

25           So is that the scenario -- you know, if that is a

1  scenario we have here, can I even assume that?  Does it matter?

2  Should I just confine myself to the fact that she got the card

3  regardless of how long it took to get the card?

4       MR. THEIS:  I think that's correct, your Honor.

5  Respectfully, all of those suggestions are not before -- this

6  is not pled in the Complaint.  What's pled in the Complaint is

7  she went to a physician, she got the -- submitted the paperwork

8  to the State and got the card.

9       There's nothing to suggest that she's -- nothing to

10 suggest that she's not using marijuana for any particular

11 purposes, nothing to suggest that she stopped using marijuana

12 the day she got the card.  All of -- all that we have is what,

13 again, in the Complaint.  And what is in the Complaint is

14 enough to dismiss the case because there's nothing there

15 that -- that would give her some sort of relief.

16       I would -- a couple of different just quick points

17 that we talked about that were also raised.  The equal

18 protection thing, I'll just very briefly address this.

19       There's this question about whether or not, so the

20 State of Nevada is a registered card, but other states -- that

21 also have recognized medical marijuana under State law, but

22 those states don't, you know, formally have registry cards, and

23 that therefore, they're somehow being treated differently.

24       What that claim really boils down to is that

25 individuals in the State of Nevada, it's more -- it's more

 1  difficult for them to evade the law than other states.  Meaning

 2  you still have to fill out a form and submit it to the ATF --

 3  or submit it to the firearm seller when you're at the firearm

 4  licensee.  The question is, are you an unlawful user of drugs,

 5  that you have to answer yes or no.

 6          And if someone doesn't have a medical marijuana --

 7  they're supposed -- if they are an unlawful user of marijuana,

 8  meaning if they use marijuana at all under Federal law, they're

 9  required to answer yes to that.  But that doesn't -- just

10  because there's two different ways in which the seller can look

11  to -- there's two different ways in which the seller can make

12  the judgment about whether or not the person is an unlawful

13  user of marijuana, but that doesn't create an equal protection

14  claim.  They're treated equally, same.  Two -- the Federal law

15  applies equally to both of those categories and individuals.

16          THE COURT:  Did she fill out the form -- the

17  application form, and did she indicate on the application form

18  that she was a marijuana user?

19          MR. THEIS:  She left that question blank.  And I

20  believe in her Complaint she stated she didn't --

21          THE COURT:  So on that basis alone the seller could --

22          MR. THEIS:  Absolutely.

23          THE COURT:  -- deny her the firearm because --

24          MR. THEIS:  That's correct.

25          THE COURT:  -- it's an incomplete application, no?

1        MR. THEIS:  That's correct.

2        THE COURT:  She might have to apply again and actually

3   indicate on that application and have a successful application

4   before we get to this legal issue, it appears.  I -- I have to

5   think about that.

6        MR. THEIS:  That's correct, your Honor.  And that is

7   certainly -- you know, if she -- that's correct.  That is

8   another grounds or cause to dismiss this present Complaint.

9        THE COURT:  With leave to amend, perhaps.

10       MR. RAINEY:  If I may really quickly, Your Honor, on

11   that point?  If you read the Complaint, it actually says that

12   she went to fill out the question, and she was stopped by

13   Mr. Houser, and he testified that he stopped her from answering

14   the question saying, "You have to answer this yes because I

15   know you have that card."  And that was -- that's why she

16   didn't fill it out.

17       THE COURT:  But he hasn't testified because we had --

18   this is the first hearing I've had on this case --

19       MR. RAINEY:  His -- his --

20       THE COURT:  -- but he's got an Affidavit or a

21   declaration.

22       MR. RAINEY:  It's attached to the Complaint, yeah.

23   And it includes -- and it actually cites -- and so is the

24   application.  And he specifically says that, "I told her not to

25   fill that out because I knew that she was an unlawful user

1   because she had a card."

2           THE COURT:  Okay.  So not only is she prevented from

3   having a firearm, she's prevented from even applying for the

4   firearm.

5           MR. RAINEY:  Essentially, yes.

6           MR. THEIS:  That's -- that's not correct, Your Honor.

7   She could still --

8           THE COURT:  That's not what the ATF, I think, intends,

9   but perhaps it is.  I don't know.

10          MR. THEIS:  Well, no, no.  She can still -- she can

11  still apply for the -- for the -- for a firearm, absolutely.

12  There's -- but until she is --

13          THE COURT:  That's not what the seller understood the

14  letter to say.

15          MR. THEIS:  But the seller -- what the sell -- again,

16  I want -- to go back to --

17          THE COURT:  So was that a misunderstanding?  Should

18  the seller have allowed her to at least complete the

19  application and then make the determination whether or not to

20  approve it?

21          MR. THEIS:  Congress has determined -- and this is the

22  language of (d)(3) -- that, "Any person that the seller knows

23  or has reasonable cause to believe is an unlawful user of a

24  controlled substance, they can deny that person a firearm."

25          But they have almost -- they have wide, wide authority

 1  to do so.  And so the question of whether or not she -- you

 2  know, she -- he stopped her from answering that question or

 3  whether -- that doesn't matter to the -- to the question before

 4  the Court, and that is, does that statute, which says you can

 5  use reasonable inferences to determine whether or not someone

 6  is an unlawful user, that that's all that -- that matters for

 7  this case.

 8          And so, you know, the fact that -- because this

 9  particular seller could use a wide variety of inferences to

10  determine whether or not the person has a reasonable cause to

11  believe that they're an unlawful -- that they're violating

12  Federal law by using marijuana.

13          And sellers, in fact, do that.  There's -- they can do

14  a wide -- they can make any sort of determinations they want in

15  that purchase process regarding this particular issue.

16          I want to just get back -- briefly back, again, to

17  this -- there's this question about -- you know, the Court

18  suggested that there's -- that somehow, because she is using

19  marijuana for medical purposes, or that individuals who use the

20  card -- or have the card use the marijuana for medical

21  purposes, that that's somehow different than other types of

22  marijuana users.

23          And I just want to drive home again that the Federal

24  Government is not taking that position.  The policy, based on

25  years of determinations and analysis of this, is the Federal

TRANSCRIBED FROM DIGITAL RECORDING                61

1   Government looks at marijuana use as exactly the same no matter

2   how one uses it or when one uses it.

3           And so -- but there's no diff -- all of the questions

4   about, well, she's somehow different, that's something that

5   she's welcome to petition Congress about and ask can we change

6   the law and -- or go to the Attorney General or the DEA and

7   say, move marijuana from Schedule I, but that's not the case

8   here.

9           All -- what has -- what has been the standing policy

10  is that marijuana cannot be used no matter what the case, even

11  marijuana for medical purposes.

12          So that's what -- I want to keep focusing in on that

13  particular issue because there's no distinguishing fact between

14  these two types of users of marijuana.

15          THE COURT:  So this medical marijuana card is only

16  good for a year, right?

17          MR. THEIS:  That's correct.

18          THE COURT:  And has to be renewed.  So if hers

19  expires, she doesn't renew it, she goes to the seller, she gets

20  a firearm, and the next day she reapplies for the medical

21  marijuana card, then she wouldn't be afoul of the seller's --

22  the seller wouldn't necessarily be in trouble, he wouldn't be

23  charged under the Gun Control Act for having sold a firearm,

24  but she would still be in the position of both possessing the

25  card and the firearm.  So you're saying then she would still be

1  subject to conviction?

2          MR. THEIS:  So in your hypothetical, the card has

3  expired --

4          THE COURT:  Mm-hmm.

5          MR. THEIS:  -- she no longer has the card, but she

6  goes and tries to purchase the firearm and is denied --

7          THE COURT:  No, no.

8          MR. THEIS:  -- or is not denied --

9          THE COURT:  Not denied.

10          MR. THEIS:  -- she gets the firearm.

11          THE COURT:  She gets the gun, yeah.

12          MR. THEIS:  So for the two different issues here.  The

13  first one is, on the seller's part, all that is incumbent upon

14  the seller is to determine whether or not there's a reasonable

15  basis to believe they're an unlawful user.

16          And hypothetically, you have the -- I don't -- there's

17  nothing that would suggest immediately, from the seller's point

18  of view, this person is a user of marijuana.  So that there's

19  nothing -- there's no issue there.

20          The question -- whether -- the second -- to your

21  second question about the former holder of the card.  All that

22  matters is whether --

23          THE COURT:  So if she was to do it in the reverse, she

24  gets the gun first, then she applies for the medical marijuana

25  card, but she at some point has both the medical marijuana card

1  and a firearm.  So is that the ATF's Open Letter's position

2  that now she is in violation of -- because she is an unlawful

3  user with a firearm?

4          MR. THEIS:  Well --

5          THE COURT:  Because the inference is that she is an

6  unlawful user if she has the medical marijuana card.

7          MR. THEIS:  I want to go back to the text of the

8  letter.  All that the letter is saying is -- first of all, the

9  letter -- the vast majority of the letter, all that it does is

10  restate the law.  It says this is what (d)(3) says.  You know

11  this.  This is what the regulation says.  You know this.

12          THE COURT:  Right.  It's addressed to the seller.

13          MR. THEIS:  And it's addressed to the seller, and it

14  specifically says, any piece of information that you have that

15  you can use is the possession of this card.  And if you know

16  that they have possession of a medical marijuana card, that

17  that's a piece of evidence that you can use to not allow them

18  to possess a firearm.

19          So -- so that that -- that's all that we're focused on

20  as far as the letter is concerned.  The letter is not

21  prescriptively giving any guidance to the Department of Justice

22  or to the public at large about who they're going to prosecute

23  based on possessions of a -- if you have -- if you're --

24          THE COURT:  But the purpose of the letter is to

25  satisfy the important Governmental interest, which is to

1  provide safety and prevent violent crimes --

2          MR. THEIS:  Correct.

3          THE COURT:  -- and prevent individuals who have both

4  firearms and a medical marijuana card from possessing both at

5  the same time.  A valid medical marijuana card, not an expired

6  one.  A valid medical marijuana card.

7          So if you can prevent someone from getting the gun,

8  the reason that you want to prevent them from getting the gun

9  is because, if they do get the gun, the Government believes

10  that they will have violated the statute by being an unlawful

11  user in possession, right?

12          MR. THEIS:  I think those are two different analyses.

13  The first is what the letter addresses, and that's only the

14  point of sale.  And that is the focus of the letter, and that

15  letter is fleshing out the -- how to deal with this -- this

16  language in (d)(3) that you have a reasonable cause to believe

17  they're violating the Federal law.

18          THE COURT:  And the letter doesn't address or even

19  intend to address the (g)(3) --

20          MR. THEIS:  Right.  Exactly.  That's not the point --

21          THE COURT:  -- language.  Okay.

22          MR. THEIS:  -- is that that's a separate analysis.  Is

23  if someone is violating (g)(3), you look to whether or not

24  they're an unlawful user of a controlled substance.  And

25  that's -- that's clear.  If you're possessing a gun at the same

 1  time that you're an unlawful user of a controlled substance,

 2  then that -- that you fall within that category.

 3          Now, I'm not hyp -- you know, making a hypothetical

 4  about this particular Plaintiff, but in the hypothetical that

 5  you set out.  That's -- that's what --

 6          THE COURT:  Right.  But you're saying the purpose of

 7  advising the seller about what -- how they interpret the

 8  language of (g)(3) is so that the seller doesn't inadvertently

 9  enable a person from violating the -- the other subsection.  So

10  I'm --

11          MR. THEIS:  Yes.  It could be read that way, but I

12  think it's clearly focused on the seller's own concerns.

13          And what animated this, obviously, was seller is

14  saying there are now these states that have passed marijuana

15  laws that exempt one from prosecution.  So what do we do with

16  that fact?  And so that's what this -- the letter was intended

17  to -- to address was specifically at the point of sale, do you

18  violate (d)(3) if you know that the person has a medical

19  marijuana card?

20          And so what the -- again, what the ATF said, and which

21  was completely reasonable and well within the scope of their

22  interpretation of the statute and the regulation, is that this

23  is clearly an inference that you can make.  If they've averred

24  to the State of Nevada that they are going to use marijuana and

25  they have a card that allows them to use marijuana, that's

1  information that you could use in your determination of whether

2  or not this person is an unlawful user of a controlled

3  substance.

4          And so that -- again, that's what that -- the focus of

5  the letter is, and that's what -- that's why the letter was

6  sent, and that's why it addresses the issues of the sellers.

7          THE COURT:  All right.  Well, I appreciate both

8  counsel's comments.  I'm now inclined to look at this more as a

9  prior restraint issue that hasn't actually been claimed yet.

10 So I'm going to take it under advisement, I'm not going to rule

11 now.  I'm thinking perhaps this is a -- the situation where the

12 Government's Motion to Dismiss might be granted with leave to

13 amend, and perhaps it needs to be either pled completely

14 different or not.  But it does sound like we might be a little

15 bit short of an actual -- of the issue that the Plaintiff

16 intended to allege at this point because of the fact that

17 there's -- the four corners of the Complaint is all that I'm

18 looking at, and that's what I'm going base my determination on.

19         And just to -- I suppose just to get on the pulpit for

20 a second and to say, again -- which I -- I find myself saying

21 very often lately -- is that the Court's purpose is not to

22 render rulings based on passions or emotions or what I would do

23 if I were a legislator, because I'm not.  We do have a

24 legislative body, we do have administrative bodies.  They are

25 delegated from time to time with the authority to prescribe

 1  rules and regulations so that they can effect the purpose of

 2  the laws that are enacted by Congress and signed into law by

 3  the President.

 4          And so it's not for this Court to say at this point

 5  whether or not the -- the theories of the Plaintiff I think is

 6  asking the Court to rule on are correct or not because I

 7  don't -- I'm not sure that they're properly before the Court at

 8  this point, and it's a question of whether or not they're

 9  constitutional, not whether or not I like it or don't like it.

10          So I think with that being said, it's -- it's probably

11  premature, the Complaint, but I will look into it.  I look

12  forward to the briefing as to the standing issue still, and

13  also as to whether or not there's a notice and comment that

14  needs to be provided as to this particular interpretation given

15  in the Open Letter or not, whether it's interpretative or

16  whether it's not.

17          Mike, do we have a briefing schedule?  Do we want to

18  just have a -- since we have dual Motions to Dismiss, I think

19  we can just do the one deadline for both to submit blind briefs

20  on the standing and issue, as well as the Nordyke issue.  And

21  then -- I don't know.  What do you all think you need?  Two

22  weeks or more?  Three weeks?  I don't want to cut you short.

23          MR. RAINEY:  Yeah.  You know, Your Honor, I -- I have

24  a prescheduled trip to Croatia to work from our Croatian office

25  for the next few weeks.  I'm not going to be back until

TRANSCRIBED FROM DIGITAL RECORDING                68

```
 1  December 6th.  And I don't think there's a rush on this.  I'd
 2  prefer it if we could have something maybe --
 3          THE COURT:  I'm sure the Government doesn't have a
 4  rush on this because, the way it stands now, Miss Wilson cannot
 5  obtain a firearm.  So if anyone has a rush --
 6          MR. RAINEY:  Yeah.
 7          THE COURT:  -- my understanding is that Miss Wilson
 8  would be the one who has --
 9          MR. RAINEY:  Yeah.
10          THE COURT:  -- the most to lose from any delay.  So
11  it's up to you all.  I know you want to take your best
12  opportunity to explain everything to me that I need to know
13  rather than rush through it.
14          MR. RAINEY:  Right.  I would prefer it be sometime
15  like mid December, like December 15th, or even December -- you
16  know, before Christmas, but mid December would be nice.
17          THE COURT:  All right.  So Mike, something right
18  before Christmas.  So -- Mr. Theis, I'm just assuming, but I
19  should ask you, if that's all right with you, something mid
20  December before Christmas?
21          DEPUTY CLERK:  45 days, Your Honor, would be
22  December 17th, 2012.
23          THE COURT:  All right.  So December 17th at, we'll
24  say, 4:00 p.m. so that we can get it -- so 4:00 p.m. on
25  December 17th.  What day of the week is that?
```

1          DEPUTY CLERK:  That is a Monday, Your Honor.

2          THE COURT:  On a Monday.  So you even have an extra

3  weekend there to work on it.  So Monday, 4:00 p.m.  Go ahead

4  and --

5          I'm hoping that you'll just stick to -- you know, the

6  issues that I really need to know is the Nordyke, and the

7  standing issue, and whether or not it's an interpretative rule

8  or not that requires -- whether it requires comment and notice

9  or not.

10          MR. THEIS:  If I might briefly, Your Honor.  So I

11  understand the second point, the notice and comment.

12          The first comment as I understood was -- and correct

13  me if I'm wrong -- is that -- is whether there's standing to

14  bring (d)(3) because she is not a seller.  Is that what

15  we're -- the focus of the standing question is?  Or -- I'm

16  sorry.  Or in your order were you --

17          THE COURT:  That was the only one originally that I

18  thought was an issue.  Now I'm not so sure whether the --

19  there's -- there's a standing question because she didn't

20  complete the application.  But the representation is that she

21  was also prevented from completing the application.  So maybe

22  there's not a standing issue as to that regard, but there does

23  seem to be as to the seller's statute, that section.

24          MR. THEIS:  And the -- the Nordyke question?  So is

25  that a separate --

 1          THE COURT:  So the Nordyke question is, is it a

 2   rational basis?  Because that's what the En Banc Court decided,

 3   and all the other cases seem to indicate that intermediate

 4   scrutiny is correct, but we still have the Plaintiff asking for

 5   the strict scrutiny.

 6          So how do I reconcile all that, keeping in mind that

 7   the other cases are not Ninth Circuit cases, and the Nordyke

 8   case is a Ninth Circuit case, which has direct precedential

 9   value on this Court.

10          MR. THEIS:  So those are the three issues that we

11   then -- as we understand -- okay.

12          THE COURT:  Yeah.  And if you think of something else,

13   file leave to amend -- I mean -- leave to supplement, rather,

14   if there's something else that you think I need to know that

15   we -- that aren't -- isn't contained in those three.

16          But I'd prefer if you can -- if you stick to those

17   three, keeping in mind, if you didn't put it in the Complaint,

18   it's probably not something that needs to be argued now.  And

19   if there is no Statute of Limitations issue, then you probably

20   can raise it later, or she could always apply again and see

21   what happens there.  That would be, I believe, a whole new

22   cause of action and then --

23          MR. RAINEY:  Your Honor, if I may.  Given the

24   discussion today, would it be appropriate for me to file a

25   Motion to Amend at this time?

1          THE COURT:  Say that again?

2          MR. RAINEY:  Would it appropriate for me to file a

3  Motion to Request Leave to Amend the Complaint at this time?

4          THE COURT:  Well, I was thinking about that, but you

5  hadn't made that motion.

6          MR. RAINEY:  I'd be happy to make that motion.

7          THE COURT:  You could make that motion.  I don't know

8  if I'll address it before or after the Motion to Dismiss.

9          MR. RAINEY:  Right.

10         THE COURT:  I usually do address both at the same

11 time --

12         MR. RAINEY:  Okay.

13         THE COURT:  -- but --

14         MR. RAINEY:  I will try to get you that motion right

15 away, and I'll also talked to my opposing counsel here and see

16 if there's any sort of stipulation --

17         THE COURT:  A stipulation is always --

18         MR. RAINEY:  -- or agreement that we can --

19         THE COURT:  -- something that's easier for me to sign

20 within a day or two, obviously, yes.

21         MR. RAINEY:  Okay.  And I guess if that happened, then

22 we would have to restart -- jump start everything over again.

23         THE COURT:  Okay.  If you want to address whether the

24 issue that she raises is even ripe or not, you can go ahead

25 and --

1          MR. RAINEY:  Ripeness.

2          THE COURT:  -- and address that, I suppose, since the

3  issue of her application is a ripeness question, but probably

4  can be addressed along with standing.

5          My understanding is that what she's asserting is that

6  she would have completed the application had she been allowed

7  to, but that the seller did not allow her to, and that there is

8  a declaration from the seller that justifies her position.

9          I can't tell you honestly right now, I can't remember

10  off the top of my head if it actually says that or not.  But --

11          So if you go back and look at it and that's not what

12  it says and you want to argue ripeness, obviously, that's

13  something that the Court would be interested in.  But I -- I'm

14  taking the Plaintiff at this point at his word as an Officer of

15  the Court that that's, in fact, what the declaration says.  If

16  you find otherwise, you probably want to address that.

17          Anything else that you think that we should be

18  thinking about addressing in these supplemental briefs or -- it

19  always helps to have these hearings to help us all focus on

20  what the actual issues are here.

21          So I'll just leave it at that, that those are the

22  issues to be addressed.  If you do find other issues that you

23  want to address, please file leave to supplement and address

24  separately, as a separate motion, and then address anything

25  else that's not included in those limitations.  All right.

TRANSCRIBED FROM DIGITAL RECORDING                73

1         MR. THEIS:  And that could be before we submit the --
2    move to file leave to supplement?
3         THE COURT:  You can just do it together.
4         MR. THEIS:  Right, okay.
5         THE COURT:  If I grant it then I consider it, so you
6    would actually brief it, as well.  Kind of like when you do a
7    Motion to Amend the Complaint and you have to attach the
8    Complaint as amended, as well, you know, do that.  That way
9    I'll have it all together.
10        MR. THEIS:  All right.
11        THE COURT:  Okay?  Any questions?  All right.  So
12   that's the date.  I didn't write it down.  Mike, I'm sorry,
13   could you repeat it?
14        DEPUTY CLERK:  It's December 17th, 2012 at 4:00 p.m.
15        THE COURT:  Okay.  So Monday, December 17th at
16   4:00 p.m., 2012, obviously.
17        If anyone has a need to extend that deadline for
18   whatever reason, and you can agree to a different deadline and
19   file a stipulation, I'll sign that.  It's --
20        You know, like I said, from my point of view, it's the
21   Plaintiff's concern to get this done quicker rather than later.
22   So if you all have a stipulation, I'll go ahead and sign that.
23        All right?  Thank you very much counsel for coming in
24   today.  Court's in recess.
25             (Proceedings concluded at 10:43:20 a.m.)

ELLEN L. FORD - (702) 366-0635

**199**

1                    **C E R T I F I C A T E**

2

3    I, Ellen L. Ford, court-approved transcriber, certify that the

4    foregoing is a correct transcript transcribed from the official

5    electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8     /s/ ELLEN L. FORD                    January 11, 2013
           Ellen L. Ford                          Date
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25